**ARMENTA & SOL, PC**
M. Cris Armenta (SBN 177403)
Credence E. Sol (SBN 219784)
11440 West Bernardo Court, Suite 300
San Diego, CA 92127
Telephone: (858) 753-1724
Facsimile: (310) 695-2560
cris@crisarmenta.com
credence@crisarmenta.com

Attorneys for Plaintiffs
JOHN DOE, MICHAEL DOE, JAMES DOE,
HENRY DOE, ROBERT DOE, CHRISTOPHER
DOE, MATTHEW DOE, POLLY ST. GEORGE,
SCOTT DEGROAT, DAVID J. HAYES, DANIEL
LEE, MISHEL McCUMBER, JEFF PEDERSEN,
JORDAN SATHER, SARAH WESTALL

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN DOE, an individual; MICHAEL
DOE, an individual; JAMES DOE, an
individual; HENRY DOE, an individual;
ROBERT DOE, an individual;
CHRISTOPHER DOE, an individual;
MATHEW DOE, an individual; POLLY
ST. GEORGE, an individual; SCOTT
DEGROAT, an individual; DAVID J.
HAYES, an individual; DANIEL LEE,
an individual, MISHEL McCUMBER, an
individual; JEFF PEDERSEN, an
individual; JORDAN SATHER, an
individual; SARAH WESTALL, an
individual,

        Plaintiffs,

vs.

GOOGLE, LLC., a Delaware limited
liability company; YOUTUBE LLC, a
Delaware limited liability company;
DOES 1 through 10, inclusive.

        Defendants.

Case No. 5:20-cv-07502

Hon.

**APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND FOR
ORDER TO SHOW CAUSE WHY
PRELIMINARY INJUNCTION
SHOULD NOT ISSUE;
MEMORANDUM OF POINTS AND
AUTHORITIES; DECLARATIONS
IN SUPPORT THEREOF;
[PROPOSED] ORDER (lodged
separately)**

Date Filed:  October 26, 2020

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiffs JOHN DOE, MICHAEL DOE, JAMES DOE, HENRY DOE, ROBERT DOE, CHRISTOPHER DOE, MATTHEW DOE, POLLY ST. GEORGE, SCOTT DEGROAT, DAVID J. HAYES, DANIEL LEE, MISHEL McCUMBER, JEFF PEDERSEN, JORDAN SATHER, SARAH WESTALL by and through their counsel, will and hereby do apply to this Court pursuant to Federal Rule of Civil Procedure 65(b) and Local Rule 65-1 for a temporary restraining order against Defendants GOOGLE, LLC., a Delaware limited liability company, and YOUTUBE LLC, a Delaware limited liability company, and for the issuance of an order to show cause why a preliminary injunction should not issue, as follows:

1.      Defendants, along with their agents, employees, and successors, shall be restrained and enjoined from breaching their contract with Plaintiffs, as set forth in YouTube's Terms of Service, by keeping their channels in suspended or terminated status, or from suspending or terminating them any further for posting content to their YouTube channels that is not in violation of the Terms of Service existing on or before October 15, 2020;

2.      Defendants shall show cause, at a time and place to be directed by the Court, why a preliminary injunction should not issue requiring Defendants to act as described above; the temporary restraining order shall remain in effect until such time as the Court has ruled on whether a preliminary injunction should issue.

This Application is made on the grounds that Plaintiffs are likely to succeed on the merits of this case, they will suffer irreparable harm without injunctive relief because there is no legal remedy that would address the issues of free speech, the balance of equities tips sharply in their favor, and the relief sought is decidedly in the public interest.

Good cause exists to issue the requested Order to preserve Plaintiffs' rights under the contract, which is and was always intended to facilitate Plaintiffs' use of the YouTube platform for the purpose, in Plaintiffs' case, of broadcasting political speech on matters of substantial public interest and importance.  Without a temporary restraining order and preliminary injunction, Plaintiffs will suffer irreparable harm to their contractual rights and their right and

**PLAINTIFFS' APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION**

ability to engage in political speech.  There is no remedy at law that could compensate the Plaintiffs, and the loss of their audience and their ability to speak cannot be adequately measured.  This Application is supported by the accompanying Memorandum of Points and Authorities, by Plaintiffs' Complaint (and all exhibits attached thereto), by the declarations of Plaintiffs and their counsel, M. Cris Armenta, by the Declaration of Lindsey Crawly (and all exhibits attached thereto), and by the declarations of Lauren Gallo White, counsel to Google and YouTube, and by such further argument and evidence that may be adduced at any hearing on this matter or of which the Court may take judicial notice.

The Complaint in this action was filed on October 26, 2020, 2020; this Application followed.  All papers relating to this Application will be delivered by email to Defendants' within 30 minutes of the uploading of this filing on October 27, 2020.  As reflected in the accompanying declaration of M. Cris Armenta, Plaintiffs have notified counsel of their intention to file this Application and to seek a temporary restraining order of the nature described above. Plaintiffs request that the Court waive any bond requirement, because enjoining Defendants from violating their Terms of Service will not financially affect Defendants.

Respectfully submitted,

Dated: October 27, 2020                    ARMENTA & SOL, PC


By:   */s/ M. Cris Armenta*
    M. Cris Armenta
    Attorneys for Plaintiffs
    JOHN DOE, MICHAEL DOE, JAMES DOE,
    HENRY DOE, ROBERT DOE, CHRISTOPHER
    DOE, MATTHEW DOE, POLLY ST. GEORGE,
    SCOTT DEGROAT, DAVID J. HAYES,
    DANIEL LEE, MISHEL McCUMBER,
    JEFF PEDERSEN, JORDAN SATHER,
    SARAH WESTAL

**PLAINTIFFS' APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ i

INTRODUCTION ...................................................................................................... 1

RELEVANT FACTUAL BACKGROUND ................................................................. 2

ARGUMENT ............................................................................................................ 10

I.      PLAINTIFFS ARE ENTITLED TO TEMPORARY AND PRELIMINARY
        INJUNCTIVE RELIEF ................................................................................. 10

        A.      There is a Strong Likelihood that Plaintiffs Will Succeed in Proving Their
                Contract Claims .............................................................................. 10

        B.      Plaintiffs Face Imminent Irreparable Harm Absent Immediate
                Injunctive Relief ............................................................................. 13

        C.      The Balance of Hardships Tips Decidedly in Plaintiffs' Favor ............................. 15

        D.      Injunctive Relief is in the Public Interest ................................................. 15

II.     THE COURT SHOULD DISPENSE WITH ANY BOND REQUIREMENT ................. 16

CONCLUSION .......................................................................................................... 17

**TABLE OF CONTENTS**

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

<u>All. For Wild Rockies v. Cottrell,</u>
632 F.3d 1127 (9th Cir. 2011) ....................................................................10

<u>Americans for Prosperity Foundation v. Harris,</u>
182 F.Supp.2d 1049 (C.D. Cal. 2016) ...................................................14, 16

<u>Aslan v. Sycamore Inv. Co. (In re Aslan),</u>
909 F.2d 367 (9th Cir. 1990) ......................................................................11

<u>Blizzard Entm't. Inc. v. Ceiling Fan Software LLC,</u>
28 F.Supp.3d 1006 (C.D. Cal. 2013) ...................................................... 15-16

<u>Cazorla v. Hughes,</u>
2014 WL 12235425 (C.D. Cal. Apr. 7, 2014) ...............................................14

<u>CBS, Inc. v. Davis</u>
510 U.S. 1315 (1994 ...................................................................................15

<u>College Republicans at San Francisco State University v. Reed,</u>
523 F.Supp.2d 1005 (N.D. Cal. 2007).   ......................................................14

<u>Earth Island Inst. v. United States Forest Serv.,</u>
351 F.3d 1291 (9th Cir. 2003).   ..................................................................10

<u>Google, Inc. v. Jackman,</u>
2011 WL 3267907 (N.D. Cal. July 28, 2011)................................................14

<u>Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,</u>
415 U.S. 423 (1974).............................................................................. 9-10

<u>John Goyak, Inc. v. Terhune,</u>
2008 WL 4832265 (9th Cir. Nov. 6, 2008).................................................14

<u>Jorgensen v. Cassiday,</u>
320 F.3d 906 (9th Cir. 2003). .....................................................................16

<u>Kaiser Trading Co. v. Associated Metals & Minerals Corp.,</u>
321 F.Supp. 923 (N.D. Cal. 1970) ..............................................................14

**TABLE OF AUTHORITIES**

Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,

    944 F.2d 597 (9th Cir. 1991) ...................................................................14

Stuhlbarg Int'l. Sales Co., Inc. v. John D. Brush & Co., Inc.,

    240 F.3d 832 (9th Cir. 2001) ...................................................................10

Stormans, Inc. v. Selecky, 586 F.3d 1109 (9th Cir. 2009).) .........................................14

Whitney v. California, 274 U.S. 357 (1927) (Brandeis, J., concurring).   ....................12

Winter v. Natural Res. Def. Council, Inc.,

    555 U.S. 7 (2008)....................................................................................10


**STATE CASES**

Superior Motels, Inc. v. Rinn Motor Hotels, Inc.,

    195 Cal. App. 3d 1032 (1987) ..................................................................11


**FEDERAL LEGISLATION**

House Resolution 1154 ....................................................................................................7


**RULES OF COURT**

Fed. R. Civ. Proc. 65....................................................................................................10, 16


**WEBSITES**

Brandwatch, "YouTube Stats," https://www.brandwatch.com/blog/youtube-stats/.......................3

Stocking, Gale, et al., Many Americans Get News on YouTube, Where News Organizations and

    Independent Producers Thrive Side by Side," Pew Research Center, Sept. 28, 2020,

    https://www.journalism.org/2020/09/28/many-americans-get-news-on-youtube-where-

    news-organizations-and-independent-producers-thrive-side-by-side/............................ 3-4

YouTube, "Community Guidelines,"

    https://support.google.com/youtube/answer/2801964?hl=en&ref_topic=9282436 ...........5

YouTube, "Harmful Conspiracy Theories," https://blog.youtube/news-and-events/harmful-

**TABLE OF AUTHORITIES**

conspiracy-theories-youtube ................................................................5

YouTube, "Terms of Service" ......................................................... 10-11, 13

**BOOKS**

Hall, Evelyn Beatrice, THE FRIENDS OF VOLTAIRE (1906)…………………………………….13

**TABLE OF AUTHORITIES**

## MEMORANDUM OF POINTS AND AUTHORITIES

### *The United States House of Representatives Officially Condemns the "Ideology" and "Antigovernment" Stance of the "QAnon" Movement*

On October 2, 2020, the United States House of Representatives passed a resolution officially condemning "QAnon," a blanket term that variously describes an Internet community, a group of conspiracy theorists, and/or an Internet poster whose views have been widely disseminated.  In the resolution, Congress criticizes "QAnon" for, *inter alia*, its "ideology," its "anti-government sentiment" and its potential to "deepen our Nation's political polarization."  In part, the resolution reads as follows:

> Resolved, That the House of Representatives—
>
> (1)     Condemns QAnon and rejects the conspiracy theories it promotes;
>
> (2)     condemns all other groups and ideologies, from the far left to the far right, that contribute to the spread of unfounded conspiracy theories …
>
> […]
>
> (5)     urges all Americans, regardless of our beliefs or partisan affiliation, to seek information from authoritative sources and to engage in political debate from a common factual foundation.

Declaration of M. Cris Armenta ("Armenta Decl."), Ex. H.  Within days, YouTube posted a blog post in which it stated:

> *"Today we're further expanding both our hate and harassment policies to prohibit content that targets an individual or group with conspiracy theories that have been used to justify real-world violence.  One example would be content that threatens or harasses someone by suggesting they are complicit in one of these harmful conspiracies, such as QAnon or Pizzagate."*

Armenta Decl. Ex. B,

### INTRODUCTION

This lawsuit and request for an emergency injunction addresses YouTube's October 15, 2020, purge of accounts in which YouTube abruptly deleted conservative content from its

platform and terminated the accounts and channels that had hosted that content.  YouTube's

massive de-platforming, just three weeks before the 2020 Presidential election, worked to the

severe detriment of both conservative content creators and American voters who seek out their

content.  YouTube took this draconian action so swiftly that the Plaintiffs, conservative content

creators with whom YouTube had a contractual relationship memorialized by YouTube's

Terms of Service ("TOS"), received no advance notice and were not able to download their

own content.  Why did YouTube do this?  To frustrate the contracts and to mollify its partner,

Congress, which just days before had passed H.R. 1154, a resolution condemning the existence

of conservative content—which it characterized as conspiracy theories—on the Internet.

Plaintiffs seek immediate and emergency relief from Defendants' breaches of their

contract with Plaintiffs, which worked to completely deny Plaintiffs the benefits of the

contracts and services for which they bargained and to deprive both Plaintiffs and their

subscribers of their First Amendment rights.  Given that the Presidential election is approaching

on November 3 and that Plaintiffs routinely provide news, commentary and information about

issues that are directly relevant to that election, Plaintiffs seek immediate and emergency relief

by way of a Temporary Restraining Order and/or Injunction to avoid irreparable harm that

cannot be cured or later resolved through monetary damages alone.

## RELEVANT FACTUAL BACKGROUND

Brief Overview of Plaintiffs and Their Channels:  The fifteen Plaintiffs are journalists,

videographers, advocates, commentators and other individuals who regularly exercise their

right to free speech under the First Amendment of the Constitution of the United States.

(Compl. ¶ 1.)  Plaintiffs created seventeen individual news channels and published those

channels on the YouTube platform.  (Compl. ¶ 1.)  Plaintiffs' videos had an enormous audience

reach both in the United States and throughout the world.  (Compl. ¶ 1.)  On October 15, 2020,

Plaintiffs' reach was so widespread that they collectively had more than 4.5 million subscribers

to their channels and had attracted  more than 800 million views. (Compl. ¶ 1; Declaration of

Lindsey Crawley, Ex. Q and Plaintiffs' Declarations ¶ 3).  Taken together, these subscriber

counts far exceed the individual viewership of the YouTube accounts maintained by legacy

cable, journalism, and news networks such as C-SPAN (806K subscribers), *The New York Times* (3.21M subscribers), Fox News (6.52M subscribers), MSNBC (3.62M subscribers), NBC News (4.1M), and CBS News (3.06M subscribers). (Compl. ¶ 1.)  Although it is clear that millions of Americans get their news, information and commentary on issues of national importance from the Plaintiffs' conservative channels, YouTube excised them and their political viewpoints from the YouTube platform without notice, just days 19 before the 2020 presidential election. (Compl. ¶ 1; Plaintiffs' Decl. ¶ 4.)

<u>YouTube is Becoming More Important than Television</u>.  YouTube is a popular online service for sharing videos and related content. (Compl. ¶ 2.)  YouTube activated its domain on February 14, 2002. (Compl. ¶ 2.)  The first YouTube video was published on April 23, 2005. (Compl. ¶ 2.)  On October 9, 2006, Google purchased YouTube for $1.65 billion. (Compl. ¶ 2.)  By May 2010, YouTube served more than 2 billion views each day. (Compl. ¶ 2.)  By March 2013, YouTube was seeing 1 billion monthly active users. (Compl. ¶ 2.)  According to statistics published by Brandwatch, a leading social intelligence company, 6 out of 10 people prefer online video platforms to live TV, and it is predicted that by 2025, half of the population under the age of 32 will not subscribe to a pay-TV service. (Compl. ¶ 2.)  YouTube is the world's second-largest search engine and the world's second most-visited site (after Google). (Compl. ¶ 2.)  YouTube, which has 1.9 billion users, is the second most popular social media platform in the United States and the world. (Compl. ¶ 2.)  Quoting from the Pew Research Center study, Brandwatch reports that one in five YouTube users say that YouTube is very important to "understanding things happening in the world."  See https://www.brandwatch.com/blog/youtube-stats/ (Compl. ¶ 2.)

<u>Many Americans Get Their News from Independent YouTube Channels.</u>  According to the Pew Research Center, a nonpartisan think tank based in Washington, D.C. that provides information about social issues, public opinion and demographic trends shaping the United States and the world, legacy and independent media are thriving side by side, and established news organizations no longer have full control over the news Americans watch. (Compl. ¶ 3; Armenta Decl. Ex. F.)  Most YouTube news consumers view both legacy and independent

**MEMORANDUM OF POINTS AND AUTHORITIES**

news videos on the platform.  (Compl. ¶ 3.)  Based on an extensive survey, the Pew Research Center confirms that independent news channels occupy a prominent position in YouTube's media ecosystem.  (Compl. ¶ 3.)  The 377 most popular YouTube channels represent a mixture of established news organizations (49%) and independent channels (42%).  See Stocking, Gale et al., "Many Americans Get News on YouTube, Where News Organizations and Independent Producers Thrive Side by Side," Pew Research Center, Sept. 28, 2020, https://www.journalism.org/ 2020/09/28/many-americans-get-news-on-youtube-where-news-organizations-and-independent-producers-thrive-side-by-side/.  (Compl. ¶ 3; Armenta Decl. ¶ F.)

        YouTube Partners with Content Creators, Allowing Them to Create Channels and Publish Content Such as News Channels Pursuant to Their Terms of Service.  To create a channel and post videos, Plaintiffs and YouTube agree that their relationship will be governed by YouTube's published TOS and their incorporated Community Guidelines.  (Compl. ¶ , White Decl. Ex. 1.)  The TOS provide that "YouTube is under no obligation to host or serve Content."  (Compl. ¶ 4; White Decl. Ex. 1.)  However, once YouTube actually hosts the content, YouTube and the creator agree to be bound by the TOS.  (Compl. ¶ 4; White Decl. Ex. 1.)  When the creator publishes content on YouTube, the terms of the TOS dictate the procedure for content removal and/or account termination.  (Compl. ¶ 4; White Decl. Ex. 1.) The relevant ground rules are as follows:

        *Accounts May be Removed at Any Time by Their Creators*:  According to the TOS, content creators may remove their own content at any time: "Terminations by You.  You may stop using the Service at any time. Follow these instructions to delete the Service from your Google Account, which involves closing your YouTube channel and removing your data. You also have the option to download a copy of your data first."  (Compl. ¶ 4; White Decl. Ex. 1.)

        *YouTube May Terminate or Suspend an Account for Cause*:  According to the TOS, YouTube may terminate a channel only in specified conditions: "YouTube may suspend or terminate your access, your Google account, or your Google account's access to all or part of the Service if (a) you materially or repeatedly breach this Agreement; (b) we are required to do

so to comply with a legal requirement or a court order; or (c) we believe there has been conduct that creates (or could create) liability or harm to any user, other third party, YouTube or our Affiliates." (Compl. ¶ 4.)

*YouTube Must Provide Notice of Terminations and Suspensions*:  We will notify you with the reason for termination or suspension by YouTube unless we reasonably believe that to do so:  (a) would violate the law or the direction of a legal enforcement authority, or would otherwise risk legal liability for YouTube or our Affiliates; (b) would compromise an investigation or the integrity or operation of the Service; or (c) would cause harm to any user, other third party, YouTube or our Affiliates. Where YouTube is terminating your access for Service changes, where reasonably possible, you will be provided with sufficient time to export your Content from the Service."  (Emphasis added.)  (Compl. ¶ 4.)

*The TOS Incorporate Community Guidelines*:  YouTube's Community Guidelines include policies against harassment and cyberbullying, which prohibit content that "encourages dangerous or illegal activities that risk serious physical harm or death."  See https://support. google.com/youtube/answer/2801964?hl=en&ref_topic=9282436.  (Compl. ¶ 4; Declaration of Lauren Gallo White ("White Decl.")[1] ¶ 5 & Ex. 4.  YouTube has provided a list of examples of what types of content constitute "harassment and cyberbullying" for the purposes of its Community Guidelines and TOS, including the following:  (1) extremely dangerous challenges; (2) dangerous or threatening pranks; (3) instructions to kill or harm; (4) hard drug use or creation; (5) glorifying or encouraging eating disorders; (6) promoting or glorifying violent events; (7) bypassing payment for digital content or services; and (8) promoting dangerous remedies or cures.  (Id.)

On October 15, 2020, YouTube Announced an Expansion of Its Hate and Harassment Policies to Exclude Targeted Content "Used to Justify Real-world Violence," But Did Not

---

[1]     Lauren Gallo White is counsel to Defendants in Daniels v. Alphabet, et al. Case No. 20-cv004687-VKD and on August 20, 2020, provided all the Terms of Service ("TOS") in connection with that case; her declaration provides the Court a snapshot in time of YouTube's TOS and constitutes admissible evidence and admissions by the Defendants. (See generally White Decl.)  Plaintiffs have included only Ms. White's exhibits that pertain to the TOS for this action.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Actually Amend its TOS Consistent with its Announcement:  On October 15, 2020, YouTube posted a blog post in which it indicated that "Today, we are taking another step in our efforts to curb hate and harassment by removing more conspiracy theory content used to justify real-world violence."  See https://blog.youtube/news-and-events/harmful-conspiracy-theories-youtube.  (Compl. ¶ 5; Armenta Decl. ¶ .)  In the blog post, the YouTube Team stated that it was "further expanding both our hate and harassment policies to prohibit content that targets an individual or group with conspiracy theories that have been used to justify real-world violence." (Compl. ¶ 5.)  Notably, however, with respect to the claimed amendment, YouTube did not actually amend its Terms of Service in the manner it claimed on its blog prior to de-platforming the Plaintiffs.  (See Armenta Decl. ¶ C.)  (Compl. ¶ 5.)

On October 15, 2020, YouTube Abruptly Instigated a Mass Purge of Conservative Accounts, Including Those Operated by Plaintiffs, Based on Its "Hate and Harassment" Policies, In a Manner That Violated the TOS:  On October 15, 2020, YouTube terminated and/or suspended Plaintiffs' channels, rendering those channels unviewable, preventing Plaintiffs from providing commentary and news on issues of national importance and preventing Plaintiffs' millions of viewers from accessing commentary and news that they are interested in viewing.  (Compl. ¶ 6; Crawley Decl. Ex. P.)  YouTube violated its own provision that states that if YouTube makes "Service changes," the affected creators "will be provided with sufficient time to export [their] Content from the Service."  (Compl. ¶ 6.)  YouTube did not provide Plaintiffs with any time, let alone "sufficient time," to export their Content from the YouTube platform.  (Compl. ¶ 6; Plaintiffs' Decl., each ¶ 4.)  Many of the Plaintiffs could not even take their previously posted work to alternative platforms for republication, and they also lost contact with their millions of subscribers.  (Compl. ¶ 6; Plaintiffs' Decl. ¶ 4. )  Moreover, even Plaintiffs who did retain some access to their content were summarily deprived of the benefits they had bargained and worked for—most significantly, a large audience built up over many years that they now cannot effectively reach, and in many cases, cannot even contact over other social media platforms, because those social media platforms are also purging

Plaintiffs' accounts and similarly situated persons.  (See Plaintiffs' Declarations.)  (Compl. ¶ 6; Plaintiffs' Decl. ¶¶ 3-4.)

YouTube Breached the TOS by Suspending/Terminating Accounts Without Cause: YouTube breached the TOS because it suspended or terminated the accounts of the Plaintiffs despite the following facts: (a) the Plaintiffs, and each of them, did not repeatedly or materially or breach the Agreement with YouTube; (b) there was no legal requirement or court order with which YouTube had to comply by suspending or terminating the accounts; and (c) YouTube did not believe there was conduct that creates or could create liability or harm to any user or third party, YouTube or its affiliates. (Compl. ¶ 7; White Decl ¶ 2 & Ex. 1.)

YouTube Breached the TOS by Failing to Provide a Reason for Account Suspension/Termination in Compliance with the TOS:  YouTube breached the TOS because it failed to notify each of the Plaintiffs as to "the reason for termination of suspension" by YouTube.  (Compl. ¶ 8; Plaintiffs' Decl ¶ 8.)  The notices that YouTube provided to the Plaintiffs did not identify a specific reason for the termination or suspension of their contracts. (Compl. ¶ 8.)  Instead, YouTube indicated only that there were two possible reasons and even with respect to those two reasons, YouTube did not indicate how the targeted accounts violated the TOS or incorporated Community Guidelines, stating only that "We'd like to inform you that due to repeated or severe violations of our Community Guidelines (https://www.youtube.com/ t/community_guidelines) your YouTube account [account name] has been suspended." (Compl. ¶ 8; Plaintiffs' Decl. ¶ 8.)  While some of the Plaintiffs received this identical cut-and-paste language from the TOS and remain baffled about how their content is alleged to have been out of compliance and/or what specific content they posted gave rise to the claim that their content was violative of the Community Guidelines, other Plaintiffs received no notice whatsoever.  (Compl. ¶ 8; Plaintiffs' Decl. ¶ 8.)  Was it content about Hunter Biden and the Ukraine scandal or the ongoing corruption probe?  (Compl. ¶ 8.)  Was it content about social media censorship?  (Compl. ¶ 8.)  Was it content about anonymous posts on political issues by someone identifying themselves as "Q" and the persons who read and talk about those posts? (Compl. ¶ 8.)  Was it posts about race relations or protests in America?  (Compl. ¶ 8.)  Again,

Plaintiffs remain baffled as to what, specifically in their content led them to be part of the massive de-platforming, other than the commonality that they are conservative news channels with widespread audience reach.  (Compl. ¶ 8; Plaintiffs' Decl. ¶ 9.)

YouTube Violated California Contract Law by Amending the TOS in a Manner that Frustrated Their Purpose:  Even if YouTube were to allege that the new amended TOS provisions discussed in its blog applied (even though they did not exist at the time) and it could claim to use that amended policy to entitle YouTube to suspend or terminate Plaintiffs' accounts, the amended TOS are invalid to the extent that they resulted in a termination of the contracts between the Plaintiffs and YouTube because under California law, a party may not invoke a unilateral right to amend a contract in a such a manner as to frustrate the purpose of the contract.  (Compl. ¶ 9; White Decl. ¶ 2 & Ex. 1.)  Because YouTube gave no advance notice of its policy, it did not provide Plaintiffs an opportunity to take down any violative content so that they could maintain their contractual relationship with YouTube.  (Compl. ¶ 9; Plaintiffs' Decl. ¶P 7-8.)

YouTube Engaged in State Action by Capitulating to Government Coercion to Terminate Plaintiffs' Accounts and Thus, Violated Plaintiffs' Right to Free Speech Under the First Amendment:  YouTube "hopped to it" shortly after Congress passed H.R. 1154, a resolution condemning the existence of a certain type of conservative content on social-media platforms.  (Compl. ¶ 10; Armenta Decl. ¶ 13 & Ex. L.)  The bill was passed in a political context in which representatives of the largest social-media platforms are regularly being hauled in front of Congressional committees to answer for business practices related to data collection and consumer privacy, powerful members of Congress have openly stated that social media platforms could lose their immunity from suit under Section 230 of the Communications Decency Act if they do not cooperate with the government, Supreme Court Justice Thomas has issued a dissent from denial of certiorari indicating that the time is ripe for the Supreme Court to entertain a case involving whether the lower courts have interpreted Section 230 too broadly, and the Department of Justice (together with eleven states' Attorney Generals) has filed a blockbuster antitrust case seeking the breakup of behemoth Google.  (Compl. ¶ 10; Armenta

Decl. ¶ 16 & Ex. O.)  In other words, YouTube's position and ability to do business going forward have become precarious indeed, especially if it refuses to "play ball" with powerful government officials who hold YouTube and Google's very existence in their hands.  (Compl. ¶ 10.)  Plaintiffs contend that in this environment of coercion and pressure, YouTube's termination of their accounts amounts to state action, rendering it vulnerable to a First Amendment challenge.  (Compl. ¶ 10.)

       <u>If YouTube Engaged in State Action, Plaintiffs' First Amendment Rights Have Been Violated:</u>  Because Plaintiffs are citizen journalists who regularly provide news reporting and political commentary to a wide audience of Americans who seek out Plaintiffs' channels, the First Amendment rights of Plaintiffs' right to speak and the public's right to hear are directly implicated.  (Compl. ¶ 11; Plaintiffs Decl. ¶ 5.)  Because YouTube terminated and suspended Plaintiffs' channels just 19 days before the November 3 election—and because many Americans have been engaged in early voting since October 15—a resolution of the propriety of YouTube's account terminations and suspensions is urgently required.  (Compl. ¶ 11; Because Plaintiffs are citizen journalists who regularly provide news reporting and political commentary to a wide audience of Americans who seek out Plaintiffs' channels, the First Amendment rights of Plaintiffs' right to speak and the public's right to hear are directly implicated.  (Compl. ¶ 11; Plaintiffs Decl. ¶ 5.)   .)  Plaintiffs seek specific performance of the TOS contract and seek immediate injunctive relief ordering YouTube to restore their channels to the condition in which they existed on October 15, 2020.  (Compl. ¶ 11.)  Because Plaintiffs' channels address issues of public concern that are highly relevant to the November 3 election and its anticipated aftermath, and because Plaintiffs have been given no time to expeditiously find an alternative platform for the widespread dissemination of their speech, both Plaintiffs and the public will suffer irreparable harm in the absence of an immediate and affirmative injunction.  (Compl. ¶ 11.)

**MEMORANDUM OF POINTS AND AUTHORITIES**

The Plaintiffs' evidence, along with that of their expert analytics accumulator, Lindsey Crawley is summarized in the following table:

| Plaintiff | Channel Name | Creation Date | Total Videos | Strike History | Subscribers | Total View Count |
|---|---|---|---|---|---|---|
| JOHN DOE | JustInformed Talk | 1/15/2015 | 890 | 0 | 281,000 | 60,154,395 |
| MICHAEL DOE | SGTreport2: *BACK UP channel* | 1/26/2011 | 31 | 0 | 107,000 | 1,597,694 |
| MICHAEL DOE | SGTreport | 2/3/2007 | 1,492 | 0 | 630,000 | 130,503,359 |
| JAMES DOE | X22Report | 2/4/2013 | 3,721 | 0 | 952,000 | 292,569,198 |
| HENRY DOE | SpaceShot76 | 12/15/2008 | 792 | 0 | 159,000 | 32,227,188 |
| ROBERT DOE | TRUreporting | 3/5/2015 | 864 | 0 | 216,000 | 23,626,051 |
| CHRISTOPHER DOE | RedPill78 | 7/21/2006 | 800 | 0 | 270,000 | 48,764,950 |
| MATHEW DOE | Edge of Wonder | 12/6/2017 | 316 | 0 | 467,000 | 38,089,707 |
| POLLY ST. GEORGE | Amazing Polly | 3/9/2016 | 387 | 0 | 375,000 | 24,660,282 |
| SCOTT DEGROAT | Woke Societies | 4/27/2019 | 217 | 0 | 108,000 | 4,617,715 |
| DAVID J. HAYES | prayingmedic | 7/27/2010 | 475 | 0 | 391,000 | 40 million+ |
| DANIEL LEE | dnajlion7 | 10/7/2007 | 2,652 | 0 | 113,000 | 28,361,823 |
| DANIEL LEE | Daniel Lee | 10/23/2019 | 84 | 0 | 30,300 | 999,348 |
| MISHEL McCUMBER | DeceptionBytes | 7/31/2011 | 1,030 | 0 | 69,200 | 18,239,613 |
| JEFF PEDERSEN | IntheMatrixxx | 7/11/2013 | 464 | 0 | 76,900 | 4,667,407 |
| JORDAN SATHER | Destroying the Illusion | 11/24/2016 | 796 | 0 | 238,000 | 35,050,517 |
| JORDAN SATHER | Destroying the Illusion 2.0 | 2/24/2018 | 3 | 0 | 51,600 | 7,605 |
| SARAH WESTALL | Sarah Westall | 4/4/2012 | 669 | 0 | 125,000 | 15,367,956 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

## LEGAL STANDARD

A temporary restraining order preserves the status quo and prevents irreparable harm until a hearing can be held on a preliminary injunction application.  See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, 415 U.S. 423, 439 (1974). It may be issued without an opportunity to be heard by the opposing party where "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1).

The standards for issuing a temporary restraining order and a preliminary injunction are the same.  See, e.g., Stuhlbarg Int'l. Sales co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).  The Ninth Circuit has established two sets of criteria for evaluating a request for injunctive relief.  Earth Island Inst. v. United States Forest Serv., 351 F.3d 1291, 1297 (9th Cir. 2003).  Under the "traditional" criteria, a plaintiff must show the following:  (1) a strong likelihood of success on the merits, (2) a likelihood of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest.  See, e.g., Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  Alternatively, a temporary restraining order or preliminary injunction may be appropriate when a movant raises "serious questions going to the merits" and the "balance of hardships tips sharply in the plaintiff's favor," provided that the plaintiff is able to show there is a likelihood of irreparable injury and that the injunction is in the public interest.  All. For Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

## ARGUMENT

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.   **PLAINTIFFS ARE ENTITLED TO TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF**

A.   **There is a Strong Likelihood that Plaintiffs Will Succeed in Proving Their Contract Claims**

Plaintiffs are likely to succeed on their contract claims, in which they allege that Defendants breached the Terms of Service when they summarily suspended and terminated Plaintiff's YouTube channels. The Terms of Service ("TOS") are clear, outlining only three "cause" instances for which Defendants may terminate or suspend channels:

> "YouTube may suspend or terminate your access, your Google account, or your Google account's access to all or part of the Service if (a) you materially or repeatedly breach this Agreement; (b) we are required to do so to comply with a legal requirement or a court order; or (c) we believe there has been conduct that creates (or could create) liability or harm to any user, other third party, YouTube or our Affiliates."

So, according to YouTube's own TOS, the Plaintiff's channels could be deleted for only one of the three enumerated reasons.  As set forth below, none of the three reasons apply:

1.   Plaintiffs Did Not Materially or Repeatedly Breach the Agreement

The question under (a) is whether the Plaintiffs materially breached the TOS.  A material breach occurs where the failure to perform "is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the contract.'"  Aslan v. Sycamore Inv. Co. (In re Aslan), 909 F.2d 367, 370 (9th Cir. 1990) (quoting Superior Motels, Inc. v. Rinn Motor Hotels, Inc., 195 Cal. App. 3d 1032, 1051 (1987)).  What is the purpose of the contract with YouTube? YouTube sets out the purpose of its service quite succinctly:

> The Service allows you to discover, watch and share videos and other content, provides a forum for people to connect, inform, and inspire others across the globe, and acts as a distribution platform for original content creators and advertisers large and small.

(TOS "Our Service").  While YouTube cannot credibly back away from its statement of purpose, as a service that allows its users to discover, watch, share and provide a form, it will likely focus its efforts on attacking the Plaintiffs and their protected speech.  It is anticipated that YouTube will provide this Court with snippets of the most inflammatory speech of the Plaintiffs, taken out of context, in order to persuade this Court that the Plaintiffs are bad, that their speech is bad, and that somehow, they are not entitled to use the "forum for people to connect, inform and inspires others across the globe."  In other words, Plaintiffs predict that YouTube will claim that they spread disinformation, ask questions about topics that are too sensitive or polarizing, spread false rumors or are somehow psychically, tangentially and amorphously "linked" to questioning whether government officials or other high profile persons are connected to corruption or criminal acts such as sex trafficking, and that once upon a time, someone who watched something once shot up a pizza parlor on Washington, D.C.  YouTube is anticipated to attack Plaintiffs' speech, primarily because they do not like it and because certain members of Congress have told them that Plaintiffs' speech is the type that is disfavored.  It may be a challenge to put aside YouTube's anticipated viewpoint-attack[2] on Plaintiffs' speech, but it is the TOS that governs the issue, not YouTube nor the Court's distaste for it.  The question then becomes, does the publication of what YouTube will inevitably call "bad speech" suffice to be a "material" breach of the TOS?

One might look to the comments of the former Google CEO, Eric Schmidt for guidance.  When actress Cindy Garcia attempted to force Google to take down the "Innocence of Muslims YouTube" video that was blamed on sparking the Benghazi incident and violent protests globally and she was issued credible and direct death threats, CEO Eric Schmidt's response was "Google has a fairly clear view of this is that we believe that the answer to bad speech is more speech and we have very distinct policies about what we accept and what we don't."  Google took the case to the Ninth Circuit *en banc* and as it stated in its papers:

---

[2]    "I disapprove of what you say, but I will defend to the death your right to say it." (Hall, Evelyn Beatrice, THE FRIENDS OF VOLTAIRE (1906) (quoting or paraphrasing Francois-Marie Arouet, known by his *nom de plume* Voltaire).

It is indisputable that the Film is expressive speech, fully protected under the First Amendment, and it has become the catalyst for even more expressive speech—indeed, it is the subject of heated debate throughout the nation and around the world. This very lawsuit together with Appellant's many public appearances have only added another layer of discourse to an already important public debate.

Google also quoted Justice Brandeis, who nearly a century ago, wrote: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression." Whitney v. California, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

In answering the question before the Court—is Plaintiffs' speech a **material** violation of the TOS?— the answer is another question:  Isn't the very purpose of the contract to support the free exchange of ideas and debate?  Isn't the answer to bad speech, well, more speech?  What is the "heart" of the Agreement?  Notably, it is difficult to address the materiality, because YouTube did not give the Plaintiffs notice of *what specific speech in their content constituted a violation*.  YouTube merely parroted its own TOS, stating that the terminations were due to "material or repeated violations" of the TOS.  Well, which was it?  Was it a material violation or was it a repeated violation?

When it comes to repetition, the Plaintiffs do not have a history of multiple strikes. YouTube uses a "strike" system, by which it issues either a Community Guidelines "strike" or a copyright "strike."  Under YouTube's strike system, a first strike will result in disabling certain features for a week.  A second strike during the same 90-day period will result in an inability to post content for 2 weeks.  A third strike "in the same 90-day period as your first strike will result in your channel being permanently removed."  YouTube also notes that "each strike expires in 90 days from the time it's issued …" (TOS.)  When it comes to the fifteen Plaintiffs, the evidence provided by the Plaintiffs shows that they did not have repeated violations during the 90-day period preceding October 15, 2020, sufficient to trigger YouTube's "three-strike" threshold for termination.  (Plaintiffs Decl. ¶ 6.)  Accordingly, there were no "repeated violations" for any of them under YouTube's "three-strike" policy that warranted channel

deletion.  If anyone materially breached the contract, it was YouTube, by deleting the Plaintiffs'

channels in violation of their own TOS and strike system and by failing to give Plaintiffs

sufficient notice to download their content.

**B.      Plaintiffs Face Imminent Irreparable Harm Absent Immediate Injunctive
         Relief**

The contract at issue in this case—to wit, YouTube's TOS—has been breached in a

manner that cannot be adequately compensated through money damages.  The gravamen of the

TOS is the agreement between YouTube and its users by which the users contribute content in

exchange for YouTube providing a platform for the broadcast of that content.  Here, Plaintiffs'

content is political speech implicating issues that are a matter of widespread public interest

notwithstanding the fact that Plaintiffs' political views are extremely controversial.  In this

lawsuit, the benefit of the bargain that Plaintiffs seek to obtain is the restoration of their access

to the YouTube platform so that they can continue to speak out on current events to their

millions of followers.  YouTube's purge of Plaintiffs' accounts has caused and will continue to

cause irreparable harm, as Plaintiffs are no longer able to communicate with the YouTube

audience that they have spent years developing—in reliance on the contract with YouTube

whereby YouTube promised access to the platform.  Money damages one year, two years, or

five years from now cannot restore Plaintiffs' ability to speak out during a hotly contested

presidential election to YouTube users who want to hear what they have to say.

The law of injunctions as it pertains both to breach of contract cases and to freedom of

expression cases is pertinent, as the reason Plaintiffs entered into the contract with YouTube

was to obtain a platform where they could express their views.  This Court has long recognized

that in contract cases in which an ongoing breach will cause an injury that cannot be

compensated by money damages, an injunction is appropriate.  See, e.g., Kaiser Trading Co. v.

Associated Metals & Minerals Corp., 321 F.Supp. 923, 934-35 (N.D. Cal. 1970) (granting

preliminary injunction in case involving the breach of a sales contract); John Goyak, Inc. v.

Terhune, 2008 WL 4832265 (9th Cir. Nov. 6, 2008) (affirming issuance of preliminary

injunction where plaintiff demonstrated a combination of probable success on the merits of a

breach of contract claim and the possibility of irreparable injury absent a preliminary injunction).  Irreparable harm may be present in a breach of contract case. <u>See, e.g.</u>, <u>Cazorla v. Hughes</u>, 2014 WL 12235425, at *18–21 (C.D. Cal. Apr. 7, 2014); <u>Google, Inc. v. Jackman</u>, 2011 WL 3267907, at *5 (N.D. Cal. July 28, 2011); <u>see also</u> <u>Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.</u>, 944 F.2d 597, 603 (9th Cir. 1991) (noting that "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award," but intangible injuries that may also arise out of a contractual breach may constitute irreparable harm).

Furthermore, in cases where the First Amendment is implicated, the Supreme Court has made it clear that interference with freedom of speech "unquestionably constitutes irreparable injury" for the purposes of a preliminary injunction.  <u>College Republicans at San Francisco State University v. Reed</u>, 523 F.Supp.2d 1005, 1011 (N.D. Cal. 2007).  In <u>CBS, Inc. v. Davis</u>, 510 U.S. 1315 (1994), the United States Supreme Court stayed an injunction that prohibited a broadcast of a video exposing a meat packing plant's practices because "indefinite delay of the broadcast will cause irreparable harm to the news media that is intolerable under the First Amendment." 510 U.S. 1315 (1994).  "Unlike a monetary injury, violations of the First Amendment 'cannot be adequately remedied through damages.'" <u>Americans for Prosperity Foundation v. Harris</u>, 182 F.Supp.2d 1049, 1058 (C.D. Cal. 2016) (citing <u>Stormans, Inc. v. Selecky</u>, 586 F.3d 1109, 1138 (9th Cir. 2009).)  Because delay of the speech of the Plaintiffs' content is *intolerable* under the First Amendment, irreparable harm is ongoing at this moment and must be immediately stopped.

Without an injunction preventing Defendants from further violating the TOS, Plaintiffs will suffer irreparable harm in that they are being deprived—during a time of widespread social and political unrest—of their ability to communicate their views to the audiences that they have spent a very long time building.  As the Supreme Court, squelching the speech of the press is "intolerable."  This type of harm cannot adequately be compensated by damages or any other remedy available at law.  Thus, irreparable injury is clearly shown, necessitating the relief Plaintiffs seek in this application.

**MEMORANDUM OF POINTS AND AUTHORITIES**

### C.    The Balance of Hardships Tips Decidedly in Plaintiffs' Favor

The balance of hardships tips decidedly in favor of the Plaintiffs, who built up their vast audiences over a long period of time in reliance of the TOS which outlined very clearly the circumstances under which their channels might be deleted.  The very purpose of the relationship between YouTube and the Plaintiffs is for the wide and rapid dissemination of speech on issue of national importance and central to the core of political debate.

By contrast, temporarily enjoining Defendants' continued breach of the TOS will not result in hardship to Defendants, who will merely be required to provide the same platform access to Plaintiffs that they have been providing for years.  Provision of this access will not result in Defendants incurring any cost or suffering any intangible harm.  Defendants will suffer no legitimate harm by continuing to accord Plaintiffs the same platform access that they accord to the rest of their user base while this matter is adjudicated.

### D.    Injunctive Relief is in the Public Interest

The public interest is served when parties perform as promised under their contracts.  Blizzard Entm't. Inc. v. Ceiling Fan Software LLC, 28 F.Supp.3d 1006, 1018-1019 (C.D. Cal. 2013) (issuing injunction in case involving breach of contract and tortious interference claims by producer of online role-playing game against software company that developed programs designed to permit players to cheat).  Furthermore, it is well recognized that there is a "significant public interest" in upholding First Amendment principles.  Americans for Prosperity Foundation, 182 F.Supp.3d at 1059.  As discussed above, Plaintiffs' contractual rights—which implicate their ability to express themselves freely and participate in the public debate—will remain in jeopardy so long as Defendants remain free to violate their TOS at will.  Accordingly, the issuance of injunctive relief is proper, and the Court should grant this Application.

## II.    THE COURT SHOULD DISPENSE WITH ANY BOND REQUIREMENT

Rule 65(c) of the Federal Rules of Civil Procedure provides that a TRO or preliminary injunction may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  However, the Court has discretion as to whether any security is required and if so, the amount thereof.  See, e.g., Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003).

Plaintiffs request that the Court waive any bond requirement because enjoining Defendants from continuing to violate their TOS will not financially affect Defendants.  A bond would, however, be burdensome on the (already burdened) Plaintiffs under these circumstances.

**CONCLUSION**

Plaintiffs respectfully request that this Court grant Plaintiffs' motion for a temporary restraining order and issue an order to show cause why a preliminary injunction should not issue as follows:

1.  Defendants, along with their agents, employees, and successors, shall be restrained and enjoined from breaching their contract with Plaintiffs, as set forth in YouTube's Terms of Service, by taking down their videos and/or YouTube channels that discuss, analyze, or mention "QAnon."

2.  Defendants shall show cause, at a time and place to be directed by the Court, why a preliminary injunction should not issue requiring Defendants to act as described above; the temporary restraining order shall remain in effect until such time as the Court has ruled on whether a preliminary injunction should issue.

Respectfully submitted,

Dated: October 27, 2020                    ARMENTA & SOL, PC


By: */s/ M. Cris Armenta*
M. Cris Armenta
Attorneys for Plaintiffs
JOHN DOE, MICHAEL DOE, JAMES DOE, HENRY DOE, ROBERT DOE, CHRISTOPHER DOE, MATTHEW DOE, POLLY ST. GEORGE, SCOTT DEGROAT, DAVID J. HAYES, DANIELLEE, MISHEL McCUMBER, JEFF PEDERSEN, JORDAN SATHER, SARAH WESTALL

**MEMORANDUM OF POINTS AND AUTHORITIES**

## **PROOF OF SERVICE**

I am over the age of eighteen years and not a party to the within action.  My business address is ARMENTA & SOL, APC, 11440 West Bernardo Court, Suite 300, San Diego, California 92127.  On October 27, 2020, I served on the persons set forth below the following documents by email, within 30 minutes of the completion of this filing, and also left a telephone message for counsel David Kramer, Lauren Gallo White and Kelly Knoll that the injunction would be in their email and to call if they did not receive the link to the papers.

**APPLICATION FOR TEMPORARY RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS; [PROPOSED] ORDER GRANTINF APPLICATION FOR TEMPORARY RESTRAINING ORDER**

| | |
|---|---|
| DAVID H. KRAMER, SBN 168452<br>LAUREN GALLO WHITE, SBN 309075<br>KELLY M. KNOLL, SBN 305579<br>WILSON SONSINI GOODRICH & ROSATI<br>Professional Corporation<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>Email: dkramer@wsgr.com<br>Email: lwhite@wsgr.com<br>Email: kknoll@wsgr.com | Counsel for Defendants |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 27, 2020, at San Diego, California.

/s/ M. Cris Armenta
M. Cris Armenta