1  DAVID H. KRAMER, State Bar No. 168452
   LAUREN GALLO WHITE, State Bar No. 309075
2  KELLY M. KNOLL, State Bar No. 305579
   WILSON SONSINI GOODRICH & ROSATI
3  Professional Corporation
   650 Page Mill Road
4  Palo Alto, CA 94304-1050
   Telephone:  (650) 493-9300
5  Facsimile:  (650) 565-5100
   Email:  dkramer@wsgr.com
6  Email:  lwhite@wsgr.com
   Email:  kknoll@wsgr.com
7
   Attorneys for Defendants
8  GOOGLE LLC and YOUTUBE, LLC

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                  SAN JOSE DIVISION

13

14  JOHN DOE, ET AL.,                    )  CASE NO.:  5:20-cv-07502-BLF
                                         )
15          Plaintiffs,                  )  **DEFENDANTS' OPPOSITION TO**
                                         )  **PLAINTIFFS' APPLICATION FOR**
16      v.                               )  **TEMPORARY RESTRAINING**
                                         )  **ORDER**
17  GOOGLE LLC, ET AL.,                  )
                                         )  Date:       November 2, 2020
18          Defendants.                  )  Time:       9:00am
                                         )  Before:     Hon. Beth Labson Freeman
19                                       )
                                         )
20  _____)

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................2

      A.    YouTube And Its Terms of Service ......................................................2

      B.    YouTube's Community Guidelines And Its Rules Against Harassment, Hate Speech, and Dangerous Conspiracies..........................................................4

      C.    Plaintiffs, Their Channels, and Their Claims Against YouTube ...........................5

ARGUMENT ...................................................................................................................7

I.     PLAINTIFFS HAVE NO CHANCE OF SUCCEEDING ON THE MERITS OF THEIR BREACH OF CONTRACT CLAIMS ..................................................8

II.    PLAINTIFFS FAIL TO SHOW ANY POSSIBILITY OF IRREPARABLE HARM ......11

III.   THE REMAINING EQUITABLE FACTORS WEIGH STRONGLY AGAINST ANY PRELIMINARY RELIEF ........................................................................12

      A.    Because A TRO Would Violate YouTube's First Amendment Rights, The Balance Of Hardships Tips Decisively In YouTube's Favor...............................13

      B.    An Injunction Compelling Publication Of Plaintiffs' Videos Would Be Contrary To The Public Interest..............................................................16

IV.   AS A MATTER OF LAW, PLAINTIFFS ARE NOT ENTITLED TO AN INJUNCTION ORDERING SPECIFIC PERFORMANCE OF THE TOS ....................18

CONCLUSION ...............................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Agency for Int'l Dev. v. Alliance for Open Society Int'l,*
570 U.S. 205 (2013) ................................................................................................... 13

*Assocs. & Aldrich Co. v. Times Mirror Co.,*
440 F.2d 133 (9th Cir. 1971) ............................................................................... 14, 15

*Barndt v. Los Angeles,*
211 Cal. App. 3d 397 (1989) ..................................................................................... 19

*Bernhardt v. L.A. County,*
339 F.3d 920 (9th Cir. 2003) ..................................................................................... 16

*Blackburn v. Charnley,*
117 Cal. App. 4th 758 (2004) .................................................................................... 18

*Blizzard Entm't. Inc. v. Ceiling Fan Software LLC,*
28 F. Supp. 3d 1006 (C.D. Cal. 2013) ...................................................................... 16

*City of Los Angeles v. Preferred Commc'ns, Inc.,*
476 U.S. 488 (1986) ................................................................................................... 14

*City of Thousand Oaks v. Verizon Media Ventures,*
2002 U.S. Dist. LEXIS 8704 (C.D. Cal. May 15, 2002).............................................. 20

*Colo Corp. v. Smith,*
121 Cal. App. 2d 374 (1953) ..................................................................................... 18

*Dahl v. HEM Pharm. Corp.,*
7 F.3d 1399 (9th Cir. 1993) .......................................................................................... 8

*Daniels v. Alphabet Inc.,*
No. 5:20-cv-04687-VKD (N.D. Cal.) ........................................................................... 1

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,*
518 U.S. 727 (1996) ................................................................................................... 15

*Ebeid v. Facebook, Inc.,*
2019 U.S. Dist. LEXIS 78876 (N.D. Cal. May 9, 2019) ............................................. 10

*Epic Games, Inc. v. Apple Inc.,*
2020 U.S. Dist. LEXIS 154231 (N.D. Cal. Aug. 24, 2020)................................... 11, 18

*e-ventures Worldwide, LLC v. Google, Inc.,*
2017 U.S. Dist. LEXIS 88650 (M.D. Fla. Feb. 8, 2017).............................................. 15

*Garcia v. Google, Inc.*,
786 F. 3d 733 (9th Cir. 2015)................................................................. 8

*Hill v. Colorado*,
530 U.S. 703 (2000) .............................................................................. 17

*Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 5574 (1995) ............................................................................ 14

*La'Tiejira v. Facebook, Inc.*,
272 F. Supp. 3d 981 (S.D. Tex. 2017) ................................................... 14

*Langdon v. Google, Inc.*,
474 F. Supp. 2d 622 (D. Del. 2007) ................................................. 14, 15

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011)................................................................... 7

*Lewis v. Google LLC*,
2020 U.S. Dist. LEXIS 150603 (N.D. Cal. May 20, 2020) ............................. 10

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) .............................................................................. 13

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019) .................................................................. 2, 15, 6

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009)................................................................... 7

*Med. Supplies, Inc. v. Strategic Health Alliance II, Inc.*,
2014 U.S. Dist. LEXIS 10881 (S.D. Ohio Jan. 29, 2014).............................. 11

*Meghrig v. KFC W., Inc.*,
516 U.S. 479 (1996) ................................................................................ 7

*Miami Herald Publ'g Co., Div. of Knight Newspapers, Inc. v. Tornillo*,
418 U.S. 241 (1974) ......................................................................... 14, 15

*Mishiyev v. Alphabet, Inc.*,
2020 U.S. Dist. LEXIS 44734 (N.D. Cal. Mar. 13, 2020) ............................. 10

*Mora v. U.S. Bank N.A.*,
2012 U.S. Dist. LEXIS 79357 (N.D. Cal. June 7, 2012) ............................... 18

*Morrow v. City of Oakland*,
2012 U.S. Dist. LEXIS 81314 (N.D. Cal. June 12, 2012) .............................. 11

*Poultry Producers of S. Cal. v. Barlow,*
    189 Cal. 278 (1922)................................................................................................... 20

*Prager Univ. v. Google LLC,*
    2019 Cal. Super. LEXIS 2034 (Cal. Super. Ct. Nov. 19, 2019) ...................................... 10

*Prager Univ. v. Google LLC,*
    951 F.3d 991 (9th Cir. 2020)........................................................... 1, 3, 12, 17

*Ramos v. Nielsen,*
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) ............................................................ 7

*Rautenberg v. Westland,*
    227 Cal. App. 2d 566 (1964) ........................................................................ 19

*Riley v. Nat'l Fed'n of Blind of N.C., Inc.,*
    487 U.S. 781 (1988) ................................................................................... 13

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984) ................................................................................... 13

*Salt Lake Trib. Publ'g Co. v. AT&T Corp.,*
    320 F.3d 1081 (10th Cir. 2003)..................................................................... 11

*Sierra On-Line, Inc. v. Phoenix Software, Inc.,*
    739 F.2d 1415 (9th Cir. 1984) ......................................................................... 7

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.,*
    100 Cal. App. 4th 44 (2002)......................................................................... 10

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009) ....................................................................... 16

*Tanner Motor Livery, Ltd. v. Avis, Inc.,*
    316 F.2d 804 (9th Cir. 1963) ........................................................................... 7

*Thayer Plymouth Ctr., Inc. v. Chrysler Motors Corp.,*
    255 Cal. App. 2d 300 (1967) ........................................................................ 19

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ................................................................................... 14

*Washington League for Increased Transparency & Ethics v. Fox Corp.,*
    No. 20-2-07428-4 SEA (Wash. Superior Ct. May 27, 2020).................................... 15

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ....................................................................................... 7

*Woolley v. Embassy Suites, Inc.,*
    227 Cal. App. 3d 1520 (1991) ...................................................................... 19

*Zhang v. Baidu.com, Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ........................................................................... 14, 15

**STATUTES**

Cal. Civ. Code § 3390 ........................................................................................................... 18

Cal. Civ. Code § 3423 ........................................................................................................... 19

Cal. Code Civ. P. § 526(b)(5) ............................................................................................... 19

**INTRODUCTION**

Plaintiffs seek an extraordinary emergency TRO that would upend the status quo by compelling YouTube to display videos that it considers harmful and in violation of its content policies. Plaintiffs ask the Court to force YouTube to publish videos that, among other things, attacked former White House Chief of Staff John Podesta as a "world class underage sex slave op cover upper," accused the late Senator John McCain of aiding and abetting a child sex-trafficking ring, and asserted that President George H.W. Bush was secretly executed for sex trafficking. Plaintiffs' request for a mandatory injunction overriding YouTube's editorial judgments has no basis in law or equity and should be denied.

Plaintiffs notably do not try to premise their application on their First Amendment claim (which is foreclosed by Ninth Circuit precedent and was recently described by another judge in this Court as "entirely implausible"). *See Prager Univ. v. Google LLC*, 951 F.3d 991, 997-99 (9th Cir. 2020); Tr. of Hearing at 9:13, *Daniels v. Alphabet Inc.*, No. 5:20-cv-04687-VKD (N.D. Cal. Oct. 6, 2020). Instead, Plaintiffs rely solely on their claim that YouTube breached its Terms of Service by removing Plaintiffs' YouTube channels. But this argument proceeds only by ignoring (or distorting) the operative language of the contract. The Terms of Service expressly provide that "YouTube is under no obligation to host or serve Content" and that YouTube has discretion to remove content that it reasonably believes violates its content guidelines or "may cause harm to YouTube, our users, or third parties." That is precisely what happened here. Indeed, ***Plaintiffs do not argue that their channels complied with YouTube's content policies***, which prohibit harassment, including content that targets individuals in connection with conspiracy theories linked to real-world violence. In removing Plaintiffs' channels, YouTube determined that Plaintiffs were engaged in conduct that violated its Harassment policy, which is designed to prevent harm to YouTube, its users, and others. YouTube did not breach the contract by doing exactly what the contract contemplates.

Plaintiffs' lack of any chance of success on the merits dooms any request for preliminary relief, but Plaintiffs' bid for a TRO flounders at every other step of the analysis as well.

*First*, Plaintiffs cannot show irreparable harm where the harm they assert is simply a consequence of YouTube's exercise of its contractual rights and where Plaintiffs remain free to use any number of other platforms, including their own websites, to disseminate their views.

*Second*, both the balance of equities and the public interest tip decisively against the relief that Plaintiffs seek. Plaintiffs have no First Amendment right to force YouTube to host their content. In contrast, an injunction compelling YouTube to publish videos that it has determined violate its content policies would directly violate YouTube's own rights to exercise "editorial discretion over the speech and speakers in the forum." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). Such an order would also be contrary to the public's interest in avoiding unwanted speech, including content promoting outlandish conspiracy theories that have been connected to actual violence.

*Finally*, as a matter of law, Plaintiffs are not entitled to any injunction seeking specific performance of YouTube's Terms of Service. That is so both because Plaintiffs cannot point to any provision of that contract that the Court could order to be specifically performed and because that agreement is a personal-service contract that involves considerable discretion and judgment.

For all these reasons, Plaintiffs' meritless TRO application should be denied.

## BACKGROUND

### A.    YouTube And Its Terms of Service

YouTube, a subsidiary of Google, is a popular online service for sharing videos and related content. Compl. ¶ 2. In general, users are able to post content to their own "channels" (or YouTube accounts) at no charge, with YouTube covering the costs of storage. Decl. of YouTube Representative ("YouTube Decl.") ¶ 2. Almost anyone, even those without a YouTube channel, can view content uploaded to the service by others. *Id.* That access is also generally provided for free, with YouTube paying for the bandwidth used to transmit the content. *Id.*

To create a YouTube channel and upload videos and other content, a user must have a Google account—an identity used across various personalized Google services, including Gmail and Drive. YouTube Decl. ¶¶ 13-14. Users must also accept the YouTube Terms of Service Agreement (the "TOS") and the various policies that are incorporated by reference in the TOS. *Id.*

¶¶ 4-5, Exs. 1-4. Most notably, the TOS expressly incorporates, and users must agree to abide by, YouTube's Community Guidelines, which establish detailed rules about the kind of content and behavior that are not allowed on YouTube. *Id.* ¶ 5, Ex. 2. The TOS also makes clear to users that the Community Guidelines "may be updated from time to time." *Id.*, Ex. 1.

The TOS has specific provisions addressing "Content on the Service" and "Removal of Content by YouTube." *Id.* The former provision states explicitly that "YouTube is under no obligation to host or serve Content." *Id.* The latter makes clear that YouTube has considerable discretion to remove unwanted material from its service: "If we reasonably believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties, we may remove or take down that Content in our discretion." *Id.* While YouTube does not promise to provide notice through any specific channel or on any specific time frame, the removal provision further states that "[w]e will notify you with the reason for our action" unless we reasonably believe that certain conditions apply, such as where doing so "would cause harm to any user, other third party, [or] YouTube." *Id.*

To enforce its Community Guidelines and content policies, YouTube continually monitors its service using a combination of automated systems and human content reviewers. YouTube Decl. ¶ 6. When it identifies content that violates its policies, YouTube removes the offending content and, depending on the severity of the violation, may issue a warning or a strike against the uploading user's channel, or may terminate the user's channel altogether. *Id.* ¶¶ 8-9, Ex. 5. Channels can be terminated due to repeated violations; for a single case of severe abuse; or where the channel is considered to be "dedicated to" a policy violation. *Id.* ¶ 9, Ex. 5. Whether in response to a single strike or a channel suspension, the user can appeal the decision to YouTube. *Id.* ¶ 10, Exs. 5, 9.

Distinct from these content-removal provisions, the TOS has separate provisions addressing "Account Suspension & Termination." *Id.*, Ex. 1. Those provisions explain that "YouTube may suspend or terminate your access [to YouTube], your *Google* account, or your *Google* account's access to all or part of the [YouTube] Service," under certain conditions. *Id.* (emphases added). Those conditions include where "we believe there has been conduct that

creates (or could create) liability or harm to any user, other third party, YouTube or our Affiliates." *Id.*

### B.     YouTube's Community Guidelines And Its Rules Against Harassment, Hate Speech, and Dangerous Conspiracies

The Community Guidelines, which (as noted) are expressly incorporated into YouTube's Terms, are public-facing policies that identify various categories of content that YouTube expressly does not permit. YouTube Decl. ¶ 5. Among those categories are: harassment, hate speech; and "harmful or dangerous" content. *Id.*, Ex. 2. Since well before Plaintiffs' channels were terminated, YouTube's Harassment policy prohibited "[c]ontent that threatens individuals" or that "targets an individual with prolonged or malicious insults based on intrinsic attributes." *Id.*, Ex. 3. As examples, the policy specifically banned "[c]ontent that incites others to harass or threaten individuals on or off of YouTube." *Id.*

Separately, YouTube's hate speech policy prohibits "content promoting violence or hatred against individuals or groups" based on a variety of attributes. *Id.*, Ex. 4. Among other types of content that violates this policy, YouTube lists "[c]onspiracy theories saying individuals or groups are evil, corrupt, or malicious" based on any of the specified attributes, and content that "den[ies] that a well-documented, violent event took place." *Id.*

Consistent with its notice in the TOS that these Community Guidelines policies "may be updated from time to time" (*id.*, Ex. 1), YouTube has been working for years to remove and limit the reach of conspiracy theory content and harmful misinformation. YouTube Decl. ¶¶ 16-20. For example, in January 2019, it announced a change to "begin reducing recommendations of borderline content and content that could misinform users in harmful ways." *Id.*, Ex. 6. And in June 2019, YouTube announced it would update its policies to explicitly reject content promoting "conspiracy theories saying individuals or groups are evil, corrupt, or malicious" based on traits such as race, religion, and sexual orientation. *Id.* ¶ 19, Exs. 4, 7.

YouTube continued that process on October 15 of this year, announcing in a public blog post entitled "Managing harmful conspiracy theories on YouTube" that it was "taking another step in our efforts to curb hate and harassment by removing more conspiracy theory content used

to justify real-world violence." *Id.*, Ex. 8. More specifically, YouTube announced that it was

"further expanding both our hate and harassment policies to prohibit content that targets an

individual or group with conspiracy theories that have been used to justify real-world violence.

One example would be content that threatens or harasses someone by suggesting they are

complicit in one of these harmful conspiracies, such as QAnon or Pizzagate." *Id.* The October 15

blog post explained that YouTube would "begin enforcing this updated policy today, and will

ramp up in the weeks to come." *Id.* In connection with this announcement, YouTube updated its

public-facing Harassment policy by adding, as an additional example of violative content, videos

"[t]argeting an individual and making claims they are involved in human trafficking in the

context of a harmful conspiracy theory where the conspiracy is linked to direct threats or violent

acts." YouTube Decl. ¶ 20; *see also id.* Ex. 3.

### C.      Plaintiffs, Their Channels, and Their Claims Against YouTube

While most of the Plaintiffs have refused to disclose their identities to Defendants'

counsel or even to the Court, they claim to be "journalists, videographers, advocates, [and]

commentators" who have collectively created 18 individual channels and published those

channels on YouTube. Compl. ¶¶ 1, 8. Plaintiffs describe their channels as "conservative news"

channels and "extremely controversial," TRO at 8, 15, but they avoid any actual description of

the videos that Plaintiffs posted to them. Tellingly, Plaintiffs do not deny that their videos

violated YouTube's Community Guidelines and content policies.

In fact, Plaintiffs' channels were rife with content espousing harmful conspiracy theories.

Many of Plaintiffs' videos included horrifying and unsubstantiated accusations of violent and

criminal conduct supposedly committed by specific individuals. *See* YouTube Decl. ¶¶ 23-25. For

example, videos posted on the channel "JustInformed Talk" suggested that Hillary Clinton "was

involved with satanic rituals with children," (including "human ritual sacrifice") and made claims

that the Democratic party had orchestrated mass infection of COVID-19 in order to encourage

voter fraud. *Id.* ¶ 23. Videos posted on the "TRUReporting" channel made similarly vile claims

about multiple well-known Americans, including that one "eats babies," another "killed his wife,"

others are "pedophiles or 'pedowoods,'" and others "breed children in order to sell them." *Id.* ¶

24. And another harassed survivors of the 2018 school shooting in Parkland, Florida by claiming that the shooting was a hoax. *Id.* Because this type of content targets individuals in connection with the QAnon and Pizzagate conspiracy theories (and others), YouTube has concluded that it is not welcome on its service and amounts to harassment that has the potential to cause harm to third parties by inciting real-world violence. *Id.* ¶¶ 22-23, 26.

After it learned of these and other equally odious videos in Plaintiffs' channels, on October 15, 2020, YouTube suspended the channels and removed all the content that was posted there. YouTube Decl. ¶ 22. YouTube took that action because it determined that each of the channels contained multiple, serious violations of the Community Guidelines. *Id.* The violations were sufficiently pervasive that YouTube found that each of the Plaintiffs' channels were dedicated to a violation of YouTube's Harassment policy. *Id.* In connection with these removal actions, YouTube sent to each of the Plaintiffs an email notification that informed them of what had happened and the reasons for it: "We'd like to inform you that due to repeated or severe violations of our Community Guidelines (https://www.youtube.com/t/community_guidelines) your YouTube account ... has been suspended." YouTube Decl. Ex. 9; *see also id.* ¶ 27. This notice also explained that Plaintiffs' videos contained "targeted harassment," and invited each of the Plaintiffs to appeal the suspension, using a form that YouTube provides for such appeals. *Id.*; *see also id.* Ex. 1.

While YouTube suspended Plaintiffs' channels, thus removing all the content from them and barring new content, YouTube did not otherwise suspend or terminate the Plaintiffs' ability to access YouTube, including to view videos. YouTube Decl. ¶ 28. Nor did YouTube suspend or terminate any of Plaintiffs' Google accounts. *Id.*

In the days that followed, Plaintiffs organized a crowdfunding page (created on October 19), which linked to a YouTube video in which their counsel details their legal strategy. Declaration of David H. Kramer ("Kramer Decl.") Exs. A-B. Plaintiffs also began using other online platforms to exhort their followers to find their content elsewhere, including on their own websites. *See, e.g.*, Kramer Decl. Ex. C. But Plaintiffs did not actually file this case until more than a week after their channel suspensions. Their Complaint asserts claims for breach of

contract, breach of the implied covenant of good faith and fair dealing, and violation of the First Amendment. ECF No. 1. The Complaint was followed by a motion to proceed under pseudonyms and the next day by an *ex parte* application for temporary restraining order. ECF Nos. 1, 4, 8. The Court directed Defendants to respond to Plaintiffs by noon on October 30, 2020, and set a hearing for November 2, 2020. ECF No. 16.

## ARGUMENT

Preliminary injunctive relief, whether in the form of a temporary restraining order or a preliminary injunction, is an "extraordinary remedy" that is "never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a temporary restraining order or a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. To grant preliminary injunctive relief, a court must find that "a certain threshold showing [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam).

A temporary restraining order is "not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1084 (N.D. Cal. 2018) (quoting *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)); *see Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963) ("It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits."). Here, however, Plaintiffs are not trying to preserve the status quo; they are asking the Court to alter it by forcing YouTube to reinstate videos that it removed from its service more than a week before Plaintiffs filed this lawsuit. Plaintiffs thus seek a "mandatory injunction"—one that "orders a responsible party to 'take action.'' *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). Such injunctions are "particularly disfavored," *Marlyn Nutraceuticals*, 571 F.3d at 879, and "are not issued in doubtful cases," *Garcia v. Google, Inc.*, 786 F. 3d 733, 740 (9th Cir. 2015) (en banc). *Accord Dahl v.*

*HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) ("mandatory preliminary relief" is "subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party.").

## I.   PLAINTIFFS HAVE NO CHANCE OF SUCCEEDING ON THE MERITS OF THEIR BREACH OF CONTRACT CLAIMS

Because Plaintiffs seek a mandatory injunction, they "must establish that the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed." *Garcia*, 786 F.3d at 740. Plaintiffs come nowhere close to that showing. Their TRO application rests wholly on the breach of contract claim against YouTube, but Plaintiffs have no chance of prevailing on that claim. Not only do Plaintiffs fail to identify the relevant provisions in the Terms of Service that actually govern the actions that YouTube took, those provisions expressly authorize YouTube to do what it did.

Plaintiffs' central theory is that YouTube breached the TOS by suspending Plaintiffs' YouTube channels "without cause." TRO at 7.[1] They base this claim on the provisions of the TOS that govern "Account Suspension & Termination." TRO at 12. But this is not the relevant provision of the contract. The provisions that Plaintiffs invoke give YouTube the right to

---

[1] Plaintiffs also suggest that YouTube breached the TOS by "failing to provide a reason" for the channel suspensions, TRO at 7, but they do not appear to rely on that claim in connection with their request for emergency relief, *see id.* at 12. Nor could they. For one thing, Plaintiffs *did* receive notice that their channels were suspended for repeated or severe violations of YouTube's Community Guidelines. YouTube Decl. ¶ 27, Ex. 9. Nothing more is promised by the Terms of Service. In any event, Plaintiffs do not even try to explain how a purported lack of adequate notice of the *reason* for the channel suspensions caused them any harm—much less irreparable harm—or how that harm could be remedied by a TRO. Nor do Plaintiffs explain how YouTube "failed to provide the appeals process it promised." *See, e.g.*, Compl. ¶ 72, 80, 88. In fact, Plaintiffs all received notices that included a form to submit an appeal of YouTube's actions. YouTube Decl. Ex. 9.

1    "suspend or terminate your access, your Google account, or your Google account's access to all

2    or part of the Service." YouTube Decl. Ex. 1. None of that happened here. YouTube did not

3    suspend or terminate Plaintiffs' access to YouTube or their Google accounts. YouTube Decl.

4    ¶ 28. Instead, YouTube suspended Plaintiffs' *channels* and removed the videos and other features

5    associated with those channels. *Id.*; *see also id.* ¶¶ 13-15.

6         These actions are expressly authorized by the provisions of the TOS related to "Content

7    on the Service" and "Removal of Content by YouTube." YouTube Decl. Ex. 1. The former, as

8    Plaintiffs acknowledge (TRO at 4), makes plain that "YouTube is under no obligation to host or

9    serve Content." YouTube Decl. Ex. 1. By itself, that provision is fatal to any claim that

10   YouTube's removal of channels or other content somehow violated the agreement. But that

11   provision does not stand alone. The Removal of Content provision expressly allows YouTube to

12   remove Content "in its discretion," if it "reasonably believe[s] that any Content is in breach of

13   this Agreement *or may cause harm to YouTube, our users, or third parties*." YouTube Decl. Ex. 1

14   (emphasis added). And that is what YouTube concluded. In removing Plaintiffs' content,

15   YouTube determined that those channels violated the Community Guidelines—including

16   YouTube's Harassment policy—and amounted to material that could cause real-world harm to

17   users and third parties. YouTube Decl. ¶¶ 22-26.

18        These provisions contain no limitation requiring a "material breach" by a user. That

19   language appears only in the separate provision governing suspensions or termination of Google

20   accounts. Because Plaintiffs' Google accounts were not terminated and because their YouTube

21   access was not cut off, Plaintiffs' extended (and convoluted) argument that they did not materially

22   breach the TOS (TRO at 12-14) is misplaced. But even if the Google account termination

23   provisions did somehow apply to this case, Plaintiffs' argument still would fail. By its terms, that

24   provision authorizes YouTube to suspend or terminate accounts or access not merely in the case

25   of a material breach (as happened here, where Plaintiffs' channels contained multiple Harassment

26   policy violations), but also where "we believe there has been conduct that creates (or could

27   create) liability or harm to any user, other third party, YouTube or our Affiliates." YouTube Decl.

28   Ex. 1. As explained above, YouTube determined that Plaintiffs' channels were engaged in just

such conduct, by publishing numerous videos that made spurious and heinous accusations against specific individuals, putting them in the cross hairs of conspiracy theories that have been linked to real-world violence. YouTube Decl. ¶¶ 22-26. That determination would have justified any action that YouTube might have taken under the Account Suspension & Termination provision.

Because YouTube's actions were authorized by the governing agreement, Plaintiffs have no likelihood of succeeding on their breach of contract claim. *See Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 56-57 (2002) ("[I]f defendants were given the right to do what they did by the express provisions of the contract there can be no breach."); *accord Lewis v. Google LLC*, 2020 U.S. Dist. LEXIS 150603, at *44 (N.D. Cal. May 20, 2020) ("YouTube's terms and guidelines explicitly authorize YouTube to remove or demonetize content that violate its policies, including 'Hateful content.' Therefore, Defendants' removal or demonetization of Plaintiff's videos with 'Hateful content' or hate speech was authorized by the parties' agreements and cannot support a claim for breach of the implied covenant of good faith and fair dealing."); *Ebeid v. Facebook, Inc.*, 2019 U.S. Dist. LEXIS 78876, at *21-22 (N.D. Cal. May 9, 2019) (Facebook did not breach implied covenant by removing plaintiff's posts where "Facebook had the contractual right to remove or disapprove any post or ad at Facebook's sole discretion"); *Mishiyev v. Alphabet, Inc.*, 444 F. Supp. 3d 1154, 1159 (N.D. Cal. Mar. 13, 2020), *appeal docketed*, No. 10-15657 (9th Cir. Apr. 14, 2020) (YouTube did not breach TOS by removing plaintiffs' videos where the TOS "authorized YouTube to do exactly that"); *Prager Univ. v. Google LLC*, 2019 Cal. Super. LEXIS 2034, at *31-32 (Cal. Super. Ct. Nov. 19, 2019) (YouTube did not breach implied covenant by demonetizing and limiting access to plaintiff's videos "in light of the express provisions of YouTube's Terms of Service").[2]

---

[2] Plaintiffs appear to suggest that, because YouTube suspended Plaintiffs' channels before changing the webpage on which its public-facing Harassment policy appears—to expressly include, as an example, content "targeting an individual and making claims they are involved in human trafficking in the context of a harmful conspiracy theory where the conspiracy is linked to direct threats or violent acts"—YouTube's Terms of Service were unilaterally amended and

(continued...)

## II.    PLAINTIFFS FAIL TO SHOW ANY POSSIBILITY OF IRREPARABLE HARM

Plaintiffs' application equally falls far short with respect to the required showing of irreparable harm: "the single most important prerequisite for the issuance of a TRO or preliminary injunction." *Morrow v. City of Oakland*, 2012 U.S. Dist. LEXIS 81314, at *8 (N.D. Cal. June 12, 2012) (internal citations omitted).

YouTube gave Plaintiffs the ability to broadcast their content for free. It did so under an unambiguous TOS that explained to Plaintiffs that YouTube had "no obligation to host" their content, that YouTube could remove content that violated its Community Guidelines, and that YouTube could change those guidelines over time. Having struck this bargain, Plaintiffs cannot now complain that YouTube's exercise of those contractual rights is causing them irreparable harm. As a matter of law, in fact, harm that "results from the express terms of [the] contract" cannot be irreparable. *Epic Games, Inc. v. Apple Inc.*, 2020 U.S. Dist. LEXIS 154231, at *8 (N.D. Cal. Aug. 24, 2020) (finding no irreparable harm and denying TRO seeking to compel Apple to restore software app where contract gave Apple the right to remove apps that failed to comply with its policies); *accord Salt Lake Trib. Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (publisher's loss of personnel or editorial voice does not constitute irreparable harm where those consequences flowed from its contractual agreement); *Med-Care Diabetic & Med. Supplies, Inc. v. Strategic Health Alliance II, Inc.*, 2014 U.S. Dist. LEXIS 10881, at *15-16 (S.D. Ohio Jan. 29, 2014) (consequences flowing from defendant's exercise of its rights under the express terms of parties' agreement do not constitute irreparable harm). Plaintiffs' cases (*see* TRO at 16) are not contrary. They merely recognize the possibility that a party's breach of

---

rendered invalid. TRO at 8. That is wrong. The update to the policy, which was publicly announced in the October 15 blog post, occurred before the removal of Plaintiffs' channels. YouTube Decl. ¶¶ 20, 22. And the TOS expressly provides that YouTube's Community Guidelines "may be updated from time to time." YouTube Decl. Ex. 1. YouTube did not amend (much less breach or invalidate) the TOS by updating its Harassment policy to make clearer what it prohibited.

contract can cause irreparable harm under some circumstances. But they do not in any way suggest that the consequences of a party's exercise of an express contractual right could ever be cognizable as irreparable harm.

Plaintiffs also reference cases recognizing the potential for irreparable harm where First Amendment rights are curtailed. TRO at 13. But Plaintiffs' First Amendment rights are not at issue. Their bid for injunctive relief rests not on the First Amendment, but on a contract theory. Even more importantly, YouTube is not the government, and the Ninth Circuit has made clear that YouTube's editorial decisions do not implicate the First Amendment. *Prager*, 951 F.3d at 996-99.

Plaintiffs' failure to establish irreparable harm runs beyond YouTube's rights under the contract. While Plaintiffs claim that they have lost their ability to communicate with their audience through YouTube, that harm is not in itself irreparable. Plaintiffs have not shown, or even attempted to show, that if they somehow won this case, obtained damages, and perhaps a permanent injunction restoring their videos, they would have suffered irreparably in the interim. In fact, Plaintiffs still have access to (and continue to use) other online platforms, including their own websites, where they have every ability to broadcast their views to anyone who wants to listen. Kramer Decl. Exs. A, C. In other ways as well, Plaintiffs' own actions refute the notion that they are suffering irreparable harm. After their channels were suspended, Plaintiffs spent ten days detailing their litigation strategy on a crowdfunding website and conducting interviews before finally heading to court. (Kramer Decl. Exs. A-B). That suggests that this case (and this application) is more of a political stunt than a situation truly warranting emergency relief. But whatever it is, it is not a case where irreparable harm will result from allowing the status quo to remain while the litigation plays out.

## III.   THE REMAINING EQUITABLE FACTORS WEIGH STRONGLY AGAINST ANY PRELIMINARY RELIEF

Plaintiffs face further insurmountable obstacles to the order they seek. First, the balance of hardships decisively favors YouTube: while Plaintiffs have no constitutional right to speak on a private platform like YouTube, a mandatory injunction restoring Plaintiffs' videos to YouTube

would violate YouTube's own First Amendment rights. Such an order would compel YouTube to publish, and thereby associate itself with, videos that it has determined, in an exercise of editorial judgment, should not appear on its platform. The First Amendment does not allow that result. In addition, the public interest would be significantly harmed by undoing the status quo to force YouTube to republish Plaintiffs' reckless and potentially dangerous efforts to target specific individuals and fan the flames of the QAnon conspiracy theory.

> **A.      Because A TRO Would Violate YouTube's First Amendment Rights, The Balance Of Hardships Tips Decisively In YouTube's Favor**

In their application, Plaintiffs make no serious effort to grapple with the hardship that their desired injunction would have on YouTube. Plaintiffs offhandedly assert that "Defendants will suffer no legitimate harm by continuing to accord Plaintiffs the same platform access that they accord to the rest of their user base." TRO at 17. That is badly mistaken. If forced to republish Plaintiffs' videos, YouTube would suffer direct harm in the form of a direct assault on its First Amendment rights.

It is a "basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Society Int'l*, 570 U.S. 205, 213 (2013) (citations omitted). Here, however, the TRO that Plaintiffs seek would compel YouTube to publish a set of videos promoting a dangerous conspiracy that YouTube does not wish to associate with and that it has determined may be harmful to its users and third parties. This is a direct violation of the First Amendment's prohibitions on compelled speech and association. *Accord Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 782 (1988) (First Amendment protects "the decision of both what to say and what *not* to say") (emphasis added); *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate"); *cf. Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764-65 (1994) (explaining that because injunctions "carry greater risks of censorship and discriminatory application than do general ordinances," they require "a somewhat more stringent application of general First Amendment principles").

Such an order would similarly offend YouTube's First Amendment right to exercise "editorial control and judgment" over its private service. *Miami Herald Publ'g Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241, 258 (1974). Under this principle, private platforms and publishers have a First Amendment right to make their own choices about whether to publish or disseminate third-party speech. *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) (cable operators engage in "editorial discretion" protected by the First Amendment by selecting what third-party programming to distribute on their networks); *Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573--74 (1995) (parade organizers engage in protected speech by selecting which marchers may participate in parade); *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494 (1986) ("by exercising editorial discretion over which stations or programs to include in its repertoire, respondent seeks to communicate messages on a wide variety of topics and in a wide variety of formats").

As the Supreme Court has explained, governmental efforts to "*compel* speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as efforts to *prohibit* them from doing so. *Turner*, 512 U.S. at 642 (emphasis added); *accord Tornillo*, 418 U.S. at 258 (First Amendment protected newspapers from statute requiring publication of public officials' responses to negative coverage); *Assocs. & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 135 (9th Cir. 1971) ("the acceptance or rejection of articles submitted for publication ... necessarily involves the exercise of editorial judgment"). And this First Amendment right to make editorial judgments about speech fully applies to online service providers. *See, e.g.*, *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 439-41 (S.D.N.Y. 2014) (search engine protected by First Amendment for excluding search results on topics it considered politically sensitive); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991-92 (S.D. Tex. 2017) (recognizing "Facebook's First Amendment right to decide what to publish and what not to publish on its platform"); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007) (First Amendment barred attempt to dictate contents of Google's search results).

Plaintiffs' proposed TRO runs afoul of these fundamental rights. The injunction they seek would compel YouTube to publish videos that it determined violated its content rules and would

be harmful to its service and potentially dangerous to its users and others. *See* TRO at 18;

YouTube Decl. ¶¶ 22-26. But the judgments that YouTube makes about what content to host—

including what videos are so dedicated to dangerous harassment that they are not welcome on the

service—are exactly what the First Amendment protects. They are akin to decisions about the

"material to go into a newspaper, and the decisions made as to limitations on the size and content

of the paper, and treatment of public issues and public officials." *Tornillo*, 418 U.S. at 258;

*accord e-ventures Worldwide, LLC v. Google, Inc*., 2017 U.S. Dist. LEXIS 88650, at *11-12

(M.D. Fla. Feb. 8, 2017) ("Google's actions in . . . determining whether certain websites are

contrary to Google's guidelines and thereby subject to removal are the same as decisions by a

newspaper editor regarding which content to publish, which article belongs on the front page, and

which article is unworthy of publication.").

Just as "the courts ... should [not] dictate the contents of a newspaper," *Aldrich*, 440 F.3d

at 135, the First Amendment does not allow Plaintiffs to obtain a court order overriding

YouTube's editorial decisions and directing what material it must publish. *See, e.g.*, *Zhang*, 10 F.

Supp. 3d at 440 (ordering search engine to include information in its search results that it had

decided to exclude "would plainly 'violate[] the fundamental rule of protection under the First

Amendment, that a speaker has the autonomy to choose the content of his own message'"); *e-*

*ventures*, 2017 U.S. Dist. LEXIS 88650, at *11-12 (First Amendment barred claims seeking to

hold Google liable for excluding certain websites from its search results); *Langdon*, 474 F. Supp.

2d at 629-30 (First Amendment prohibits order compelling search engines to "'honestly' rank

Plaintiff's websites"); *accord Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S.

727, 737-38 (1996) (plurality op.) (because "the editorial function itself is an aspect of 'speech,' a

court's decision that a private party, say, the station owner, is a 'censor,' could itself interfere

with that private 'censor's' freedom to speak as an editor"). Such an order would "eviscerate"

Defendants' "rights to exercise editorial control over speech and speakers on their properties or

platforms." *Halleck*, 139 S. Ct. at 1932; *cf. Washington League for Increased Transparency &*

*Ethics v. Fox Corp.*, No. 20-2-07428-4 SEA (Wash. Superior Ct. May 27, 2020) (First

Amendment bars claims attacking cable programmer's decision to publish alleged misinformation

regarding COVID-19). That, by itself, tips the balance of hardships heavily in YouTube's favor and warrants denial of Plaintiffs' application.

## B.   An Injunction Compelling Publication Of Plaintiffs' Videos Would Be Contrary To The Public Interest

The public-interest factors also cut decisively against undoing the status quo by forcing YouTube to republish Plaintiffs' potentially dangerous conspiracy mongering. Although Plaintiffs bear the initial burden of showing that the injunction is in the public interest, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009), they do not offer any explanation (much less evidence) of how the injunction they seek would offer any benefit to non-parties, *Bernhardt v. L.A. Cty.*, 339 F.3d 920, 931-32 (9th Cir. 2003). Instead, Plaintiffs say that the "public interest is served when parties perform as promised under their contracts." TRO at 17. That may be so, but it does not help Plaintiffs here. As discussed, nothing in the TOS requires YouTube to host Plaintiffs' videos—to the contrary, the agreement expressly provides that YouTube is "under no obligation" to do so. YouTube Decl. Ex. 1.

The only case Plaintiffs offer on this point is *Blizzard Entm't. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1018-1019 (C.D. Cal. 2013), which is entirely irrelevant. That case did not involve preliminary injunctive relief at all. Instead, the court issued a *permanent* injunction following a motion for *summary judgment*, which was based on the plaintiff's showing that defendants were liable for multiple claims, one of which was breach of contract. Here, in contrast, Plaintiffs seek a TRO solely based on a breach of contract claim, and they face the "doubly demanding" burdens of seeking emergency, mandatory injunctive relief. Moreover, in evaluating the public-interest factor, *Blizzard* simply noted the benefits of parties performing under their contracts "rather than seeking out surreptitious methods to commit difficult-to-detect breaches of those contracts." *Id.* There is nothing remotely like that here.

Plaintiffs also assert that "there is a significant public interest in upholding First Amendment principles." TRO at 17. That is true, but this principle only cuts further *against* the TRO they seek. Plaintiffs have no relevant First Amendment rights here. The Ninth Circuit could hardly have been clearer in holding that "the state action doctrine precludes constitutional

scrutiny of YouTube's content moderation pursuant to its Terms of Service and Community Guidelines." *Prager*, 951 F.3d at 999; *accord Halleck*, 139 S. Ct. at 1933 (explaining that a private actor "is not subject to First Amendment constraints on how it exercises editorial discretion over the speech and speakers" on its platform). Instead, as discussed above, the relevant First Amendment rights implicated here are YouTube's, not Plaintiffs'. That only underscores that injunctive relief is decidedly *not* in the public interest.

That is especially so here, given the nature of the content at issue. As discussed above, in cracking down generally on QAnon videos and on Plaintiffs' channels specifically, YouTube determined that such "conspiracy theory content" is often "used to justify real-world violence." YouTube Decl. Ex. 8. That problem is even worse where, as here, that material "targets an identifiable individual as part of a harmful conspiracy theory where the conspiracy theory has been linked to direct threats or violent acts." YouTube Decl. ¶¶ 22-26, Ex. 3. Tellingly, Plaintiffs never dispute that their videos were seeking to promote such conspiracies or that YouTube appropriately classified their channels under these policies. Indeed, nowhere in their application do Plaintiffs identify the content of their channels or the videos that were removed. That matters greatly for the public-interest factor.

Plaintiffs brush past the possibility that much of the public might not want to see their videos and that those videos may be linked to actual violence. But the House Resolution that Plaintiffs cite (Compl. ¶ 10) indicates a genuine public concern about QAnon and related conspiracy theories. The resolution explains that the FBI "has assessed with high confidence that 'fringe political conspiracy theories', including QAnon, 'very likely motivate some domestic extremists, wholly or in part, to engage in criminal or violent activity', and that these conspiracy theories 'very likely encourage the targeting of specific people, places and organizations, thereby increasing the likelihood of violence against these targets.'" Compl. Ex. F (finding that "QAnon adherents have been implicated in crimes that they claim their QAnon beliefs inspired"); *see also* YouTube Decl. ¶ 26. This Court should not enter an order compelling YouTube to publish content that may contribute to such real-world harm and expose members of the public to exactly the kind of material that they might wish to avoid. *Cf. Hill v. Colorado*, 530 U.S. 703, 716 (2000)

("The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases.").[3]

## IV.    AS A MATTER OF LAW, PLAINTIFFS ARE NOT ENTITLED TO AN INJUNCTION ORDERING SPECIFIC PERFORMANCE OF THE TOS

Beyond all of this, Plaintiffs' bid for injunctive relief on their contract claim fails as a matter of California contract law. For two separate reasons, the contract at issue simply is not one for which an injunction compelling specific performance is legally permissible: (1) Plaintiffs do not (and cannot) point to any provision in the TOS that they seek to enforce through specific performance; and (2) specific performance is not available under California law for the alleged breach of a personal service contract like this one.

*First*, California law makes clear that specific performance is not available where there is no specific and clear contractual term establishing the supposed right to be enforced. *See* Cal. Civ. Code § 3390 (prohibiting courts from ordering specific performance where "the precise act" to be done is not "clearly ascertainable" from the terms of the agreement). "Where a party seeks specific performance of a contract, the terms of the contract must be certain and definite in all particulars essential to its enforcement. A court must be able to say what is the stipulated performance." *Colo Corp. v. Smith*, 121 Cal. App. 2d 374, 376 (1953); *accord Blackburn v. Charnley*, 117 Cal. App. 4th 758, 766 (2004) (specific performance may only be ordered where there is "substantial similarity of the requested performance to the contractual terms"); *Mora v. U.S. Bank N.A.*, 2012 U.S. Dist. LEXIS 79357, at *18 (N.D. Cal. June 7, 2012) ("Plaintiffs … do

---

[3] Against this backdrop, the possibility that some members of the public may have an interest in Plaintiffs' YouTube channels (see TRO at 2, 9) is not remotely enough to tip the public interest in Plaintiffs' favor, particularly since Plaintiffs' audience remains able to access Plaintiffs' content through other platforms. *See, e.g.*, *Epic Games, Inc.*, 2020 U.S. Dist. LEXIS 154231, at *11-12 (denying TRO despite "numerous internet postings and comments submitted in the record that Fortnite players are passionate supporters of the game, and eagerly anticipate its return to the iOS platform").

not allege, among other things, sufficiently definite terms that would allow the Court to determine whether the requested performance is substantially similar to that required under the contract.").

Here, Plaintiffs do not identify any provision in the TOS that they would have YouTube specifically perform. *See* TRO at 18. Nor could they. Not only is there no provision in the Terms that Plaintiffs could invoke to force YouTube to host their videos, the agreement expressly provides that "YouTube is under no obligation to host or serve Content." YouTube Decl. Ex. 1. Because there is nothing in the agreement that obligates YouTube to do the "precise act" that Plaintiffs seek to compel—the publication and continued hosting of their videos on its service— California law does not permit the Court to enter such an order.

*Second*, Plaintiffs' requested relief fails because, under California law, "specific performance cannot be decreed to enforce a contract for personal services." *Woolley v. Embassy Suites, Inc.*, 227 Cal. App. 3d 1520, 1533 (1991) (rejecting specific performance for contracts that required the "exercise of special skill and judgment" and "involve[d] daily discretionary activities"); *accord Thayer Plymouth Ctr., Inc. v. Chrysler Motors Corp.*, 255 Cal. App. 2d 300, 303 (1967) ("A contract which requires a continuing series of acts and demands cooperation between the parties for the successful performance of those acts is not subject to specific performance."); Cal. Civ. Code § 3423; Cal. Code Civ. P. § 526(b)(5). The TOS is just such a contract: it "obligates the individual parties to perform acts requiring an exercise of personal judgment and a degree of cooperation in making the several enterprises successful which cannot be compelled by a court decree of specific performance." *Rautenberg v. Westland*, 227 Cal. App. 2d 566, 572 (1964); *accord Barndt v. Cty. of L.A.*, 211 Cal. App. 3d 397, 404 (1989) (rationale for prohibiting specific performance "is particularly applicable where the services to be rendered require mutual confidence among the parties and involve the exercise of discretionary authority"). The TOS requires extensive, discretionary decision-making, especially in regard to the content-moderation and removal issues raised here. YouTube must (and does) frequently review the content on its service to determine whether it complies with its guidelines, and YouTube continually refines and updates its content policies as real-world conditions, threats, and challenges evolve. *See* YouTube Decl. ¶¶ 5-6, 16-20. The injunction that Plaintiffs seek would

put the Court right in the middle of these discretionary processes, effectively requiring the Court to assess and supervise YouTube's content moderation decisions on an ongoing basis. California law does not permit that. *See City of Thousand Oaks v. Verizon Media Ventures*, 2002 U.S. Dist. LEXIS 8704, at *27 (C.D. Cal. May 15, 2002), *revd. on other grounds*, 69 Fed. App'x 826 (9th Cir. 2003) (rejecting specific performance because "it is impractical to require judicial oversight of a contract which calls for special knowledge, skill, or ability"); *Poultry Producers of S. Cal. v. Barlow*, 189 Cal. 278, 281 (1922) (courts will not enjoin the breach of a contract "requiring the exercise of skill and discretion, and covering repeated transactions").

## CONCLUSION

Plaintiffs have no chance of success on the merits of their claim, and equitable considerations cut overwhelmingly against the extraordinary mandatory injunction they seek. For these reasons, Plaintiffs' application for a TRO should be denied.

Dated:  October 30, 2020

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By:    */s/ Lauren Gallo White*
       Lauren Gallo White
       lwhite@wsgr.com

Attorneys for Defendants
GOOGLE LLC and YOUTUBE, LLC