DAVID H. KRAMER, State Bar No. 168452
LAUREN GALLO WHITE, State Bar No. 309075
KELLY M. KNOLL, State Bar No. 305579
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com
Email: lwhite@wsgr.com
Email: kknoll@wsgr.com

Attorneys for Defendants
GOOGLE LLC and YOUTUBE, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOHN DOE, ET AL., | CASE NO.: 5:20-cv-07502-BLF |
| Plaintiffs, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| GOOGLE LLC, ET AL., | |
| Defendants. | Before:      Hon. Beth Labson Freeman |
| | Courtroom:   3 |
| | Hearing Date: September 9, 2021 |
| | Time:        9 a.m. |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..................................................................1

STATEMENT OF REQUESTED RELIEF ...........................................................1

STATEMENT OF ISSUES TO BE DECIDED.....................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................1

FACTUAL AND PROCEDURAL BACKGROUND ............................................3

    A.    YouTube And Its Terms Of Service...........................................3

    B.    YouTube's Community Guidelines And Its Rules Against Harassment, Hate, And Dangerous Conspiracies ...........................................4

    C.    Plaintiffs' Channels Ran Afoul Of YouTube's Policies .........................5

    D.    Plaintiffs' Lawsuit And TRO Motion ...................................6

ARGUMENT ......................................................................................6

I.    PLAINTIFFS FAIL TO STATE A VIABLE CAUSE OF ACTION ................................7

    A.    Plaintiffs Fail To State A Claim Under The First Amendment.............................7

        1.    Private Actors Cannot Be Held Liable Under A Compulsion Theory........7

        2.    Plaintiffs' Actual Allegations Fall Far Short Of Any Actual Compulsion .........................................8

        3.    Accepting Plaintiffs' State Action Theory Would Have Far-Reaching And Pernicious Consequences .............................12

    B.    Plaintiffs Fail To State A Contract-Based Claim ................................13

        1.    The Terms Of Service Allow YouTube To Remove Content In Its Discretion ..................................13

        2.    Plaintiffs Cannot State A Contract Claim Based On A Purported Lack Of Advance Notice Or Opportunity To Appeal ..............................15

        3.    The Implied Covenant Cannot Override The Express Terms Of The Agreement ..................................16

II.    SECTION 230 BARS PLAINTIFFS' CONTENT MODERATION CLAIMS ..............17

CONCLUSION ..................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abu-Jamal v. Nat'l Pub. Radio*,
    1997 U.S. Dist. LEXIS 13604 (D.D.C. Aug. 21, 1997)...................................................... 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................ 6

*Ass'n of Am. Physicians & Surgeons v. Schiff*,
    2021 U.S. Dist. LEXIS 19241 (D.D.C Feb. 2, 2021)...................................................... 11

*Barnes v. Yahoo, Inc.*,
    570 F.3d 1096 (9th Cir. 2009)............................................................................. 18, 19, 20

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ....................................................................................... 19

*Bennett v. Google, LLC*,
    882 F.3d 1163 (D.C. Cir. 2018) ..................................................................................... 19

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) .................................................................................................... 7, 8

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003)....................................................................................... 18

*Coffee v. Google, LLC*,
    2021 U.S. Dist. LEXIS 26750 (N.D. Cal. Feb. 10, 2021)............................................... 18

*Daniels v. Alphabet Inc.*,
    2021 U.S. Dist. LEXIS 64385 (N.D. Cal. Mar. 31, 2021) ......................................*passim*

*Domen v. Vimeo, Inc.*,
    2021 U.S. App. LEXIS 7101 (2d Cir. Mar. 11, 2021) ........................................ 2, 18, 19

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019)....................................................................................... 18

*Enigma Software Grp. USA, LLC v. Malwarebytes*,
    946 F.3d 1040 (9th Cir. 2019)....................................................................................... 18

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008)................................................................................. 18, 19

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
    666 F.3d 1216 (9th Cir. 2012)....................................................................................... 17

*Fayer v. Vaughn,*
    649 F.3d 1061 (9th Cir. 2011) ........................................................................... 6

*Fed. Agency of News LLC v. Facebook, Inc.,*
    395 F. Supp. 3d. 1295 (N.D. Cal. 2019) ........................................................ 20

*Fed. Agency of News LLC v. Facebook, Inc.,*
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) ......................................................... 20

*Fyk v. Facebook, Inc.,*
    808 F. App'x 597 (9th Cir. 2020) .................................................................... 20

*George v. Pacific-CSC Work Furlough,*
    91 F.3d 1227 (9th Cir. 1996) ............................................................................ 9

*Gonzalez v. Planned Parenthood of L.A.,*
    759 F.3d 1112 (9th Cir. 2014) .......................................................................... 6

*Heineke v. Santa Clara Univ.,*
    965 F.3d 1009 (9th Cir. 2020) .......................................................................... 9

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
    515 U.S. 557 (1995) ........................................................................................ 17

*INS v. Chadha,*
    462 U.S. 919 (1983) ........................................................................................ 11

*Johnson v. Knowles,*
    113 F.3d 1114 (9th Cir. 1997) .......................................................................... 9

*King v. Facebook, Inc.,*
    2019 U.S. Dist. LEXIS 151582 (N.D. Cal. Sept. 5, 2019) ............................. 20

*Klayman v. Zuckerberg,*
    753 F.3d 1354 (D.C. Cir. 2014) ...................................................................... 18

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) .......................................................................... 3

*La'Tiejira v. Facebook, Inc.,*
    272 F. Supp. 3d 981 (S.D. Tex. 2017) ........................................................... 17

*Lewis v. Google LLC,*
    461 F. Supp. 3d 938 (N.D. Cal. 2020) ............................................... 14, 16, 20

*Manhattan Cmty. Access Corp. v. Halleck,*
    139 S. Ct. 1921 (2019) ............................................................................... 7, 12

*Mezey v. Twitter, Inc.,*
    2018 U.S. Dist. LEXIS 121775 (S.D. Fla. Jul. 19, 2018) ............................... 20

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974) ................................................................................ 17

*Mishiyev v. Alphabet, Inc.*,
    444 F. Supp. 3d 1154 (N.D. Cal. 2020) ................................................ 14

*Murphy v. Twitter, Inc.*,
    60 Cal. App. 5th 12 (2021) .................................................................. 20

*Pasadena Live v. City of Pasadena*,
    114 Cal. App. 4th 1089 (2004) ............................................................ 16

*Prager University v. Google LLC*,
    951 F.3d 991 (9th Cir. 2020) ..................................................... 1, 7, 14

*Sepehry-Fard v. MB Fin. Servs.*,
    2014 U.S. Dist. LEXIS 71568 (N.D. Cal. May 23, 2014) ..................... 6

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
    144 F. Supp. 3d 1088 (N.D. Cal. 2015) ......................................... 19, 20

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
    100 Cal. App. 4th 44 (2002) ............................................................ 14, 16

*Sutton v. Providence St. Joseph Med, Ctr.*,
    192 F.3d 826 (9th Cir. 1999) ............................................................ 7, 8

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) ............................................................................ 17

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) .............................................................. 19

*Zhang v. Baidu.com, Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ................................................... 17

**STATUTES**

47 U.S.C. § 230(c) ..................................................................................... *passim*

47 U.S.C. § 230(e) ........................................................................................... 17

**RULES**

Fed. R. Civ. P. 12(b)(6) .......................................................................... 1, 6, 18

**MISCELLANEOUS**

H.R. Res. 1154 ........................................................................................... 7, 11

U.S. Const. amend. I. .................................................................................. *passim*

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on September 9, 2021, at 9 o'clock in the morning, before the Honorable Beth Labson Freeman of the United States District Court for the Northern District of California, Courtroom 3, Fifth Floor, 280 South 1st Street, San Jose, California, Defendants Google LLC ("Google") and YouTube, LLC ("YouTube") (collectively "Defendants") shall and hereby do move for an order dismissing with prejudice all claims advanced by Plaintiffs in their First Amended Complaint ("FAC"). The motion is based upon this Notice of Motion; the supporting Memorandum of Points and Authorities; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

**STATEMENT OF REQUESTED RELIEF**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and 47 U.S.C. § 230(c), Defendants request that the Court dismiss Plaintiffs' claims without leave to amend.

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether the First Amended Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim.

2.      Whether Plaintiffs' claims challenging YouTube's decision to remove Plaintiffs' channels are barred by Section 230(c) of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c) ("Section 230").

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs filed this lawsuit to challenge YouTube's decision to suspend YouTube channels espousing conspiracy theories (including those associated with "QAnon") that have been linked to real-world violence and that many consider objectionable and harmful. FAC ¶¶ 8, 12, 29-30, 42; Ex. F. Rather than see these actions for what they are—YouTube's efforts to enforce its policies against hate speech and harassment, and to remove from its platform content that could harm YouTube, its users, and others—Plaintiffs claim that YouTube violated the First Amendment and breached its Terms of Service. These claims must be dismissed.

Plaintiffs' First Amendment claim is foreclosed by an unbroken series of cases—including the Ninth Circuit's decision in *Prager University v. Google LLC*, 951 F.3d 991, 997-99 (9th Cir.

2020)—which makes clear that private online platforms making content-moderation decisions are not state actors. Plaintiffs try to sidestep that precedent by claiming that YouTube was somehow coerced into acting by two members of Congress who have expressed concern about the spread of online misinformation and by a non-binding House Resolution condemning QAnon. This argument fails as a matter of law: neither the public statements of individual members of Congress nor the House's symbolic Resolution (which said nothing about Plaintiffs or their content) can transform YouTube's private content-moderation decisions into state action that violates the First Amendment. Indeed, another court in this district recently rejected this exact theory of state action in another case brought by the same counsel who represents Plaintiffs here. *See Daniels v. Alphabet Inc.*, 2021 U.S. Dist. LEXIS 64385, at *13-20 (N.D. Cal. Mar. 31, 2021).

Beyond that, Plaintiffs' contract claims fail because the Amended Complaint does not identify any contractual provision that YouTube supposedly breached. To the contrary, and as *Daniels* recognized in dismissing nearly identical contract claims predicated on the same Terms of Service agreement, Plaintiffs' contract claims are barred by the plain terms of the agreement at issue, which makes explicit Defendants' broad right to remove potentially harmful content on YouTube in its discretion. Because YouTube's decision to suspend Plaintiffs' channels was authorized by the governing agreement, there can be no breach—whether of the contract itself or of the implied covenant. *See id.* at *21-28.

Finally, even if Plaintiffs had a possible claim under state law, it would be barred by Section 230 of the CDA. *Daniels* again is directly on point: Judge DeMarchi applied both Section 230(c)(1) and 230(c)(2)(A) to affirm the dismissal of nearly identical claims based on the removal of conspiracy-theory videos that YouTube determined violated its guidelines. *See id.* at *32-37. In another very recent case, the Second Circuit similarly held that Section 230(c)(2)(A) required dismissal of claims arising from another online video platform's termination of a user's account for posting content that violated the platform's speech rules. *Domen v. Vimeo, Inc.*, 2021 U.S. App. LEXIS 7101, at *3 (2d Cir. Mar. 11, 2021) (explaining that "the fundamental purpose of Section 230(c)(2) is to provide platforms . . . the discretion to identify and remove what they

1  consider objectionable content from their platforms without incurring liability for each decision").

2  So too here, Plaintiffs' claims should be dismissed without further leave to amend.

3  **FACTUAL AND PROCEDURAL BACKGROUND**

4       **A.**    **YouTube And Its Terms Of Service**

5       YouTube, a subsidiary of Google, is a popular online service for sharing videos and

6  related content. FAC ¶ 2. To create a YouTube channel and upload videos and other content, a

7  user must have a Google account. *See* Declaration of Lauren Gallo White in Support of

8  Defendants' Motion to Dismiss First Amended Complaint ("White Decl."), Ex. 1 at 4. Almost

9  anyone, even those without a YouTube channel or a Google account, can view content uploaded

10  to the YouTube service by others. *Id.*[1]

11       As a free video hosting service with billions of users and a vast array of content on nearly

12  every topic imaginable, YouTube offers a platform for people from diverse backgrounds, and

13  across the political spectrum, to share their perspectives and experiences. *See* FAC ¶¶ 2-3. But

14  YouTube's service is not a free-for-all. The use of YouTube is governed by rules and policies that

15  make clear that certain kinds of content are not allowed and that YouTube has discretion to

16  remove unwanted material from its service. FAC ¶ 4. More specifically, to create a channel and

17  post videos, in addition to having a Google account, Plaintiffs must agree to YouTube's Terms of

18  Service and the various policies that are incorporated by reference therein. *Id.*; *see also* White

19  Decl., Ex. 1 at 3. Most notably, the Terms of Service expressly incorporate, and users must agree

20  to abide by, YouTube's Community Guidelines, which establish detailed rules about the kinds of

21  _____

22     [1] In ruling on this motion, the Court may consider documents incorporated by reference in the

23  FAC. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). That includes YouTube's Terms of

24  Service (FAC ¶ 49; *see also, e.g. id.* ¶¶ 4, 6-8, 69, 191), YouTube's Community Guidelines and

25  related policies (*see, e.g.*, FAC ¶¶ 4-6 & n.1; Exs. A-B), the notice that YouTube sent to Plaintiffs

26  regarding their channel terminations (*see, e.g.*, FAC ¶¶ 8, 12), and YouTube's October 15, 2020

27  blog post concerning its hate and harassment policies (*see* FAC ¶ 5). For the Court's convenience,

28  each of these documents is attached to the White Declaration.

1   content and behavior that are not allowed on YouTube. *See* FAC ¶¶ 4-5 & n. 1; White Decl., Ex.

2   2. The Terms of Service also make clear to users that the Community Guidelines "may be

3   updated from time to time." White Decl., Ex. 1 at 3.

4       The Terms of Service state explicitly that "YouTube is under no obligation to host or

5   serve Content." FAC ¶ 4; White Decl., Ex. 1 at 4. They also make clear that YouTube has

6   considerable discretion to remove unwanted material from its service: "If we reasonably believe

7   that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or

8   third parties, we may remove or take down that Content in our discretion." White Decl., Ex. 1 at

9   6. While YouTube does not promise to provide notice through any specific channel or on any

10  specific time frame, the removal provision further states that "[w]e will notify you with the reason

11  for our action" unless we reasonably believe that certain conditions apply, such as where doing so

12  "would cause harm to any user, other third party, [or] YouTube." *Id.*

13      **B.      YouTube's Community Guidelines And Its Rules Against Harassment, Hate,**

14              **And Dangerous Conspiracies**

15      The Community Guidelines incorporated into YouTube's Terms identify various

16  categories of content that YouTube expressly does not permit. *See* White Decl., Ex. 2. Those

17  categories include harassment, hate speech, and "[h]armful or dangerous" content. *Id.*; *see also*

18  White Decl., Exs. 3, 4, 5. YouTube's harassment policy prohibits "[c]ontent that threatens

19  individuals" or that "targets an individual with prolonged or malicious insults based on intrinsic

20  attributes." White Decl., Ex. 3 at 1. As examples, the policy specifically bans "[c]ontent that

21  incites others to harass or threaten individuals on or off YouTube." *Id.* at 2.

22      Separately, YouTube's hate speech policy prohibits "content promoting violence or hatred

23  against individuals or groups," based on a variety of attributes. White Decl., Ex. 4 at 1. Among

24  other types of content that violates this policy, YouTube lists "[c]onspiracy theories saying

25  individuals or groups are evil, corrupt, or malicious" based on any of the specified attributes, and

26  content that "den[ies] that a well-documented, violent event took place." *Id.* at 2.

27      YouTube has been working for years to remove and limit the reach of conspiracy theories

28  and harmful misinformation via its platform. *See* FAC ¶¶ 5, 29; White Decl., Ex. 6 at 1. On

October 15, 2020, YouTube announced in a public blog post that it was "further expanding both our hate and harassment policies to prohibit content that targets an individual or group with conspiracy theories that have been used to justify real-world violence." FAC ¶ 5; White Decl., Ex. 6 at 2. YouTube named "QAnon" and "Pizzagate" as examples of such conspiracy theories that promote violence and hate in violation of its policies. *Id.* The blog post also explained that YouTube would "begin enforcing this updated policy today [October 15, 2020], and will ramp up in the weeks to come." *Id.* In connection with this announcement, YouTube updated its public-facing harassment policy by adding, as an additional example of violative content, videos "[t]argeting an individual and making claims they are involved in human trafficking in the context of a harmful conspiracy theory where the conspiracy is linked to direct threats or violent acts." FAC ¶ 5 n.1; White Decl., Ex. 3 at 2.

## C. Plaintiffs' Channels Ran Afoul Of YouTube's Policies

Plaintiffs claim to be "journalists, videographers, advocates, [and] commentators" who have collectively created 17 individual channels on YouTube. FAC ¶¶ 1, 12-28. They describe their channels as "conservative news" channels (FAC ¶ 8), but they avoid any actual description of the specific videos that Plaintiffs posted to them. The FAC does, however, indicate that Plaintiffs' channels generally contained content about "anonymous posts on political issues by someone identifying themselves as 'Q' and the persons who read and talk about those posts." FAC ¶ 8. And it acknowledges that some may consider their content "conspiracy theories" or otherwise "harmful" or "offensive." FAC ¶ 29. Plaintiffs do not deny that the videos they posted to their channels violated YouTube's Community Guidelines and content policies, and in fact, in their motion to proceed under pseudonyms, Plaintiffs expressly rely on the premise that the content in their YouTube channels may expose them to criminal liability. *See* Plaintiffs' Motion to Proceed Under Pseudonyms, Dkt. No. 4, at 3-4.

On October 15, 2020, YouTube suspended Plaintiffs' channels and removed all the content that was posted there. FAC ¶¶ 6, 12-28. YouTube took that action because it determined that each channel contained multiple and/or serious violations of the Community Guidelines. FAC ¶¶ 8, 12-28. In connection with these removal actions, YouTube notified Plaintiffs of what

had happened and the reasons for it, including by email: "We'd like to inform you that due to repeated or severe violations of our Community Guidelines (https://www.youtube.com/t/community_guidelines) your YouTube account . . . has been suspended." FAC ¶ 8; *see also* White Decl., Ex. 7. This notice explained that Plaintiffs' videos contained "targeted harassment," and invited the Plaintiffs to appeal the suspension, using a form that YouTube provides for such appeals. White Decl., Ex. 7.

### D.   Plaintiffs' Lawsuit And TRO Motion

Plaintiffs filed this lawsuit on October 26, 2020. Dkt. No. 1. The next day, Plaintiffs filed an application for a temporary restraining order, seeking to compel YouTube to restore their channels. *See* Dkt. No. 8. The Court heard argument on Plaintiffs' TRO application on November 2, 2020 (*see* Dkt. No. 26) and denied the application, ruling that Plaintiffs could not demonstrate a likelihood of success on their contract claims (*see* Order Denying Application for Temporary Restraining Order, Dkt. No. 27 ("Order")). Plaintiffs filed a First Amended Complaint on November 17, 2020. *See* Dkt. No. 30. Although Plaintiffs indicated that they planned to file a motion for preliminary injunction, they ultimately declined to do so.

## ARGUMENT

To survive a motion under Rule 12(b)(6), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, Plaintiffs must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (citation omitted). Nor should the Court accept allegations that contradict documents attached to the complaint or incorporated by reference, *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014), or that rest on "unwarranted deductions of fact[], or unreasonable inferences," *Sepehry-Fard v. MB Fin. Servs.*, 2014 U.S. Dist. LEXIS 71568, at *4 (N.D. Cal. May 23, 2014).

1    **I.**     **PLAINTIFFS FAIL TO STATE A VIABLE CAUSE OF ACTION**

2          **A.**     **Plaintiffs Fail To State A Claim Under The First Amendment**

3          Plaintiffs' core claim is that Defendants violated the First Amendment when YouTube

4 suspended their channels. This claim fails as a matter of law. "The Free Speech Clause does not

5 prohibit *private* abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct.

6 1921, 1928 (2019). A First Amendment violation requires state action, but there is none here.

7          In an attempt to concoct state action, Plaintiffs first suggest that YouTube is engaged in

8 some kind of "public function." FAC ¶ 307. But this allegation runs headlong into the Ninth

9 Circuit's decision in *Prager*, which expressly rejected the argument "that YouTube is a state actor

10 because it performs a public function." 951 F.3d at 997-99. As the Court of Appeals held, "the

11 state action doctrine precludes constitutional scrutiny of YouTube's content moderation pursuant

12 to its Terms of Service and Community Guidelines." *Id.* at 999.

13          Seeking to evade this clear precedent, Plaintiffs suggest that YouTube somehow became a

14 state actor because it was supposedly pressured into acting by the influence of two individual

15 members of Congress (Adam Schiff and Nancy Pelosi) and because of a non-binding House

16 Resolution (H.R. Res. 1154). While courts have used different names to describe the different

17 tests for finding state action, Plaintiffs seem to be relying on the so-called "governmental

18 compulsion" or "coercion" theory. FAC ¶¶ 30, 37, 43, 304, 307, 312; *accord Sutton v. Providence

19 St. Joseph Med, Ctr.*, 192 F.3d 826, 837 (9th Cir. 1999) (citing *Blum v. Yaretsky*, 457 U.S. 991,

20 1004-1005 (1982)). As Judge DeMarchi recently held in a case brought by the same counsel

21 advancing the same argument, this claim fails for multiple reasons.

22               1.    <u>Private Actors Cannot Be Held Liable Under A Compulsion Theory</u>

23          As a threshold matter, binding precedent precludes Plaintiffs' effort to use a government

24 compulsion theory to assert a claim against a private party. In *Sutton*, the Ninth Circuit explained

25 that the "compulsion analysis originated in cases in which the government itself, not a private

26 entity, was the defendant." 192 F.3d at 836 (discussing, among other cases, *Blum*, 457 U.S. at

27 1004-05, which rejected state action via compulsion in the decision of private nursing homes to

28 discharge patients pursuant to federal regulations). In that context, where the government is

pressuring a private party to take some action, the "compulsion alone provides a sufficient nexus so that it is fair to attribute a private entity's conduct to the government." *Id*. at 837-38. In such cases, "***the government cannot escape liability*** when it compels a result, even though the government does not actually engage in the unlawful act but, instead, pressures another to do so." *Id*. (emphasis added). But the responsibility does not run both ways. When a claim is brought against a private party, "a plaintiff must show 'something more' than state compulsion in order to hold a private defendant liable as a government actor." *Id.* at 838.

Following that rule, the court in *Sutton* rejected a First Amendment claim brought against a private party, even though its action—requiring the plaintiff to provide a social security number as a condition of employment—***was expressly compelled by federal law***: "the mere fact that the government compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant. Indeed, without some other nexus between the private entity and the government, we would expect that the private defendant is *not* responsible for the government's compulsion." *Id*. at 838. In short, "only the state actor, and not the private party, should be held liable for the constitutional violation that resulted from the state compulsion." *Id*. (citation omitted). As *Sutton* makes clear, therefore, insofar as Plaintiffs' theory is that government officials created an "environment of coercion and pressure" to compel YouTube to terminate Plaintiffs' YouTube channels (FAC ¶ 10), their only relief lies against those government officials. They cannot use the coercion theory to transform Google and YouTube into state actors, and then assert a First Amendment claim directly against them.

## 2. Plaintiffs' Actual Allegations Fall Far Short Of Any Actual Compulsion

While the Court need go no further to reject Plaintiffs' reliance on a compulsion theory, this claim also fails because Plaintiffs have not plausibly alleged any actual government compulsion or participation. The Supreme Court explained in *Blum* that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." 457 U.S. at 1004. And the Ninth Circuit has repeatedly made clear that state action can be found on this theory only when the government "commanded a particular result in,

1    or otherwise participated in, [the plaintiff's] *specific* case." *Heineke v. Santa Clara Univ.*, 965

2    F.3d 1009, 1014 (9th Cir. 2020) (emphasis added); *accord Johnson v. Knowles*, 113 F.3d 1114,

3    1120 (9th Cir. 1997) (no state action where "Plaintiffs cannot point to any state regulation or

4    custom having the force of law that compelled, coerced, or encouraged the Defendants to

5    discriminate *against the Plaintiffs*" (emphasis added)); *George v. Pacific-CSC Work Furlough*, 91

6    F.3d 1227, 1232 (9th Cir. 1996) (no state action where "[n]othing in [the plaintiff's] complaint

7    suggests that state law or custom forced [the defendant] to discharge *him*" (emphasis added)).

8         Applying this rule, Judge DeMarchi recently dismissed a nearly identical claim based on

9    the same theory that "Congressional representatives coerced defendants into taking action to

10   remove content from the YouTube platform that resulted in YouTube's removal of [plaintiff's]

11   videos from the YouTube service." *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *7. As the court

12   explained, plaintiff "does not plead any facts that support his argument that the federal

13   government 'coerced' or 'significantly encouraged' defendants to remove his specific . . . videos

14   from YouTube's platform. His speculative assertions about the possibility defendants will be

15   subpoenaed to testify before Congress or exposed to some other peril if they ignore letters from

16   Congressional representatives do not support a theory of government action." *Id.* at 18; *see also

17   id.* ("Mr. Daniels does not allege that the federal government directed a particular result with

18   respect to his . . . videos."). Plaintiffs' allegations suffer from the same problem.

19        **Individual Legislators' Correspondence and Statements**. Like the plaintiff in *Daniels*,

20   Plaintiffs point to correspondence and a handful of public statements from two individual

21   members of Congress (Adam Schiff and Nancy Pelosi) that they claim somehow "influence[d]"

22   YouTube. *See* FAC ¶¶ 31-34, 37; Exs. C-E; *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *7-11.

23   These statements generally discuss the issue of online misinformation (including medical

24   misinformation) and the content-moderation practices of YouTube and other online platforms.

25   But Plaintiffs admit that these statements had no actual legal force (FAC ¶ 37), and they did not

26   purport to direct or instruct YouTube to do anything, much less in regard to Plaintiffs. Indeed,

27   while Plaintiffs repeatedly characterize Mr. Schiff's letters and Tweet as "demands" (*e.g.*, FAC

28   ¶¶ 31, 37), it is clear that none of them actually demanded anything from YouTube—and

1  certainly not the suspension of any YouTube channels. *See* FAC, Exs. C-E. The same is true of

2  Ms. Pelosi's informal remarks. FAC ¶¶ 33-34.

3        As a matter of law, these statements from individual legislators cannot transform private

4  content-regulation into state action. *Daniels* is directly on point. The plaintiff there relied on the

5  exact same statements at issue here to claim that YouTube had engaged in state action. Judge

6  DeMarchi rejected that theory:

7        [Plaintiff] does not plead any facts suggesting that Speaker Pelosi or Rep. Schiff were

8        personally involved in or directed the removal of Daniels's videos. He alleges only

9        that they wanted certain kinds of videos removed and that his videos fell within that

10        category. . . . [S]uch allegations do not reflect the kind of governmental involvement

11        in the conduct of private entities like defendants that is sufficient to support a nexus

12        theory of government action.

13  *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *20. Likewise, in *Abu-Jamal v. Nat'l Pub. Radio*, 1997

14  U.S. Dist. LEXIS 13604, at *3, *17 (D.D.C. Aug. 21, 1997), the plaintiff challenged on First

15  Amendment grounds NPR's decision not to air his political commentaries. The plaintiff argued

16  that remarks from then-Senator Dole (among others) had pressured NPR to cancel the program,

17  rendering NPR's otherwise private decision as state action. *Id*. at *4-5. The court disagreed:

18  "Assuming that the [Fraternal Order of Police] and individual members of Congress did call NPR

19  in attempts to pressure it not to air the program, not one of these people has any legal control over

20  NPR's actions." *Id*. at *17.

21        The same is true here. Neither Mr. Schiff nor Ms. Pelosi has any legal control over

22  YouTube or its actions. Their public statements—which again made no reference to Plaintiffs or

23  their content—lacked any legal force. Calling such statements "veiled threat[s]" (FAC ¶ 32) does

24  not change that reality or transform YouTube's actions into those of the government. In fact, this

25  is an even easier case than *Abu-Jamal*. There, no state action was found even though Rep. Dole

26  had referred *specifically* to the plaintiff's broadcast and expressly urged NPR not to air it. Here, in

27  contrast, neither Mr. Schiff nor Ms. Pelosi said anything about Plaintiffs. *See Daniels*, 2021 U.S.

28  Dist. LEXIS 64385, at *16-17 (discussing *Abu-Jamal* and rejecting state action where plaintiff

"cannot plausibly allege that Speaker Pelosi and Rep. Schiff have legal control over defendants' actions, or that either of them ever contacted defendants about Mr. Daniels's . . . videos").

Another court recently dismissed a case against technology companies for taking action on medical misinformation supposedly prompted by Mr. Schiff. *Ass'n of Am. Physicians & Surgeons v. Schiff*, 2021 U.S. Dist. LEXIS 19241, at *3-6 (D.D.C Feb. 2, 2021). As the court explained, "[t]he open letters and public statements made by Congressman Schiff do not mention [plaintiffs], do not advocate for any specific actions, and do not contain any threatening language." *Id.* at *15. The requisite causal connection is similarly absent here. Plaintiffs have no plausible allegation that YouTube did what it did as the result of coercion from Mr. Schiff's same statements (or similar statements by Ms. Pelosi).

**House Resolution 1154**. Plaintiffs also rely heavily on a Resolution passed by the House of Representatives (*see* FAC ¶¶ 10, 41, 43; Ex. F (H.R. Res. 1154)), which expresses concern about QAnon and related conspiracy theories (*see* FAC, Ex. F). But this non-binding Resolution does not (and could not) compel any action; indeed, it has no force of law whatsoever. *See INS v. Chadha*, 462 U.S. 919, 949-59 (1983).

The form of the Resolution aside, the Resolution does not encourage, much less seek to compel, YouTube or other online platforms to remove content or terminate user accounts. And of course it says nothing whatsoever about these Plaintiffs, their content, or their YouTube channels. Nothing in this Resolution remotely commands a result in Plaintiffs' specific cases. To the contrary, the Resolution speaks in general language, and the only action it encourages is by "the Federal Bureau of Investigation," "Federal law and homeland security agencies," and "the intelligence community." FAC, Ex. F. The sole mention of online service providers is praise for actions they had already taken to remove dangerous conspiracy-theory content from their platforms, consistent with their existing policies (and before Plaintiffs' channels were suspended, *see* FAC ¶ 35, Exs. F, G). *See* FAC, Ex. F ("Facebook, Twitter, and Google have removed or blocked QAnon groups and content from their platforms for violating their policies against misinformation, bullying, hate speech, and harassment"). Nothing about this Resolution compelled Defendants to act or creates any basis for transforming them into state actors. *Accord*

1    *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *20 (general allegations that members of Congress

2    "wanted certain kinds of videos removed and that his videos fell within that category" do not

3    demonstrate a nexus between YouTube and the government.

4           3.      Accepting Plaintiffs' State Action Theory Would Have Far-Reaching And

5                   Pernicious Consequences

6           Beyond its conflicts with established law, Plaintiffs' state action theory would have

7    serious and far-reaching consequences. Plaintiffs effectively ask this Court to find that, if either

8    the House or the Senate expresses some popular sentiment, but actually binds no one, a business

9    could be charged as a state actor when it acts in a manner consistent with that sentiment.

10   Likewise, if any of the 535 members of Congress publicly stated a view about how a private

11   business should operate, that business would become a state actor merely by acting consistent

12   with that legislator's view. Under Plaintiffs' logic, by expressing a preference for online

13   platforms to more aggressively limit some form of objectionable content (whether pornography or

14   hate speech or extremist propaganda), legislators would constitutionally disable those platforms

15   from removing such material.

16          This case perfectly illustrates the problem. Plaintiffs posted videos rife with conspiracy

17   theories (*see* FAC ¶ 8), some of which have resulted in real-world violence (*see* FAC, Ex. F). Yet,

18   under Plaintiffs' theory, because the House of Representatives has expressed concern about the

19   spread of online misinformation, YouTube is legally required to continue hosting Plaintiffs'

20   videos, even if they violate YouTube's own rules for acceptable speech. This is not how the First

21   Amendment works. While the Free Speech Clause is a vital protection from actual government

22   censorship, it "does not disable private property owners and private lessees from exercising

23   editorial discretion over speech and speakers on their property" (*Halleck*, 139 S. Ct. at 1931)—

24   even when their judgments might be supported by elected officials. In short, Plaintiffs' approach

25   threatens to do just what the Supreme Court has warned against: "Expanding the state-action

26   doctrine beyond its traditional boundaries would expand governmental control while restricting

27   individual liberty and private enterprise." *Id*. at 1934.

28

1

**B.     Plaintiffs Fail To State A Contract-Based Claim**

2          Plaintiffs' remaining claims allege that YouTube's removal of their channels violated

3  YouTube's Terms of Service agreement (FAC ¶¶ 68-189 (breach of contract)) and the implied

4  covenant they say should be read into that agreement (¶¶ 190-301 (implied covenant)). These

5  contract claims are based on a hodgepodge of purported promises that Plaintiffs say YouTube

6  failed to honor: (1) refrain from terminating Plaintiffs' channels "without cause"; (2) notify

7  Plaintiffs of the reason for their channels' termination; (3) provide "advanced notice" of their

8  channels' termination "sufficient to allow [Plaintiffs] to download [their] content"; and

9  (4) provide an appeals process. FAC ¶¶ 71, 79, 87, 95, 104, 113, 122, 131, 140, 149, 158, 167,

10  176, 185; 194, 202, 210, 218, 226, 234, 242, 250, 258, 266, 274, 282, 290, 298. This Court has

11  already found that Plaintiffs do not have a reasonable chance of prevailing on these claims. Order

12  at 9. On top of that, Judge DeMarchi recently dismissed with prejudice Plaintiffs' counsel's prior

13  attempt to advance these same claims. For the same reasons, these claims fail as a matter of law.

14          1.     The Terms Of Service Allow YouTube To Remove Content In Its

15                 Discretion

16          Plaintiffs' central theory is that YouTube breached the Terms of Service by suspending

17  Plaintiffs' YouTube channels "without cause." *E.g.*, FAC ¶¶ 7, 71. The FAC invokes the

18  provision in the Terms of Service relating to "Account Suspension & Termination" as the basis

19  for this claim. FAC ¶ 4.b; *see also* White Decl., Ex. 1 at 6. But this provision relates to the

20  termination of *Google* accounts and suspension of access to the YouTube service. As this Court

21  has already recognized, that is not what Plaintiffs allege happened here: "the action Defendants

22  took was against Plaintiffs' YouTube accounts, not their Google accounts." Order at 8; White

23  Decl., Ex. 7. As such, the Account Suspension & Termination provision is simply irrelevant.

24          Instead, the conduct underlying Plaintiffs' claims—the suspension of Plaintiffs' YouTube

25  channels and removal of videos and other features associated with those channels (*e.g.*, FAC ¶¶ 6,

26  12-28)—is governed by the separate provisions of YouTube's Terms of Service related to

27  removal of content. *See* White Decl., Ex. 1 at 6; Order at 8. These provisions give YouTube broad

28  discretion to decide whether to host or remove user content. The agreement states expressly that

"YouTube is under no obligation to host or serve Content." White Decl., Ex. 1 at 4. Beyond that, a separate provision allows YouTube to remove Content "in our discretion," if YouTube "reasonably believe[s] that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties." White Decl., Ex. 1 at 6. Applying these same provisions in *Daniels* to dismiss virtually identical contract claims against YouTube for removing another user's content, Judge DeMarchi explained that "defendants were given the right to do what they did by the express provisions of the contract." 2021 U.S. Dist. LEXIS 64385, at *25 (citation omitted).

As *Daniels* explained, these provisions rule out any claim that YouTube's removal of Plaintiffs' channels or other content violated the agreement. *Id.*; *accord Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 56-57 (2002) (conduct expressly permitted by contract cannot support a claim for breach). Other courts have consistently rejected claims that YouTube breached its Terms of Service by removing user content, observing that YouTube's Terms give it "unilateral discretion to remove, restrict, demonetize or demote . . . content." *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 961 (N.D. Cal. 2020); *see also, e.g.*, *Prager*, 951 F.3d at 995 ("YouTube has reserved the right to remove or restrict content. YouTube may remove content that violates its Terms of Service, or restrict otherwise objectionable videos (even if they do not violate the Terms of Service)."); *Mishiyev v. Alphabet, Inc.*, 444 F. Supp. 3d 1154, 1159 (N.D. Cal. 2020), *appeal docketed*, No. 20-15657 (9th Cir. Apr. 14, 2020).

Plaintiffs appear to suggest that, because YouTube allegedly suspended Plaintiffs' channels prior to expressly including the QAnon conspiracy theory as a specific example of misconduct in its public-facing harassment policy, YouTube's Terms of Service were unilaterally amended and rendered invalid. *See* FAC ¶¶ 5 n.1, 9; *see also, e.g.*, FAC ¶ 195. But this Court has already explained why this is wrong—"that YouTube added a new example of violative conduct to its harassment and cyberbullying policy does not change the calculus here." Order at 8. It is undisputed that, at the time of the takedowns, YouTube's harassment policy prohibited "[c]ontent that threatens individuals." FAC, Ex. A.

Even apart from that specific policy, YouTube has always had the right to remove content that it reasonably believes would cause harm to YouTube, its users, or third parties. White Decl., Ex. 1 at 6. Whether YouTube had expressly identified the QAnon conspiracy theory in its public-facing content guidelines as an example of such content is irrelevant to whether YouTube's removal decisions were authorized by the Terms of Service. *See Daniels*, 2021 U.S. Dist. LEXIS 64385, at *25 ("The express terms of the alleged contract contradict [plaintiff's] claim that the Terms of Service permit YouTube to remove content only in the event that content violates the Community Guidelines."). Indeed, Plaintiffs allege that YouTube removed their content supposedly out of fear that YouTube might be compelled to testify at hearings or face injurious legislation or new lawsuits. *See* FAC ¶¶ 10, 33, 38. While none of that creates state action, these allegations, if credited, would only confirm that YouTube's actions fell squarely within the discretion expressly conferred by the Terms of Service. On Plaintiffs' own story, that is, YouTube acted under a reasonable belief that Plaintiffs' videos, unless removed, "may cause harm to YouTube." White Decl., Ex. 1 at 6. On that ground as well, YouTube's actions were expressly authorized.

> 2. Plaintiffs Cannot State A Contract Claim Based On A Purported Lack Of Advance Notice Or Opportunity To Appeal

Beyond their primary claim (based on the removal of their channels), Plaintiffs also seek to premise their contract claim on YouTube's supposed failure to provide sufficiently specific advanced notice of those removals or an opportunity to appeal those decisions. None of these allegations states a claim for breach.

As to notice, the Terms of Service indicate only that, where YouTube removes content, "[w]e will notify you with the reason for our action" unless certain circumstances are present. White Decl., Ex. 1 at 6. As Judge DeMarchi explained in rejecting the plaintiff's similar argument in *Daniels*, "[t]his statement is not an unqualified promise to notify [the plaintiff] when [content] is flagged or removed. Rather, YouTube expressly reserves the option to not provide notification of the reason for removal of [content] based on its reasonable belief that certain circumstances apply." *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *23. And in any event, this Court has already

1    recognized (Order at 9) that YouTube *did* notify Plaintiffs both that their channels were

2    suspended and of the reason why their content was removed. *See* White Decl., Ex. 7; *see also*

3    FAC ¶¶ 6, 8, 12-28 (each of Plaintiffs' channels taken down for violation of Community

4    Guidelines). Accordingly, there can be no claim for breach based on some alleged lack of notice.

5          As for allegations about a lack of *advance* notice (FAC ¶¶ 6, 71), that simply is not

6    required by the agreement. Once more, Plaintiffs point to inapplicable provisions (those covering

7    situations where YouTube terminates user access to the platform "for Service changes"). *See*

8    FAC ¶¶ 4.c, 6. This was not a service change; as this Court has recognized, it was a content

9    removal decision. Order at 8. And the provisions of the Terms of Service authorizing removals by

10   YouTube do not make any promise about advance notice or an opportunity to download content.

11   Plaintiffs' allegation that YouTube failed to "provide the appeals process it promised" (FAC ¶ 71)

12   is similarly ungrounded in the agreement and unsupported by the FAC's factual allegations. With

13   respect to decisions to remove content, all the Terms of Service say is that "You can learn more

14   about reporting and enforcement, including how to appeal on the Troubleshooting page of our

15   Help Center." White Decl., Ex. 1 at 6. As Judge DeMarchi made clear in *Daniels*, "[t]his

16   statement does not guarantee an appeals process in any particular form." 2021 U.S. Dist. LEXIS

17   64385, at *24. And even imagining that this is some actual promise of an appeal, this Court has

18   already recognized that YouTube *did* provide Plaintiffs the opportunity to appeal. Order at 9;

19   White Decl., Ex. 7 ("If you would like to appeal the suspension [of your YouTube channel],

20   please submit this form.").

21              3.    The Implied Covenant Cannot Override The Express Terms Of The
                      Agreement

23          Finally, Plaintiffs' invocation of the implied covenant (FAC ¶¶ 190-301) fails for an

24   additional reason. The implied covenant "is limited to assuring compliance with the *express terms*

25   of the contract, and cannot be extended to create obligations not contemplated by the contract."

26   *Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094 (2004); *Storek*, 100 Cal. App.

27   4th at 56-57. Here, however, as "in most cases," Plaintiffs' implied covenant claim "add[s]

28   nothing to [their] claim for breach of contract." *Lewis*, 461 F. Supp. 3d at 961. Insofar as

1  Plaintiffs seek to impose limits "beyond those to which the parties actually agreed, the [implied

2  covenant] claim is invalid. To the extent the implied covenant claim seeks simply to invoke terms

3  to which the parties *did* agree, it is superfluous." *Id*. Either way, the claim should be dismissed.

4  *See Daniels*, 2021 U.S. Dist. LEXIS 64385, at *28 (dismissing implied covenant claim "based on

5  precisely the same allegations as [the plaintiff's] purported breach of contract claim").

6       That is especially so given the context in which Plaintiffs seek to invoke an implied

7  covenant. The provisions of the Terms of Service agreement governing content removal embody

8  a contractual manifestation of YouTube's right to exercise "editorial control and judgment" over

9  speech on its platform—a right squarely protected by the First Amendment. *Miami Herald Pub.*

10  *Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *accord Hurley v. Irish-Am. Gay, Lesbian & Bisexual*

11  *Grp.*, 515 U.S. 557, 569-70 (1995) (First Amendment protects parade organizer's choice of what

12  messages to include in a parade); *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 636, (1994) (First

13  Amendment applies to cable operator's "editorial discretion over which stations or programs to

14  include in its repertoire"); *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 439-41 (S.D.N.Y. 2014)

15  (search engine protected by First Amendment for excluding search results on topics it considered

16  politically sensitive); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991-92 (S.D. Tex. 2017)

17  (recognizing "Facebook's First Amendment right to decide what to publish and what not to

18  publish on its platform"). In short, extending the implied covenant as Plaintiffs propose would

19  impermissibly limit YouTube's constitutional and contractual right to make such decisions. Basic

20  principles of constitutional avoidance preclude such an unprecedented and unwarranted

21  application of state law. *Cf. Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,

22  666 F.3d 1216, 1222-23 (9th Cir. 2012) (rejecting interpretation of a California statute that would

23  place it at odds with the U.S. Constitution under the "canon of constitutional avoidance").

24  **II.      SECTION 230 BARS PLAINTIFFS' CONTENT MODERATION CLAIMS**

25       While the Court need go no further, even if Plaintiffs had stated a viable claim, YouTube

26  would be protected from liability by Section 230. The statute bars claims against online platforms

27  seeking to hold them liable for publishing decisions with respect to content on their services. *See*

28  47 U.S.C. §§ 230(c), (e)(3). Section 230 "is designed at once 'to promote the free exchange of

1    information and ideas over the Internet and to encourage voluntary monitoring for offensive or

2    obscene material.'" *Barnes v. Yahoo, Inc.*, 570 F.3d 1096, 1099-1100 (9th Cir. 2009) (quoting

3    *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003)). The immunity is

4    intended to "protect websites not merely from ultimate liability, but from having to fight costly

5    and protracted legal battles." *Fair Hous. Council of San Fernando Valley v. Roommates.com,*

6    *LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008). Courts thus routinely dismiss claims where, as here,

7    the defendant's entitlement to Section 230 immunity "is evident from the face of the complaint."

8    *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014)); *accord Dyroff v. Ultimate*

9    *Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019); *Domen*, 2021 U.S. App. LEXIS 7101,

10   at *16; *Coffee v. Google, LLC*, 2021 U.S. Dist. LEXIS 26750, at *24 (N.D. Cal. Feb. 10, 2021)

11   (Freeman, J.). Two separate provisions of Section 230 apply here.

12       *First*, Section 230(c)(2) expressly immunizes interactive service providers for "any action

13   voluntarily taken in good faith to restrict access to or availability of material that the provider or

14   user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise

15   objectionable, whether or not such material is constitutionally protected." 47 U.S.C.

16   § 230(c)(2)(A). This "provision establishes a subjective standard whereby internet users and

17   software providers decide what online material is objectionable." *Enigma Software Grp. USA,*

18   *LLC v. Malwarebytes*, 946 F.3d 1040, 1044 (9th Cir. 2019).

19       Both *Daniels* and the Second Circuit's recent decision in *Domen*, 2021 U.S. App. LEXIS

20   7101, are directly on point. The plaintiffs in *Domen* asserted claims against an online video-

21   hosting platform (Vimeo) after their videos were removed and their account deleted. *Id.* at *4-7.

22   The Second Circuit found that Section 230(c)(2) unequivocally barred those claims. The court

23   explained that the statute "explicitly provides protection for restricting access to content that

24   providers '***consider***[] . . . objectionable,' even if the material would otherwise be constitutionally

25   protected, granting significant subjective discretion." *Id.* at *12 (emphasis in original). And the

26   court rejected the plaintiffs' allegations that Vimeo acted in bad faith as "too conclusory to

27   survive a motion to dismiss under Rule 12(b)(6)." *Id.* at *3, *13. Similarly, in *Daniels*, Judge

28   DeMarchi held that Section 230(c)(2) required dismissal of various state-law claims premised on

1   the removal of the plaintiff's videos. *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *35-37. The court

2   explained that the "complaint contains no plausible factual allegations suggesting that YouTube

3   did not consider the content of the [plaintiff's] videos objectionable and/or contrary to its stated

4   policies and guidelines, or that it removed, restricted access to, or demonetized the videos in bad

5   faith." *Id.* at *36.

6   　　　　The same result is warranted here. Plaintiffs acknowledge that their videos espouse fringe

7   political conspiracies linked to real-world violence (*see* FAC ¶ 8; *see also* FAC ¶ 5 & n.1) and

8   that have been widely condemned as harmful and dangerous (*see, e.g.*, FAC ¶¶ 8, 10, 29, 35, 41;

9   Ex. F). There are no plausible allegations that YouTube did not subjectively believe that such

10  content was objectionable or in violation of its Community Guidelines. FAC ¶¶ 4.d, 5-6, 8, 12-28;

11  *see also* White Decl., Exs. 3, 4, 5. Plaintiffs' effort to assert claims against YouTube for

12  restricting access to such material "run[s] headfirst into the CDA's immunity provision, which

13  'allows computer service providers to establish standards of decency without risking liability for

14  doing so.'" *Domen*, 2021 U.S. App. LEXIS 7101, at *15 (quoting *Bennett v. Google, LLC*, 882

15  F.3d 1163, 1168 (D.C. Cir. 2018)). As in *Domen* and *Daniels*, token allegations of bad faith

16  cannot overcome this protection.

17  　　　　*Second*, Section 230(c)(1) provides a further reason why Plaintiffs' claims cannot proceed.

18  That provision bars lawsuits "seeking to hold a service provider liable for its exercise of a

19  publisher's traditional editorial functions—such as deciding whether to publish, withdraw,

20  postpone or alter content." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *accord*

21  *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003). As the Ninth Circuit has explained,

22  "publication involves reviewing, editing, and deciding whether to publish or to withdraw from

23  publication third-party content." *Barnes*, 570 F.3d at 1102. It follows that "any activity that can

24  be boiled down to deciding whether to exclude material that third parties seek to post online is

25  perforce immune under section 230." *Id.* (quoting *Roommates*, 521 F.3d at 1170-71). Applying

26  that rule, courts routinely hold that Section 230(c)(1) provides immunity for exactly the kinds of

27  claims at issue here: attacks on a service provider's "decision to block access to—or, in other

28  words, to refuse to publish"—user content, including user-uploaded videos. *Sikhs for Justice*

1   *"SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1094-95 (N.D. Cal. 2015) (blocking of

2   plaintiff's page), *aff'd*, 697 F. App'x 526 (9th Cir. 2017); *see also*, *e.g.*, *Fyk v. Facebook, Inc.*,

3   808 F. App'x 597, 597-98 (9th Cir. 2020) (depublication of user's pages); *Lewis*, 461 F. Supp. 3d

4   at 952-55 (demonetizing, restricting, and removing user's videos); *King v. Facebook, Inc.*, 2019

5   U.S. Dist. LEXIS 151582, at *8-10 (N.D. Cal. Sept. 5, 2019), *appeal docketed*, No. 20-15188

6   (9th Cir. Feb. 11, 2020) ("removing [plaintiff's] posts, blocking his content, or suspending his

7   accounts"); *Mezey v. Twitter, Inc.*, 2018 U.S. Dist. LEXIS 121775, at *3 (S.D. Fla. Jul. 19, 2018)

8   (suspension of Twitter account); *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *33 ("removal of or

9   restriction of access to [the plaintiff's] videos from [YouTube's] platform").

10         To be sure, the Ninth Circuit has recognized a narrow exception to Section 230(c)(1) for a

11   discrete class of promise-based claims. *See Barnes*, 570 F.3d at 1109. But *Barnes* involved a very

12   different situation: a specific promise made personally to the plaintiff by Yahoo's director of

13   communications that the particular content at issue would be removed. As the California Court of

14   Appeal recently explained, "*Barnes* never suggested . . . that *all* contract or promissory estoppel

15   claims survive CDA immunity." *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 29 (2021). *Murphy*

16   is directly on point. It addressed a contract claim that accused an online service (Twitter) "of

17   unfairly applying its general rules regarding what content it will publish." *Id.* On these facts, the

18   Court of Appeal held that *Barnes* did not apply and that Section 230(c)(1) barred the plaintiff's

19   breach of contract and promissory estoppel claims because "Twitter's alleged actions in refusing

20   to publish and banning Murphy's Tweets . . . 'reflect paradigmatic editorial decisions not to

21   publish particular content.'" *Id.* at 26. Plaintiffs' contract claims here are just like those in

22   *Murphy* (*see, e.g.*, FAC ¶ 194), and Section 230(c)(1) covers them for the same reason. *See also*,

23   *e.g.*, *Daniels*, 2021 U.S. Dist. LEXIS 64385, at *33-35 (applying Section 230(c)(1) to implied

24   covenant claim); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1120 (N.D.

25   Cal. 2020) (same); *Fed. Agency of News LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295, 1308

26   (N.D. Cal. 2019) (same).

27

28

1

## CONCLUSION

2          For these reasons, Plaintiffs' Amended Complaint should be dismissed. Because it is clear

3  that no amendment could cure the multiple, independently dispositive defects in Plaintiffs'

4  claims, dismissal should be without leave to amend their complaint further.

5  Dated:  April 7, 2021                              WILSON SONSINI GOODRICH & ROSATI
                                                       Professional Corporation
6

7                                                      By:    /s/ Lauren Gallo White
                                                              Lauren Gallo White
8                                                             lwhite@wsgr.com

9                                                      Attorneys for Defendants
                                                       GOOGLE LLC and YOUTUBE, LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28