1

2

3

4

5

6

7

8

9

**ARMENTA & SOL, PC**
M. Cris Armenta (SBN 177403)
Credence E. Sol (SBN 219784)
11440 West Bernardo Court, Suite 300
San Diego, CA 92127
Telephone: (858) 753-1724
Facsimile: (310) 695-2560
cris@crisarmenta.com
credence@crisarmenta.com

Attorneys for Plaintiffs
JOHN DOE, MICHAEL DOE, JAMES DOE,
HENRY DOE, ROBERT DOE, CHRISTOPHER
DOE, MATTHEW DOE, POLLY ST. GEORGE,
SCOTT DEGROAT, MISHEL McCUMBER,
DANIEL LEE, JEFF PEDERSEN, JORDAN
SATHER, and SARAH WESTALL

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, an individual; MICHAEL DOE, an individual; JAMES DOE, an individual; HENRY DOE, an individual; ROBERT DOE, an individual; CHRISTOPHER DOE, an individual; MATTHEW DOE, an individual; POLLY ST. GEORGE, an individual; SCOTT DEGROAT, an individual; MISHEL McCUMBER, an individual; DANIEL LEE, an individual; JEFF PEDERSEN, an individual; JORDAN SATHER, an individual; SARAH WESTALL, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> GOOGLE, LLC., a Delaware limited liability company; YOUTUBE LLC, a Delaware limited liability company; DOES 1 through 10, inclusive. <br><br> Defendants. | Case No. 5:20-CV-07502-BLF <br><br> **OPPOSITION OF PLAINTIFFS TO MOTION TO DISMISS FILED BY DEFENDANTS** <br><br> Before:      Hon. Beth Labson Freeman <br> Courtroom:   3 <br> Hearing Date:  September 9, 2021 <br> Time:        9:00 a.m. |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. i

I.      PRELIMINARY STATEMENT ........................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................ 1

        A.      A Brief Overview of YouTube and Its Terms of Service ........................ 1

        B.      A Brief Overview of Plaintiffs and the Reach of Their Channels ........... 3

        C.      Representative Schiff's 2020 Demands .................................................... 3

        D.      Speaker Pelosi's Threat to Punish Big Tech ............................................ 4

        E.      Introduction of House Resolution 1154 .................................................... 5

        F.      The Senate Orders Google CEO to Testify on the Hill About Censorship ............. 5

        G.      On October 15, 2020, YouTube Instigated a Mass Purge of Conservative
                Accounts Based on its "Hate and Harassment" Policies in a Manner That
                Violated the TOS ...................................................................................... 6

        H.      YouTube's Claim that Content Creators Who Comment on "QAnon" are
                Linked to Real-World Violence is Unsupported by Any Admissible
                Evidence ................................................................................................... 6

III.    LEGAL STANDARD ........................................................................................... 7

IV.     ARGUMENT ....................................................................................................... 7

        A.      Plaintiffs' First Amendment Claim is Appropriately Pleaded .................. 7

                1.      Plaintiffs Have Appropriately Pleaded that YouTube Can be Held
                        Liable Under a Compulsion Theory ............................................. 8

                2.      Plaintiffs Have Appropriately Pleaded that YouTube was Substantially
                        Encouraged or Compelled to Censor Them ................................. 10

                3.      Holding YouTube Accountable for Partnering Up in Congress's
                        Censorship Scheme Will Not Create a Slippery Slope ............... 15

        B.      Plaintiffs' Contract Claim is Appropriately Pleaded ............................. 16

**TABLE OF CONTENTS**

1.    YouTube's Discretion is Not Unlimited, and It is Up to the Court to
Make the Factual Decision of Whether YouTube Exercised its
Discretion Reasonably ...................................................................17

2.    YouTube's Failure to Notify of Provide an Opportunity for a
Meaningful Appeal Did Breach the TOS...................................................19

3.    Plaintiffs Have Alleged a Proper Claim for the Breach of California's
Implied Covenant of Fair Dealing Found in Every Contract....................21

C.    Section 230 of the CDA Does Not Bar this Lawsuit .............................................22

V.    CONCLUSION.................................................................................................................25

**TABLE OF CONTENTS**

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Abu-Jamal v. National Public Radio,
    1997 WL 527349 (D. D.C. Aug. 21, 1997) ...................................................................... 13

Association of American Physicians and Surgeons v. Schiff,
    2021 WL 354174 (D. D.C. Feb. 2, 2021) .................................................................. 13, 14

Baker v. Cuomo,
    58 F.3d 814 (2d Cir.), cert denied sub nom., Pataki v. Baker, 516 U.S. 980 (1995),
    vacated in part on other grounds, 85 F.3d 919 (2d Cir. 1996) (en banc) ........................... 9

Blum v. Yaretsky,
    457 U.S. 991 (1982) ...................................................................... 8, 10, 11, 12

Broam v. Bogan,
    320 F.3d 1023 (9th Cir. 2003) ........................................................................ 7

Brunette v. Humane Soc'y of Ventura Cty.,
    294 F.3d 1205 (9th Cir. 2002) ...................................................................... 12

Collins v. Womancare,
    878 V.2d 1145 (9th Cir. 1989) .................................................................. 11, 12

Daniels v. Alphabet, Inc.,
    2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) .......................................................... 9, 10

Domen v. Vimeo, Inc.,
    433 F.Supp.3d 592 (S.D.N.Y. 2020) .................................................................. 23

Eastland v. United States,
    421 U.S. 491 (1975) .................................................................................... 12

Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.,
    764 F.2d 619 (9th Cir. 1985) ........................................................................ 10

Enigma Software Group USA, LLC v. Malwarebytes,
    946 F.3d 1040 (9th Cir. 2019) ...................................................................... 23

George v. Pacific-CSC Work Furlough,

    91 F.3d 1227 (9th Cir. 1996) ........................................................................... 11

Heineke v. Santa Clara University,

    953 F.3d 1009 (9th Cir. 2020) ................................................................... 11, 12

I.N.S. v. Chadha,

    462 U.S. 919 (1983) ........................................................................................ 14

Jackson v. Metropolitan Edison Co.,

    419 U.S. 345 (1974) ........................................................................................ 11

Lewis v. Google, LLC,

    461 F.Supp.3d 938 (N.D. Cal. 2020) ............................................................ 17, 21

Lugar v. Edmonson Oil Co.,

    457 U.S. 922 (1982) ........................................................................................ 11

Manhattan Cmty. Access Corp. v. Halleck,

    139 S.Ct. 1921 (2019) ................................................................................... 8, 15

McGary v. City of Portland,

    386 F.3d 1259 (9th Cir. 2004) ......................................................................... 9, 10

Mishiyev v. Alphabet, Inc.,

    444 F.Supp.3d 1154 (N.D. Cal. 2020) ............................................................ 17

OSU Student Alliance v. Ray.,

    699 F.3d 1052 (9th Cir. 2012) ........................................................................... 7

Parks Sch. of Bus. Inc. v. Symington.,

    51 F.3d 1480 (9th Cir. 1995) ............................................................................. 7

Prager University v. Google, LLC.,

    951 F.3d 991 (9th Cir. 2020) .......................................................................... 8, 18

Schulken v. Washington Mut. Bank, Henderson NV.,

    2011 WL 4804063 (N.D. Cal. Oct. 11, 2011) .................................................... 18

Sutton v. Providence St. Joseph Medical Ctr.,

    192 F.3d 826 (9th Cir. 1999) ........................................................................... 10

         Case No. 20-cv-7502-BLF

**TABLE OF AUTHORITIES**

Texas v. Johnson,

    491 U.S. 397 (1989) ................................................................. 25

Trudeau v. Google LLC,

    349 F.Supp.3d 869 (N.D. Cal. 2018) ......................................... 22

Trump v. Mazars USA, LLP,

    140 S.Ct. 2019 (2020) ............................................................... 12

United States v. Biaggi,

    853 F.2d 89 (2d Cir. 1988) .................................................. 12, 13

United States v. Price,

    383 U.S. 787 (1966) ................................................................. 11

Williams v. Albertsons Cos.,

    822 Fed. Appx. 579 (9th Cir. 2020) .......................................... 12

Zango Inc. v. Kaspersky Lab, Inc.,

    568 F.3d 1169 (9th Cir. 2009) ................................................. 23


**STATE CASES**

Pasadena Live v. City of Pasadena,

    114 Cal.App.4th 1089 (2004) ................................................... 21

Peng v. First Republic Bank,

    219 Cal.App.4th 1462 (2013) ................................................... 21

Storek & Storek, Inc. v. Citicorp Real Estate, Inc.,

    100 Cal.App.4th 44 (2002) ....................................................... 18


**FEDERAL CONSTITUTION**

U.S. Const., amend. 1 ................................................ 3, 7, 8, 11, 12, 14, 15, 24, 25

U.S. Const., art..3 ................................................................. 13

**TABLE OF AUTHORITIES**

**FEDERAL LEGISLATION**

House Resolution 1154 ............................................................................ 5, 10, 14, 15, 21

**FEDERAL STATUTES**

47 U.S.C. § 230 ...................................................................... 1, 4, 8, 13, 23, 24

**RULES OF COURT**

Fed. R. Civ. Proc. 12 ................................................................................. 7, 9

**BOOKS**

C. Wright & A. Miller, 5 FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1359 (1969) ................. 10

## I.     **PRELIMINARY STATEMENT**

This case addresses two questions of hornbook law:  Can a party to a contract retroactively amend that contract to frustrate its purpose?  And can non-violent—but controversial—political speech be censored to appease certain government officials who threatened to remove Section 230 immunity from Big Tech if they did not "act responsibly?"  As this Court is aware, that is exactly what happened to Plaintiffs, conservative content creators who were unceremoniously "deplatformed" by Defendants Google and YouTube shortly after the House of Representatives passed a resolution urging Big Tech to suppress the speech of Internet users who discuss QAnon.  Google and YouTube argue that QAnon-related speech is wrong, bad, and dangerous.  That factual conclusion—that QAnon-related speech leads to violence—has been disputed even by the chief of the FBI, who testified before Congress not only that the FBI has not "seen lethal attacks including that kind of motivation," but unequivocally stated that QAnon "ideology" is not a subject of government investigation.

Defendants' decision to take a blunderbuss to Congressionally disfavored speech reflects an alarming trend in favor of censorship and in opposition to the foundational freedoms of our republic.  In this lawsuit, Plaintiffs ask the Court to hold YouTube to its contractual promise to Plaintiffs to provide a platform for their non-violent political speech regardless of Congressional coercion. YouTube moves to dismiss and seeks to use the Motion to litigate the merits of the case, ignoring the impact of the Ninth Circuit's decision in <u>Enigma Software v. Malwarebytes</u>, which dramatically changed the previously boundless immunities afforded to them.

## II.     **FACTUAL BACKGROUND**

### A.     <u>A Brief Overview of YouTube and Its Terms of Service</u>

YouTube partners with content creators, who create channels and publish news content and political commentary. To create a channel and post videos, Plaintiffs and YouTube agree that their relationship will be governed by YouTube's published TOS and Community Guidelines. (FAC ¶ 4.)  The TOS provide that "YouTube is under no obligation to host or serve Content." (FAC ¶ 4.)  However, once YouTube actually hosts content, YouTube and the creator agree to be bound by the TOS.  (FAC ¶ 4.)  The relevant ground rules are as follows:

**OPPOSITION TO MOTION TO DISMISS**

- *YouTube May Terminate/Suspend an Account **for Cause***:  According to the TOS, "YouTube may suspend or terminate your access, your Google account, or your Google account's access to all or part of the Service if (a) you materially or repeatedly breach this Agreement; … or (c) we believe there has been conduct that creates (or could create) liability or harm to any user, other third party, YouTube or our Affiliates."  (FAC ¶ 4(b).)

- *YouTube Must Provide Notice of Terminations/Suspensions*:  "We will notify you with the reason for termination or suspension by YouTube unless we reasonably believe that to do so:  (a) would violate the law or the direction of a legal enforcement authority, or would otherwise risk legal liability for YouTube or our Affiliates; (b) would compromise an investigation or the integrity or operation of the Service; or (c) would cause harm to any user, other third party, YouTube or our Affiliates. Where YouTube is terminating your access for Service changes, where reasonably possible, you will be provided with sufficient time to export your Content from the Service."  (FAC ¶ 4(c).)

- *In Removing Content, You Tube Must Act Reasonably.*  The TOS severely limits *YouTube*'s power to remove content.

> If we reasonably believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties, we may remove or take down that Content in our discretion.

- *The TOS Incorporate Community Guidelines*:  YouTube's Community Guidelines include policies against harassment and cyberbullying, prohibiting content that "encourages dangerous or illegal activities that risk serious physical harm or death."  (FAC ¶ 4(d).) YouTube has provided a list of examples of what types of content constitute "harassment and cyberbullying" for the purposes of its Community Guidelines and TOS, including, *inter alia*, instructions to kill or harm and promoting or glorifying violent events.  (Id.)

On October 15, 2020, YouTube announced that it would target "conspiracy theory content used to justify real-world violence."  (FAC ¶ 5.)  Notably, however, YouTube *did not actually amend* its TOC prior to censoring the Plaintiffs, whose story is told below.  (FAC ¶ 5.) So, they removed the content without a contractual basis to do so.

**OPPOSITION TO MOTION TO DISMISS**

B.     A Brief Overview of Plaintiffs and the Reach of Their Channels:

The Plaintiffs are journalists, commentators, and other individuals who exercise their right to free speech under the First Amendment of the Constitution.  (First Amended Complaint ("FAC") ¶ 1.)  Plaintiffs created numerous news channels and published them on YouTube.  (FAC ¶ 1.)  On October 15, 2020, Plaintiffs' reach was so widespread that they collectively had more than *4.5 million subscribers to their channels and had attracted more than 800 million views.* (FAC. ¶ 1.)  Taken together, these subscriber counts far exceed the individual viewership of the YouTube accounts maintained by legacy cable, journalism, and news networks such as C-SPAN (806K subscribers), *The New York Times* (3.21M subscribers), Fox News (6.52M subscribers), MSNBC (3.62M subscribers), NBC News (4.1M), and CBS News (3.06M subscribers).  (FAC. ¶ 1.)  Although millions of Americans get news, information and commentary on issues of national importance from Plaintiffs' channels, YouTube unceremoniously terminated them just 19 days before the 2020 presidential election.  (FAC ¶ 1.)

C.     Representative Schiff's 2020 Demands

Plaintiffs' excision from YouTube did not, of course, occur in a vacuum:  in recent years, there has been an unrelenting drumbeat in favor of censorship at the highest levels of government. Plaintiffs were hit by a wave of censorship beginning in early 2019, when Representative Adam Schiff sent a letter to Google CEO Sundar Pichai demanding that Google/YouTube censor unpopular views about health issues and concluded that what he deemed "conspiracy theories" violated Community Guidelines.  (FAX ¶ 31, Ex. C.).  He sent a similar letter to Mr. Pichai and YouTube CEO Susan Wojcicki on April 29, 2020.  (FAC ¶ 31 and Exs. C, D.)  The letters were published on official letterhead and signed by "Adam B. Schiff, Member of Congress" in his official capacity and as the Chairman of the Permanent Select Committee on Intelligence and an *ex officio* member of the Committee on Appropriations. (FAC ¶ 31 and Exs. C, D.)

Schiff's 2020 Letter was also published on his official Twitter account, @RepAdamSchiff, which has more than 2.3 million followers.  (FAC ¶ 31.)  Ms. Wojcicki almost immediately retweeted Rep. Schiff's post on her Twitter account, see https://twitter.com/SusanWojcicki/status/1256304911446208512.  (FAC ¶ 31.)  Responding

OPPOSITION TO MOTION TO DISMISS

1  directly to Rep. Schiff, Ms. Wojcicki publicly acknowledged her company's "partnership" with

2  him and other government actors or Congress itself: "Thanks for reaching out. @YouTube, we're

3  working every day to protect people from misinformation and help them find authoritative

4  information. **We appreciate your partnership** and will continue to consult with and ask the

5  advice of Members of Congress as we address the evolving issues around #COVID19."

6  (Emphasis added.) (FAC ¶ 31.) Ms. Wojcicki also appeared on CNN and acknowledged that

7  YouTube would comply with Rep. Schiff's request—to "raise authoritative information"—and

8  promised that YouTube would identify, remove and delete videos that were "medically

9  unsubstantiated" or that disagreed with the World Health Organization. (FAC ¶ 31.)

10         In his 2020 letter, Rep. Schiff urged social-media platforms, including Defendants, to

11  remove what he claimed was "harmful misinformation" (how it was harmful, he did not say) and

12  to direct their users to "authoritative" sources. (FAC ¶ 32.) In the FAC, Plaintiffs allege that the

13  purpose and effect of Schiff's 2020 Letter was to pressure Google/YouTube into doing his

14  bidding through the veiled threat that attends a public directive issued by a powerful member of

15  Congress with significant power to institute and force the passage of laws to regulate Defendants

16  in innumerable ways that would affect their business operations. (FAC ¶ 32.)

17         D.      Speaker Pelosi's Threat to Punish Big Tech

18         Representative Schiff is not the only influential Congressman who put a target on

19  Google/YouTube's back: in 2019 and 2020, Nancy Pelosi, the powerful Speaker of the House,

20  made numerous public statements indicating that Big Tech was in her sights if social-media

21  companies did not toe the line. During a podcast with Silicon Valley journalist Kara Swisher,

22  Speaker Pelosi made the following statement about CDA 230 immunity:

23            It is a gift to them and I don't think that they are treating it with the respect that
              they should, and so I think that that could be a question mark and in jeopardy… I
24            do think that for the privilege of 230, there has to be a bigger sense of
              responsibility on it. And it is not out of the question that that could be removed.
25

26  (FAC ¶ 33.) The threat from Speaker Pelosi was clear – if Defendants did not censor as she

27  deemed "responsible," the most powerful woman in Congress said Section 230 immunity "could

28  be removed." Similarly, on June 16, 2020, Speaker Pelosi participated in a Georgetown

---

4                                   Case No. 20-cv-7502-BLF

**OPPOSITION TO MOTION TO DISMISS**

1   University event online titled "Forum on COVID-19 Social Media Disinformation."  (FAC ¶ 34.)

2   There, Speaker Pelosi stated, "The American people, including social media platform employees,

3   are demanding an end to the exploitation of the public's health, financial security, and lives.

4   Congress, employees, advertisers, and the public must work as one to shine a bright light on the

5   division and the disinformation proliferating online.  And together, we must send a message to

6   social media executives. You will be held accountable for your misconduct."  (FAC ¶ 34.)

7         Although Speaker Pelosi and Rep. Schiff may not have the power to pass legislation on

8   their own, they unquestionably wielded influence sufficient to coerce and substantially encourage

9   the Defendants and, on information and belief, have done so.  (FAC ¶ 37.)  This power is wielded

10   through official inquiries and demands from Congress, along with public statements, examples of

11   all of which are set forth in the preceding paragraphs.  Furthermore, both Rep. Schiff and Speaker

12   Pelosi represent California, where Defendants have their principal places of business.  (FAC

13   ¶ 37.)  In addition, the state actors referenced above and Committees of Congress (all of whose

14   members, at least those in the majority party, answer to Speaker Pelosi) have the power to call the

15   Defendants' executives before Congress to testify, as they did in 2018 and 2020, and as recently

16   as the day the First Amended Complaint was filed.  (FAC ¶ 37.)

17         E.      Introduction of House Resolution 1154

18         On August 25, 2020, just months after Rep. Schiff and Speaker Pelosi made headlines

19   with threats against Big Tech for permitting people to hear COVID-related speech that they did

20   not like, the House of Representatives introduced a resolution condemning a "movement"

21   referred to as "QAnon," which the resolution states consists of conspiracy theories that undermine

22   the public trust.  HR 1154 lauds "Facebook, Twitter, and Google" for censoring "QAnon groups

23   and content," the start of the narrative encouraging Big Tech to encourage the public to "seek

24   information from authoritative sources" and condemning the existence of QAnon because they

25   question, comment or discuss flaws in official narratives.  (FAC, Ex. F.)

26         F.      The Senate Orders Google's CEO to Testify on the Hill About Censorship

27         Less than six weeks later, on October 1, 2020, the Senate Commerce Committee voted to

28   compel the testimony of the CEOs of Facebook, Google and Twitter to mark the start of a new

1   war on what it characterized as hate speech, misinformation and political bias on social media.

2   (FAC ¶ 38.)  The Committee indicated the testimony was needed to "to reveal the extent of

3   influence that their companies have over American speech during a critical time in our

4   democratic process," according to committee head Sen. Wicker, a Republican.  (FAC ¶ 38.)

5       G.      On October 15, 2020, YouTube Instigated a Mass Purge of Conservative

6               Accounts Based on Its "Hate and Harassment" Policies in a Manner That

7               Violated the TOS

8       Two weeks later, on October 15, 2020, YouTube terminated and/or suspended Plaintiffs'

9   channels.  (FAC ¶ 6.)  In doing so, YouTube violated its own rules that state that if YouTube

10  makes "Service changes," the affected creators "will be provided with sufficient time to export

11  [their] Content from the Service."  (FAC ¶ 6.)  YouTube did not provide Plaintiffs with any time,

12  let alone "sufficient time," to export their content.  (FAC ¶ 6.)  Many of the Plaintiffs could not

13  even take their previously posted work to alternative platforms for republication, and they lost

14  contact with millions of subscribers.  (FAC ¶ 6.)  Moreover, even Plaintiffs who did retain access

15  to their content were summarily deprived of the benefits they had bargained and worked for—a

16  large audience built up over years that they now cannot reach, and in many cases, cannot even

17  contact over other social media platforms, which also purged the accounts of Plaintiffs and

18  similarly situated persons (FAC ¶ 6), up to and including the former U.S. President.

19      H.      YouTube's Claim that Content Creators Who Comment on "QAnon" are Linked

20              to Real-World Violence is Unsupported by Any Admissible Evidence

21      Big Tech and some members of Congress have claimed that QAnon promotes violence.

22  (FAC ¶ 42.)  This is simply not true.  The term "Q" refers to anonymous Internet posts that

23  individuals use as prompts to research issues.  (FAC ¶ 42.)  YouTube has attempted to

24  characterize Q as a group of wingnuts, who might attack innocent people.[1]  However, when asked

25

26  _____
    [1] Prior to the TRO hearing in this matter, YouTube provided this Court with what it
27  deemed Plaintiffs' most incendiary speech, and this Court adopted the following facts as its own
    notwithstanding the fact that they were unsupported by any admissible evidence:

28          that the Plaintiffs' channels were "rife with content espousing harmful
            conspiracy theories" and contained videos with "horrifying and

**OPPOSITION TO MOTION TO DISMISS**

1   about QAnon on September 17, 2020, FBI Director Christopher Wray testified as follows: "So we

2   view QAnon as essentially less of an organization and more of a sort of complex conspiracy

3   theories, and certainly we've had cases where that properly predicate cases involving violence

4   where people have been motivated by some of those conspiracy theories, but as you said, you

5   know, we don't investigate the ideology or the conspiracy theory itself.  I don't think we've seen

6   lethal attacks involving that kind of motivation..."  (FAC ¶ 42.)  The fact that the House has

7   condemned political speech in H.R. 1154 and that YouTube quickly purged Plaintiffs' content

8   raises a strong inference that YouTube acted at Congress's behest.  (FAC ¶ 43.)

9   **III.   LEGAL STANDARD**

10          When ruling on a 12(b)(6) motion, the Court must construe the complaint in the light most

11   favorable to the plaintiff.  Parks Sch. of Bus. Inc. v. Symington, 51 F.3d 1480, 1484 (9th

12   Cir.1995).  Accepting as true the complaint's material allegations, any ambiguities are resolved in

13   the plaintiff's favor.  OSU Student Alliance v. Ray, 699 F.3d 1052, 1061 (9th Cir. 2012).  Rule

14   12(b)(6) motions are "viewed with disfavor and rarely granted."  Broam v. Bogan, 320 F.3d 1023,

15   1028 (9th Cir. 2003) (dismissal with prejudice proper only in "extraordinary cases").

16   **IV.   ARGUMENT**

17          **A.      Plaintiffs' First Amendment Claim is Appropriately Pleaded**

18          In the FAC, Plaintiffs allege that YouTube engaged in state action for First Amendment

19   purposes by capitulating to government coercion and threats.  (FAC ¶¶ 10, 33.)  YouTube

20

---

21   unsubstantiated accusations of violent conduct supposedly committed by
     specific individuals."  For example, the employee reported that videos
22   posted on the channel "JustInformed Talk" suggested Hillary Clinton was
     "involved with satanic rituals with children," including "human ritual
23   sacrifice") while videos posted on the "TRUReporting" channel made claims
     of famous Americans, including that one that "eats babies, another "killed
24   his wife," others are "pedophiles or 'pedowoods,'" and others still "breed
     children in order to sell them."

25   (Order Denying TRO, Docket 27 at 2:19-27:1).  YouTube did not provide a *citation* for these
26   incendiary accusations, which now are part of the record notwithstanding the fact that they should
     not be considered on a Motion to Dismiss ("MTD").  The Court still has no admissible evidence
27   that the Plaintiffs made such statements, even if such evidence were appropriately considered on
     an MTD.  Respectfully, Plaintiffs maintain that this Court should not have accepted Defendants'
28   anonymous declaration that purports to summarize Plaintiffs' speech, nor should the declarant's
     identity have been withheld, nor should counsel have been prevented from examining him.

**OPPOSITION TO MOTION TO DISMISS**

1    "hopped to it" shortly after Congress passed H.R. 1154, which condemned the existence of

2    allegedly QAnon-related conservative content on social-media platforms.  (FAC ¶ 10.)  The bill

3    was passed in a political context in which representatives of the largest social-media platforms

4    are regularly hauled in front of Congressional committees to answer for business practices

5    related to consumer privacy, powerful members of Congress have openly stated that social

6    media platforms could lose their immunity from suit under Section 230 of the Communications

7    Decency Act if they do not cooperate with the government, Justice Thomas has indicated that the

8    time is ripe for the Supreme Court to entertain a case involving whether the lower courts have

9    interpreted Section 230 too broadly, and the Department of Justice (together with eleven state

10   Attorney Generals) has filed an antitrust case seeking the breakup of Google.  (FAC ¶ 10.)  In

11   other words, YouTube's position and ability to do business going forward have become

12   precarious indeed, especially if it refuses to "play ball" with powerful government officials who

13   hold YouTube and Google's existence in their hands.  (FAC ¶ 10.)  Plaintiffs contend that in this

14   environment of coercion and pressure, YouTube's termination of their accounts amounts to state

15   action, rendering it vulnerable to a First Amendment challenge.  (FAC ¶ 10.)

16        If Plaintiffs are correct (and at the pleadings stage, they need only allege that YouTube

17   engaged in state action, then their First Amendment rights have been violated.  Because

18   Plaintiffs are citizen journalists who regularly provide reporting and political commentary to a

19   wide audience of Americans who seek out their channels, their First Amendment rights to speak

20   and the public's right to hear are implicated.  (FAC ¶ 11.)  Plaintiffs' work addresses issues of

21   public concern that are highly relevant to the 2020 election and its aftermath, which is ongoing

22   as legal battles over the integrity of the election continue to rage in various states.  (FAC ¶ 11.)

23   Their speech is quintessentially political and deserving of the highest level of protection.

24              1.    <u>Plaintiffs Have Appropriately Pleaded that YouTube Can be Held Liable</u>

25                    <u>Under a Compulsion Theory</u>

26        In its Motion to Dismiss, YouTube argues that it is not a state actor because it is a private

27   company.  (Opening Br. 7:3-6).  Historically, litigants alleging First Amendment violations

28   against Big Tech have lost because Big Tech is comprised of companies, i.e., they have been

**OPPOSITION TO MOTION TO DISMISS**

considered private actors, unconstrained by First Amendment concerns.  (FAC ¶ 30.)  However,

state actors, as set forth in the FAC, have pressed Big Tech into their service to combat what

they consider "harmful" wrongthink on social media.  In <u>Blum v. Yaretsky</u>, 457 U.S. 991 (1982),

the Supreme Court stated that state action may be pleaded, presumed or proved where "there is a

sufficiently close nexus between the State and the challenged action of the regulated entity so

that the action of the latter may be fairly treated as that of the State itself."  The purpose of this

requirement is to assure that constitutional standards are invoked only when the State is

responsible for the conduct of which the plaintiff complains—as in this case, where the state has

exercised "coercive power or has provided such significant encouragement, either overt or

covert, that the choice must in law be deemed that of the state."

Defendants cite <u>Manhattan Cmty. Access Corp. v. Halleck</u>, 139 S.Ct. 1921, 1930 (2019)

(cited in Opening Br. at 7:3-6), which held that a public access channel was not a state actor

because "merely hosting speech by others is not a traditional public function and does not alone

transform private entities into state actors subject to First Amendment constraints." <u>See also</u>

<u>Prager University v. Google, LLC</u>, 951 F.3d 991, 997-99 (9th Cir. 2020) (following <u>Halleck</u> in

censorship challenge against YouTube) (*cited in* Opening Br. at 8:7-12).

Unfortunately for Defendants, neither of those cases are on point: The facts and theories

in the FAC are quite different than those addressed in <u>Halleck</u> and <u>Prager University</u>.  Plaintiffs'

theory—that Speaker Nancy Pelosi and Rep. Adam Schiff coerced, substantially encouraged,

and threatened Defendants to remove the type of speech that Plaintiffs express—is novel.[2]

When a plaintiff advances a novel but plausible theory of liability, an MTD may not be granted:

> [T] he fact that McGary's claim does not fall within the four corners of our prior
> case law does not justify dismissal under Rule 12(b)(6). On the contrary, Rule
> 12(b)(6) dismissals "are especially disfavored in cases where the complaint sets
> forth a novel legal theory that can best be assessed after factual development."
> <u>Baker v. Cuomo</u>, 58 F.3d 814, 818-19 (2d Cir.), <u>cert. denied sub nom., Pataki v.</u>
> <u>Baker</u>, 516 U.S. 980, 116 S.Ct. 488, 133 L.Ed.2d 415 (1995), vacated in part on
> other grounds, 85 F.3d 919 (2d Cir.1996) (en banc). As we have previously

---

[2] Indeed, Defendants admitted this in <u>Daniels v. Alphabet, Inc.</u>, 2021 WL 1222166 (N.D. Cal.
Mar. 31, 2021), in which another YouTube creator advanced the state-action theory, arguing that
the theory (which is the same as in this case) is "novel."  (Defendants' MTD, <u>Daniels</u> at 7:3-4.)

**OPPOSITION TO MOTION TO DISMISS**

observed, "'[t]he court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.'" <u>Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.</u>, 764 F.2d 619, 623 (9th Cir.1985) (quoting 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1357, at 601-03 (1969)).

<u>McGary v. City of Portland</u>, 386 F.3d at 1270.  Defendants claim that the compulsion theory is available only when the government itself is a defendant. (Op. Br. at 8:8-20, citing <u>Sutton v. Providence St. Joseph Medical Ctr.</u>, 192 F.3d 826 9th Cir. 1999).  YouTube is correct that the Ninth Circuit has held that to hold a private party liable, rather than the government, the Plaintiff must show "something more."  (Opening Br. at 7:6-8.)  Even a cursory review of the Ninth Circuit's opinion in <u>Sutton</u>, however, leaves us with this:  "the 'something more' required for a finding of governmental action on the part of a private defendant was satisfied when the plaintiff alleged that the private defendant and the state were jointly pursuing an unconstitutional end." <u>Id</u>. at 840.   Here, the Plaintiffs clearly allege that Rep. Schiff, Speaker Pelosi, Congress in passing HR 1154, and the Defendants were jointly pursuing an unconstitutional end—the censorship of Plaintiff's speech, which was unpalatable to these powerful figures who publicly admitted that they were in a **partnership**.

        2.    <u>Plaintiffs Have Appropriately Pleaded that YouTube was Substantially Encouraged or Compelled to Censor Them</u>

Next, Defendants argue that Plaintiffs have made no plausible allegation of government compulsion or participation in their censorship program.  (Opening Br. at 8:22-24.)  Defendants are wrong.  Under <u>Blum</u>, 457 U.S. at 991, and the cases that follow it, Defendants have engaged in state action under one or both of two theories:  the governmental nexus test and the joint action test.

<u>Blum</u> held that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  457 U.S. at 1004.  Over the years, the Ninth Circuit has interpreted <u>Blum</u> as encompassing four theories of state action by a private actor, any one of which is alone sufficient:  the public function test, the state compulsion

**OPPOSITION TO MOTION TO DISMISS**

1  test, the governmental nexus test, and the joint action test.  George v. Pacific-CSC Work

2  Furlough, 91 F.3d 1227, 1230 (9th Cir. 1996).

3        Here, Plaintiffs allege that Defendants' censorship satisfies either the **governmental nexus**

4  **test** or **the joint action test**. Under the **governmental nexus test**, a private entity acts under color

5  of state law if "there is a sufficiently close nexus between the State [and] the entity such that the

6  latter may fairly be treated as that of the state itself."  Blum, 457 U.S. at 1004.  Under the **joint**

7  **action test**, a private entity acts under color of law if it is "a willful participant in joint action with

8  the state or its agents" to the point that the state and the private entity are interdependent, as

9  typically demonstrated through a substantial degree of cooperation involving sustained, joint

10  efforts.  Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989) (reversing summary

11  judgment because "there is no question that state actors were involved in the challenged conduct;

12  the only question is whether [the private party] acted as 'a willful participant in joint activity");

13  U.S. v. Price, 383 U.S. 787, 794 (1966) (private actors can be liable for constitutional violations:

14  "it is enough that he is a willful participant in joint activity with the State or its agents").

15        Under the law, a private entity can qualify as a state actor in a few circumstances—

16  including (i) when it performs a traditional, exclusive public function, see, e.g., Jackson v.

17  Metropolitan Edison Co., 419 U.S. 345, 352-354 (1974); (ii) when the government compels it to

18  take a particular action, see, e.g., Blum, 457 U.S. at 1004-1005; or (iii) when the government acts

19  jointly with it, see, e.g., Lugar v. Edmondson Oil Co., 457 U.S. 922, 941-942 (1982).

20        Defendants claim that Heineke v. Santa Clara University, 953 F.3d 1009 (9th Cir. 2020),

21  stands for the proposition that a plaintiff must show that the government demanded a particular

22  result or otherwise participated in the plaintiff's specific case.  (Opening Br. at 9:1-2.)  Even if

23  that description of Heineke were accurate, Plaintiffs have alleged that Congress demanded that the

24  unpopular speech dubbed "misinformation," and QAnon-related speech be limited and erased,

25  which is precisely what Plaintiffs allege Defendants did.  In any event, Defendants are wrong.[3]  In

26

27  ─────────────────────

28  [3] Indeed, under Defendants' reasoning, if the government told YouTube that it should ban all
speech promoting Catholicism, no First Amendment interest would be implicated, but if the

**OPPOSITION TO MOTION TO DISMISS**

1   <u>Heineke</u>, the Ninth Circuit held that the presumption that private conduct does not constitute state

2   action "may be overcome in limited circumstances, such as where the state 'has exercised coercive

3   power or has provided such significant encouragement' that the challenged action must be

4   considered that of the state." <u>Id.</u> at 1012 (quoting <u>Blum</u>, 457 U.S. at 1004).  In addition, numerous

5   courts have held that a private party can be held to answer for constitutional violations when it is a

6   "willful participant" in a state action.  <u>See, e.g., Collins</u>, 878 F.2d at 1154 (so stating); <u>Brunette v.

7   Humane Soc'y of Ventura Cty.</u>, 294 F.3d 1205, 1211 (9th Cir. 2002) ("To be engaged in joint

8   action, a private party must be a 'willful participant' with the State or its agents in an activity

9   which deprives others of constitutional rights") (*cited in* <u>Williams v. Albertsons Cos.</u>, 822 Fed.

10  Appx. 579 (9th Cir. 2020)).

11          Next, Defendants make the somewhat incredible claim that Rep. Schiff and Speaker Pelosi

12  did not actually make any demands of Defendants—just friendly suggestions.  (Opening Br. at

13  9:19-10:2.)  This is simply wrong: Speaker Pelosi and Rep. Schiff's encouragement, coercion, and

14  threats are described in detail in the FAC.  (FAC ¶¶ 32, 33.)  Plaintiffs also allege that Pelosi and

15  Schiff's coercion and encouragement *was so significant that Defendants actually capitulated:*

16  YouTube CEO Susan Wojcicki, *in direct response* to Rep. Schiff's letter, acknowledged that

17  "@YouTube" and Schiff were in a "partnership" and pledged that Defendants would "continue to

18  consult with Members of Congress" on Schiff's content-moderation demands.  (FAC ¶ 31.)  But

19  Defendants fail to acknowledge the variety of ways in which influential Members of Congress

20  may exert imperious control on an industry even without actually passing a law. <u>See, e.g., Trump

21  v. Mazars USA, LLP</u>, 140 S.Ct. 2019, 2032 (2020) (congressional committees have the power to

22  issue subpoenas); <u>Eastland v. United States</u>, 421 U.S. 491, 504 n.15 (1975) (Congress's power of

23  inquiry is "as penetrating and far-reaching as the potential power to enact and appropriate under

24  the Constitution"); <u>United States v. Biaggi</u>, 853 F.2d 89 (2d Cir. 1988) (affirming conviction of

25  Congressman who sent letters on congressional and committee stationery to improperly influence

26

27  government told YouTube that it should ban speeches by the Pope, then a First Amendment
    interest would be implicated.  This result would be absurd.

28

**OPPOSITION TO MOTION TO DISMISS**

1   third parties).  No industry leaders will lightly brush off the possibility that Congress can hold

2   televised hearings where they will be asked probing or embarrassing questions, or pass legislation

3   injurious to their business—such as repealing Section 230 of the of the Communications Decency

4   Act, on which Defendants rely so heavily in this and every other case brought against them for the

5   past two decades. Far better to knuckle under to the Speaker's threat that "you will be held

6   accountable" and graciously accept Rep. Schiff's "partnership" by promising to censor views with

7   which those powerful individuals disagree.

8          Defendants additionally argue that under the District of Columbia's unpublished decision

9   in Abu-Jamal v. National Public Radio, 1997 WL 527349 (D. D.C. Aug. 21, 1997), this is an

10  "easy" case because in Abu-Jamal, Senator Robert Dole specifically denounced the plaintiff, who

11  still lost his challenge to having his commentaries removed from NPR.  (Opening Br. at 10:21-

12  28.)  The allegations in Abu-Jamal were markedly different.  The court noted that "[t]here is no

13  suggestion of joint action here…"  Id. at *5.  "Jamal merely asserts that there is a 'close

14  relationship' with NPR."  By contrast, here, Plaintiffs have put forth specific facts showing an

15  admitted partnership between the governmental actors and the purportedly private Defendants.

16  Plaintiffs have provided the Court with the clear threats made by the government actors to

17  YouTube that it better "play ball" or lose its precious Section 230 immunity.  The facts and

18  allegations of Abu-Jamal and the current case could not be more distinct.

19         Defendants' penultimate argument on the compulsion issue is that Association of

20  American Physicians and Surgeons v. Schiff, 2021 WL 354174 (D.D.C. Feb. 2, 2021), a district

21  court case from the District of Columbia that is currently on appeal, stands for the proposition that

22  there is no causal relationship between the politicians' threats and YouTube's censorship.

23  (Opening Br. at 11:3-10.)  First, Plaintiffs note that Association of American Physicians was

24  decided on the issue of Article III standing, not state action.  2021 WL 354174 at *3.  Indeed, the

25  facts of Association of American Physicians involved an individual plaintiff—a content

26  consumer—who could not show how it had become more difficult for her to access the

27  information she wanted to read.  Id.  That is not the case here:  it is undisputed that Plaintiffs have

28  been completely deprived of their ability to broadcast their speech on YouTube and, to the extent

OPPOSITION TO MOTION TO DISMISS

that YouTube refused to provide Plaintiffs with access to their materials before terminating their

channels, they have been completely deprived of their ability to broadcast their materials

anywhere on the Internet.  With respect to the content provider, the AAPS, the court in the District

of Columbia found that the association had made no concrete allegations of any activities that

were thwarted or prevented by the actions of the defendant (Rep. Schiff).  Id. at *4.  To the extent

that the D.C. court rejected the association's argument that its First Amendment rights had been

violated, Plaintiffs note that unlike in this case, in the Association of American Physicians case the

plaintiffs complained about Facebook providing links to organizations such as the World Health

Organization.  That is not the case here.  Furthermore, the institutional plaintiffs in Association of

American Physicians "do not allege any concrete limitation on their rights to speak or associate"

because, for example, the association could still publish information about vaccines.  Id. at *5.

Here, in contrast, YouTube simply seized control of Plaintiffs' materials and they are unable to

broadcast them anywhere.  Finally, with respect to causation specifically, in the Association of

American Physicians case the state defendant successfully pointed the finger at the private

company (Big Tech giant Amazon and its founder Jeff Bezos) that had actually deplatformed the

institutional plaintiff.  Id. at *6.  That appears to be the result Defendants seek here, only in

reverse.  In the event that this Court is persuaded by Defendants' attempt to shift the blame,

Plaintiffs are fully prepared to amend the Complaint again to add Rep. Schiff, Speaker Pelosi, and

other powerful members of Congress, so that none of the culpable parties can avoid accountability

by pointing their finger outside of the courtroom.

Finally, Defendants challenge the notion that HR 1154, the anti-QAnon resolution that

kicked off Defendants' censorship spree, has any relation to their liability.  In support of this

proposition, Defendants argue that the Resolution is non-binding, citing I.N.S. v. Chadha, 462

U.S. 919 (1983).  However, HR 1154 is still government action, and a public, collective and

Congressional statement condemning the very language, speech, persons and constitutionally

protected ideas that the First Amendment is intended at its core to protect, even if the language or

ideas are wildly unpopular.  Indeed, Defendants seem to argue, the resolution does not command a

result—it only praises Big Tech for the censorship it had already committed.  (Opening Br. at

**OPPOSITION TO MOTION TO DISMISS**

11:16-28.)  Defendants cannot see that *this is part of the problem.*  Notwithstanding the fact that Big Tech was, for the most part, "being good" and doing what the government wanted, the government wanted more.  The fact that the government wanted more was clear from the passage of HR 1154 (the carrot) to the continuation of the anti-Big Tech show-trial-style Capitol Hill hearings (the stick) that continue to this day.  The government has sent its message loud and clear.  HR 1154 is just one example.  If Rep. Schiff was not adequately loud and clear in his letter, and Speaker Pelosi in her threats, then Congress made its position on QAnon censorship loud, clear, and decidedly official, in HR 1154.

> 3.  <u>Holding YouTube Accountable for Partnering Up in Congress's Censorship Scheme Will Not Create a Slippery Slope</u>

Defendants' final point in support of their First Amendment argument is that if it is held accountable in any way, the dreaded slippery slope will appear over the horizon.  In a worst-case scenario, as Defendants tell it, private businesses could be pilloried in the courts merely for agreeing with the government.  Perversely, politicians could create constitutional protections for bad content merely by condemning it—all to the detriment of individual liberty and private enterprise.  (Opening Br. at 12:1-27, citing <u>Halleck</u>, 139 S.Ct. at 1934.)

Defendants' fears, assuming this argument is made in good faith (a fact of which Plaintiffs are not convinced), are overblown.  The Court is invited to imagine a situation in which a nefarious politician might seek to obtain constitutional protection for noxious speech merely by sending a strongly worded missive on letterhead to Big Tech.  To create the type of state-action situation presented in this case, our politician would have to be powerful himself and would have to convince the most powerful politicians in his party to help him with the plan.  He would then have to convince powerful politicians in the other party to cooperate by participating in bipartisan Congressional hearings.  In addition, this Machiavellian lout must have the ear of the President or at least of the Attorney General, not to mention the attorneys general of ten or twelve states, to pursue an antitrust action that could bring the full weight of the American justice system down on Big Tech if it were to refuse to cooperate.  All in the service of one politician's perverse plan.  And to think that the Defendants accuse the *Plaintiffs* of being conspiracy theorists…

**OPPOSITION TO MOTION TO DISMISS**

1

    **B.**    __Plaintiffs' Contract Claim is Appropriately Pleaded__

2

    Defendants also seek dismissal of Plaintiffs' contract and quasi-contract claims.  In the

3 FAC, Plaintiffs allege that YouTube breached its TOS in numerous ways.  First, YouTube

4 breached the TOS because it suspended or terminated the accounts of the Plaintiffs despite the

5 following facts: (a) the Plaintiffs, and each of them, did not repeatedly or materially or breach

6 the Agreement with YouTube; (b) there was no legal requirement or court order with which

7 YouTube had to comply by suspending or terminating the accounts; and (c) YouTube did not

8 believe there was conduct that created or could create liability or harm to any user or third party,

9 YouTube or its affiliates. (FAC ¶ 7.)  Second, YouTube breached the TOS because it failed to

10 notify each of the Plaintiffs as to "the reason for termination of suspension" by YouTube.  (FAC

11 ¶ 8.)  The notices that YouTube provided to the Plaintiffs did not identify a specific reason for

12 the termination or suspension of their contracts.  (FAC. ¶ 8.)  Instead, YouTube indicated only

13 that there were two possible reasons and even with respect to those two reasons, YouTube did

14 not indicate how the targeted accounts violated the TOS or Community Guidelines.  (FAC ¶ 8.)

15 While some of the Plaintiffs received identical cut-and-paste language from the TOS and remain

16 baffled about how their content is alleged to have been out of compliance and/or what specific

17 content they posted gave rise to the claim that their content was violative of the Community

18 Guidelines, other Plaintiffs received no notice whatsoever.  (FAC ¶ 8.)

19

    Furthermore, even if YouTube were to allege that its amended TOS provisions applied

20 (even though they did not exist at the time) and it could claim to use that amended policy to

21 entitle it to suspend or terminate Plaintiffs' accounts, the amended TOS are invalid to the extent

22 that they resulted in a termination of the contracts between the Plaintiffs and YouTube; under

23 California law, a party may not invoke a unilateral right to amend a contract in a such a manner

24 as to frustrate the purpose of the contract.  (FAC ¶ 9.)  Because YouTube gave no advance notice

25 of its policy, it did not provide Plaintiffs an opportunity to take down any violative content so

26 that they could maintain their contractual relationship with YouTube.  (FAC ¶ 9.)

27

    In their MTD, Defendants do not address any of these issues in any intellectually honest

28 way.  Instead, they argue the following: (1) The TOS gives YouTube discretion to terminate

**OPPOSITION TO MOTION TO DISMISS**

Google accounts (Opening Br. at 13); (2) YouTube's failure to provide notice or a true appeal does not give rise to a claim for breach of contract (Opening Br. at 15-16); and (3) the implied covenant of good faith and fair dealing cannot override the express terms of the TOS, and in any event, YouTube has the right to exercise "editorial control."  (Opening Br. at 12:23.)  All three of these arguments fail.

     1. <u>YouTube's Discretion is Not Unlimited, and It is Up to the Court to Make the Factual Decision of Whether YouTube Exercised Its Discretion Reasonably</u>

   Defendants' first argument on the breach of contract claim should still be rejected.  While it is true that many content-removal cases against YouTube have failed because courts have concluded that YouTube's TOS authorized removal and demonetization, the TOS identified by Defendants in this case do not provide that latitude.  Defendants' TOS includes two relevant paragraphs on the topic of removal, one governing the removal of content by the creator and one governing the removal of content by YouTube.  The TOS paragraph governing removal by the content creator states clearly: "You may remove your Content from the Service at any time."  This gives *Plaintiffs* the right to remove their content at any time with no restrictions.  In contrast, the TOS drafted by Defendants severely limits *YouTube*'s power to remove content:

> If we reasonably believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties, we may remove or take down that Content in our discretion.

Significantly, not a single case cited by Defendants for the proposition that YouTube enjoys unfettered discretion to remove content discusses this "reasonable belief" restriction on YouTube's ability to remove content.  In <u>Mishiyev v. Alphabet, Inc.</u>, 444 F.Supp.3d 1154 (N.D. Cal. 2020) (*cited in* Opening Br. at 14:18-19), the trial court agreed that YouTube's TOS permitted removal due to repeated copyright claims based on the term stating that "YouTube does not permit copyright infringing activities … [and] will remove all Content if properly notified that such Content infringes…").  In <u>Lewis v. Google, LLC</u>, 461 F.Supp.3d 938 (N.D. Cal. 2020) (*cited in* Opening Br. at 14:14-15), the court dismissed only a breach of implied covenant claim based on plaintiff's concession that "YouTube's terms and guidelines explicitly authorized YouTube to

**OPPOSITION TO MOTION TO DISMISS**

1   remove or demonetize content that violates its policies."  Here, Plaintiffs make no such

2   concession, the TOS does not give YouTube unfettered discretion and Plaintiffs allege that their

3   content did *not* violate the published policies.  In their Opening Brief, Defendants point this Court

4   to the case of <u>Prager University</u>, 951 F.3d at 997-99, but fail to appreciate that <u>Prager</u> was

5   premised on a state action theory that the Ninth Circuit did not adopt – the platform as a public

6   function theory.

7          The key issue arising out of the operative TOS is whether their removal of Plaintiffs'

8   content is authorized by the provision requiring that YouTube "reasonably believe[]" that the

9   "Content [was] in breach of this Agreement or may cause harm to YouTube, our users, or third

10  parties."  Because Plaintiffs have alleged that YouTube breached the contract by removing his

11  content without a contractual justification and in violation of their First Amendment rights, it is

12  *Defendants*' factual burden to show that they held a reasonable belief that Plaintiffs' content was

13  in breach of the TOS or "may cause harm to YouTube, [its] users, or third parties."  While it is

14  true that the good faith covenant cannot be interpreted to impose a new condition that is contrary

15  to an express contract (<u>Storek & Storek, Inc. v. Citicorp Real Estate, Inc.</u>, 100 Cal.App.4th 44

16  (2002)), here, the Plaintiffs have alleged that the content at issue was not that which "may cause

17  harm."  These vague policies and TOS, which Defendants drafted, may not be used as pretexts for

18  doing that which it is prohibited from doing – conspiring with, reacting to, or partnering with

19  government actors to censor political speech and to claim falsely that in some unspecified and

20  unarticulated manner, the content violates company policies.

21         In determining whether "reasonable belief" may be adjudged at the MTD stage, consider

22  <u>Schulken v. Washington Mut. Bank, Henderson NV</u>, 2011 WL 4804063 (N.D. Cal. Oct. 11,

23  2011).  There, the plaintiff complained that a bank had cancelled his home equity line of credit

24  ("HELOC"). The bank moved to dismiss, pointing to a provision authorizing it to cancel a

25  HELOC under "Regulation Z."  <u>Id.</u> at *9.  However, as Judge Koh noted, Regulation Z permitted

26  such cancellation only where the creditor had a "reasonable belief that the consumer will be

27  unable to repay the debt due to a material change in circumstances."  <u>Id.</u> (citations omitted).

28  Judge Koh held that the plaintiff had sufficiently stated a breach of contract claim, and it was a

**OPPOSITION TO MOTION TO DISMISS**

1   question of fact to be proved by the parties what information the bank had to support its supposed

2   "reasonable belief."  Id.  Similarly, whether YouTube held a "reasonable belief" about Plaintiffs'

3   content calls for a factual inquiry. If, for instance, Defendants did not have a reasonable belief that

4   Plaintiffs breached the TOS or that their content would harm others, and they were merely

5   acceding to governmental censorship demands, then Plaintiffs would prevail under the terms of

6   the TOS.  In stating that YouTube breached the contract by removing and demonetizing his

7   content without any "compelling, significant or legitimate reason" (FAC ¶ 316), Plaintiffs have

8   sufficiently stated a breach of contract claim against YouTube for the improper and unjustified

9   removal of their content in direct violation of the TOS.  This is not a matter that can be decided at

10  the pleading stage, particularly where Plaintiffs alleged the removals were without justification

11  and done in bad faith. (FAC ¶¶ 315, 316.)

12          Defendants also claim that their action was justifiable because at the time of the

13  takedowns, YouTube policy prohibited threatening conduct.  (Opening Br. at 14:20-27.)  Plaintiffs

14  do not dispute that assertion.  However, they do dispute that they engaged in any threatening

15  conduct at the time of the takedowns.  Notwithstanding the fact that Defendants have had more

16  than *six months* to identify the materials that they now claim constituted "threatening conduct,"

17  they have never, ever done so.  This Court should not just take Defendants at their conclusory

18  word that Plaintiffs' videos were "threatening," particularly because that is a quintessentially

19  factual question and therefore not appropriate for adjudication at the pleading stage.[4]

20          2.   YouTube's Failure to Notify or Provide an Opportunity for a Meaningful

21               Appeal Did Breach the TOS

22          Defendants next deny all responsibility to fulfill their commitment to notify their content

23  creators with the reason for their termination of suspension, which they argue was not a promise.

24  (Opening Br. at 15:22-28.)  At they same time, they argue that they did tell Plaintiffs why their

25

26  [4] Defendants' claim that Plaintiffs have admitted that their content was harmful by the very fact of
    their argument that YouTube acted under government compulsion (Opening Br. at 15:8-15) is

27  disingenuous.  Plaintiffs do not purport to understand *why* the state actors referenced in the FAC
    do not like their speech and certainly do not concede that their speech was harmful.  The annals of

28  time are replete with stories of individuals persecuted for their free speech—and it is never the
    book burners (or today, the video-deleters) who find themselves on the right side of history.

**OPPOSITION TO MOTION TO DISMISS**

content was removed.  (Opening Br. at 16:1-5.)  What Defendants do not understand is that under the plain language of the TOS, any reasonable reader would believe that they would receive a reason that is more informative than simply having a chatbot repeat the phrase "community guidelines" over and over again.  (FAC ¶ 4 (citing notice provision of TOS.)  Plaintiffs submit that the high level of confusion between YouTube and Plaintiffs (not to mention the plaintiffs in the many other content-removal lawsuits that have been filed against YouTube) on the issue of whether the use of the phrase "community guidelines," unadorned with more information or even basic identification of the material that crossed the line, constitutes the provision of a "reason" under the TOS indicates that this question is a factual issue.  Accordingly, it cannot be decided at the pleadings stage.

Plaintiffs allege that Defendants violated the TOS by failing to notify them for the "reason for our action" and by failing to provide an appeal.  Defendants apparently seek to transform this pleading motion into a factual argument on the merits, claiming that they did, in fact, notify the Plaintiffs.  (Opening Br. at 15:22-16:2.)  Aside from the obvious problems in attempting to argue facts on a pleading motion, the issue of whether any notice provided by YouTube satisfied the TOS is clearly a question of fact.  Plaintiffs were promised to be provided with a *reason* if they were deplatformed.  Plaintiffs are still in the dark as to the *reason* for YouTube's action:  Was their speech deemed violent?  Lewd?  Harassing?  Plaintiffs challenge the Defendants to articulate *why* their content was taken down other than the reason that an aggravated parent typically offers a confused child:  because I said so.

As to the opportunity to appeal that was promised, Defendants offer only the TOS itself. Plaintiffs have clearly alleged that "Defendants failed to provide the appeals process it promised." Now, it is true that Defendants did not offer much at all, but they did offer a process.  The question of whether Defendants complied with their process, however, is clearly a factual issue and one that cannot be determined at the pleading stage.  It is interesting that YouTube feels emboldened to attempt to frame a motion to dismiss as a trial on the merits, a precept contrary to the well-established and ingrained standards inherent in the Federal Rules of Civil Procedure.

**OPPOSITION TO MOTION TO DISMISS**

Apparently, it believes that it has gotten away with this approach for so long that there is no reason to stop now.

### 3. Plaintiffs Have Alleged a Proper Claim for the Breach of California's Implied Covenant of Fair Dealing Found in Every Contract

Defendants argue that the implied covenant was not breached, citing law to the effect that the implied covenant does not extend "to create obligations not contemplated by the contract." (Opening Br. 16:24-28, citing Pasadena Live v. City of Pasadena, 114 Cal.App.4th 1089, 1084 (2004) and Lewis, 461 F.Supp.3d at 961. Defendants are wrong for two reasons:

*First*, as Plaintiffs have properly pleaded, Defendants are alleged to be in direct breach of their own TOS. They set forth specific reasons that content might be moderated and then overstepped their own boundaries–Plaintiffs have specifically referenced in the FAC that the only thing "offensive" about their speech was that it was unpopular and condemned by Congress, Speaker Pelosi and Rep. Schiff. Plaintiffs further alleged that YouTube did not actually believe there was any content that "could create liability or harm to any user or third party." (FAC ¶ 7.) While YouTube seems bent on a merits discussion at this stage, it does not point to a single piece of speech by the Plaintiffs that violated the TOS. Under the implied covenant, Defendants cannot vaguely point to some catchall provision or apparently limitless "editorial discretion" when they themselves drafted *specific* policies to apply in the event that content is removed.

*Second*, to the extent that Defendants claim they amended their TOS to permit them to eradicate the Plaintiffs from their platform, the implied covenant comes squarely into play. California's implied covenant prohibits a party from modifying a contract to render it illusory. Peng v. First Republic Bank, 219 Cal.App.4th 1462 (2013). In this case, the Plaintiffs have alleged that they and their content were on the YouTube platform for *years*. (FAC ¶¶ 12-28 (alleging dates as early as 2007 that Plaintiffs posted content).) They had not received any recent "strikes" and were communicating with their customers and public through content creation and publication, so much so that their collective reach surpassed 771 million views. (FAC ¶ 1). Suddenly, and apparently as a direct result of this publicly acknowledged "partnership" between government officials and YouTube, sealed with HR 1154, Plaintiffs became *personae non grata*.

**OPPOSITION TO MOTION TO DISMISS**

1  If the content was so harmful, then why was Plaintiff Christopher Doe's content up since 2006?

2  (FAC ¶ 18.)  Why was the X22 Report up since 2013?  (FAC ¶ 15.)  Why was Spacshot76 up

3  since 2008? (FAC ¶ 16.)  Why was Jeff Pederson's "InTheMatrixxx" channel up since 2013?

4  (FAC ¶ 25.)  This content only *became* harmful after the government got ambitious and Speaker

5  Pelosi threatened Big Tech.  What changed?  What changed was YouTube's interpretation of its

6  TOS.  What changed was YouTube's new "policies" against "conspiracy theories." (Forget that

7  there are no allegations in the FAC, nor evidence, that Plaintiff's content is harmful or

8  conspiratorial…)  And, under California law, a party that holds a unilateral right to modify a

9  contract may not modify it in a way that interferes with the other party's expectations regarding

10  how the agreement is applied to those claims.  This Court acknowledged the same in <u>Trudeau v.</u>

11  <u>Google LLC</u>, 349 F.Supp.3d 869 (N.D. Cal. 2018) when it noted that in that case, Google had

12  provided "ample notice" to advertisers that any claims would be subject to arbitration.  By

13  contrast, in this case, not only was there inadequate notice, but the allegation of the Plaintiffs is

14  that there was a unilateral amendment either of the TOS or the manner in which YouTube applies

15  them such that the TOS were rendered illusory and the Plaintiffs were put in a position to receive

16  no benefits whatsoever.

17        **C.**       **<u>Section 230 of the CDA Does Not Bar this Lawsuit</u>**

18        Defendants claim that YouTube is protected from liability by Section 230 because the

19  statute purportedly bars claims for liable for publishing decisions with respect to content on their

20  services.  *See* 47 U.S.C. §§ 230(c), (e)(3).  YouTube points to two provisions of Section 230 that

21  purportedly bar this suit.  These subsections can no longer be interpreted to immunize YouTube

22  for government-prompted censorship.  Although Defendants have enjoyed a long reign of power

23  under Section 230, that law cannot be used to immunize them for the acts alleged in *this* case.

24        *First*, YouTube argues that Section 230(c)(2) expressly immunizes interactive service

25  providers for "any action voluntarily taken in good faith to restrict access to or availability of

26  material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively

27  violent, harassing, or otherwise objectionable, whether or not such material is constitutionally

28  protected."  47 U.S.C. § 230(c)(2)(A).  Without understanding or appreciating the analysis and

holding in the Ninth Circuit's recent opinion in <u>Enigma Software Grp. USA, LLC v. Malwarebytes</u>, 946 F.3d 1040, 1044 (9th Cir. 2019), YouTube proceeds to mis-cite that case for the proposition that this "provision establishes a subjective standard whereby internet users and software providers decide what online material is objectionable."  (Opening Br. at 18:12-14.) What the Ninth Circuit actually held was that "*We have previously recognized that the provision establishes a subjective standard whereby internet users and software providers decide what online material is objectionable*."  <u>Enigma</u>, 946 F.3d at 1044 (citing <u>Zango Inc. v. Kaspersky Lab, Inc.</u>, 568 F.3d 1169 (9th Cir. 2009)). The Ninth Circuit went on then to hold that the immunity conferred by Section 230 is not limitless.  After a lengthy survey of the Section 230 cases on the issue of immunity, the Ninth Circuit concluded as follows:

> We find these decisions recognizing limitations in the scope of immunity to be persuasive.  The courts interpreting <u>Zango</u> as providing unlimited immunity seem to us to have stretched our opinion in <u>Zango</u> too far.

<u>Enigma</u>, 946 F.3d at 1050.  YouTube then equates the instant case with <u>Domen v. Vimeo, Inc.</u>, 433 F.Supp.3d 592 (S.D.N.Y. 2020), a case decided by the Southern District of New York.  In <u>Vimeo</u>, the district court judge cited <u>Zango</u> as to the subjective issue, attempting to blunt the impact of <u>Enigma</u>'s limitation of <u>Zanga</u>'s immunity holding.  The Ninth Circuit has not yet squarely addressed the limits of Section 230 immunity in the context of a First Amendment or censorship claim in which censorship is alleged to have been the result of pressure and coercion from powerful government officials.  But to ignore the Ninth Circuit's decision to reign in the district courts on the issue of Section 230 immunity in <u>Enigma</u> would be both irresponsible and wrong.

*Second,* in an unprecedented position, YouTube argues that it is a publisher and entitled to immunity under 230(c)(1).  Subsection (c), entitled "Protection for 'Good Samaritan' Blocking and Screening of Offensive Material," states that "no provider of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  The entire purpose of Section 230(c) was to permit ISPs to take down, without liability, that is "obscene, lewd, lascivious, filthy excessively violent, harassing, or otherwise

1   objectionable…" YouTube collapses the Section 230 analysis into a contorted reading of a

2   straightforward statute, citing a litany of cases that preceded <u>Enigma</u>. The question that arises is

3   whether the Ninth Circuit will agree that Section 230 immunity also should not apply where a

4   takedown represents a clear attempt to squelch protected speech that is not lewd, lascivious, filthy,

5   excessively violent or harassing. Plaintiffs submit that it is high time for the Ninth Circuit to

6   address an issue that is relevant, temporal and about which an enormous contingent of the

7   American public cares—government's coercion of Big Tech and Big Tech's un-American use of

8   Section 230 to squelch unpopular or government-disfavored speech.

9        England's Prince Harry was recently reported as stating that America's "First Amendment

10  is bonkers." However, Americans who have realized the extent of Big Tech's power over their

11  right to speech most likely do not believe that the First Amendment is bonkers. It is more likely

12  that they wonder if the First Amendment even exists anymore. In the post-COVID world, where

13  students take classes through Zoom portals, trials are held on WebEx platforms, and Americans

14  have been ordered to stay in their homes, where the main source of their news is the Internet, we

15  should wonder whether the notion that Big Tech is *not* the "town square" has become outdated.

16  Perhaps now that Americans have been all but forced to resort to the Internet for everything from

17  news to birthday parties to weddings and funerals, it is time to reconsider the body of law holding

18  that the Internet is not the town square. Whether we like it or not, times have changed. We live in

19  an era where state governments have barred citizens from physically congregating in traditional

20  town squares. The Internet is the only town square that remains. The fact that Big Tech can

21  summarily block political content, shielded by a statute that was designed to keep predators off the

22  Internet, has created a dismal state of affairs. The First Amendment is not bonkers. The way

23  Section 230 has been used by Big Tech is bonkers.

24       We have seen this chapter in history before -- there were objections when football player

25  Colin Kaepernick kneeled during the National Anthem to protest the manner in which African-

26  Americans were and are treated in America; there were objections when the KKK sought to march

27  through Skokie, Illinois, there were objections when a young man in a Los Angeles Courthouse

28  wore a jacket that said "Fuck the Draft." Yes, speech can be objectionable. "If there is a bedrock

**OPPOSITION TO MOTION TO DISMISS**

1    principle underlying the First Amendment, it is that the government may not prohibit the

2    expression of an idea simply because society finds the idea itself offensive or disagreeable."

3    <u>Texas v. Johnson</u>, 491 U.S. 397, 414 (1989).  Section 230 cannot immunize contract-breaching

4    conduct—whether coerced by or in cooperation with the government—that violates Plaintiffs'

5    First Amendment right to speak.  If this Court determines that Congress has immunized YouTube

6    from any accountability for complying with the government's edicts—even if YouTube has been

7    coerced to do so—to violate Plaintiffs' First Amendment rights, then Prince Harry might just be

8    right.

9    **V.      <u>CONCLUSION</u>**

10            For the reasons set forth above, Plaintiffs respectfully request that this Court DENY

11   Defendants' Motion to Dismiss the First Amended Complaint.

12   Dated: May 19, 2021                           ARMENTA & SOL, PC

13

14                                                       */s M. Cris Armenta*

15                                   By: _____

                                          M. Cris Armenta
16                                        Attorneys for Plaintiffs JOHN DOE, MICHAEL
                                          DOE, JAMES DOE, HENRY DOE, ROBERT
17                                        DOE, CHRISTOPHER DOE, MATTHEW DOE,
                                          POLLY ST. GEORGE, SCOTT DEGROAT,
18                                        MISHEL McCUMBER, DANIEL LEE, JEFF
                                          PEDERSEN, JORDAN SATHER, and SARAH
19                                        WESTALL

20

21

22

23

24

25

26

27

28

**OPPOSITION TO MOTION TO DISMISS**